(Slip Opinion) OCTOBER TERM, 2005 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HAMDAN *v*. RUMSFELD, SECRETARY OF DEFENSE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 05–184. Argued March 28, 2006—Decided June 29, 2006

Pursuant to Congress' Joint Resolution authorizing the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed or aided" the September 11, 2001, al Qaeda terrorist attacks (AUMF), U. S. Armed Forces invaded Afghanistan. During the hostilities, in 2001, militia forces captured petitioner Hamdan, a Yemeni national, and turned him over to the U. S. military, which, in 2002, transported him to prison in Guantanamo Bay, Cuba. Over a year later, the President deemed Hamdan eligible for trial by military commission for then-unspecified crimes. After another year, he was charged with conspiracy "to commit . . . offenses triable by military commission." In habeas and mandamus petitions, Hamdan asserted that the military commission lacks authority to try him because (1) neither congressional Act nor the common law of war supports trial by this commission for conspiracy, an offense that, Hamdan says, is not a violation of the law of war; and (2) the procedures adopted to try him violate basic tenets of military and international law, including the principle that a defendant must be permitted to see and hear the evidence against him.

The District Court granted habeas relief and stayed the commission's proceedings, concluding that the President's authority to establish military commissions extends only to offenders or offenses triable by such a commission under the law of war; that such law includes the Third Geneva Convention; that Hamdan is entitled to that Convention's full protections until adjudged, under it, not to be a prisoner of war; and that, whether or not Hamdan is properly classified a prisoner of war, the commission convened to try him was established in

violation of both the Uniform Code of Military Justice (UCMJ), 10 U. S. C. §801 *et seq.*, and Common Article 3 of the Third Geneva Convention because it had the power to convict based on evidence the accused would never see or hear. The D. C. Circuit reversed. Although it declined the Government's invitation to abstain from considering Hamdan's challenge, cf. *Schlesinger* v. *Councilman,* 420 U. S. 738, the appeals court ruled, on the merits, that Hamdan was not entitled to relief because the Geneva Conventions are not judicially enforceable. The court also concluded that *Ex parte Quirin,* 317 U. S. 1, foreclosed any separation-of-powers objection to the military commission's jurisdiction, and that Hamdan's trial before the commission would violate neither the UCMJ nor Armed Forces regulations implementing the Geneva Conventions.

*Held:* The judgment is reversed, and the case is remanded.

415 F. 3d 33, reversed and remanded.

JUSTICE STEVENS delivered the opinion of the Court, except as to Parts V and VI–D–iv, concluding:

1. The Government's motion to dismiss, based on the Detainee Treatment Act of 2005 (DTA), is denied. DTA §1005(e)(1) provides that "no court . . . shall have jurisdiction to hear or consider . . . an application for . . . habeas corpus filed by . . . an alien detained . . . at Guantanamo Bay." Section 1005(h)(2) provides that §§1005(e)(2) and (3)—which give the D. C. Circuit "exclusive" jurisdiction to review the final decisions of, respectively, combatant status review tribunals and military commissions—"shall apply with respect to any claim whose review is . . . pending on" the DTA's effective date, as was Hamdan's case. The Government's argument that §§1005(e)(1) and (h) repeal this Court's jurisdiction to review the decision below is rebutted by ordinary principles of statutory construction. A negative inference may be drawn from Congress' failure to include §1005(e)(1) within the scope of §1005(h)(2). Cf., *e.g., Lindh* v. *Murphy,* 521 U. S. 320, 330. "If . . . Congress was reasonably concerned to ensure that [§§1005(e)(2) and (3)] be applied to pending cases, it should have been just as concerned about [§1005(e)(1)], unless it had the different intent that the latter [section] not be applied to the general run of pending cases." *Id.,* at 329. If anything, the evidence of deliberate omission is stronger here than it was in *Lindh.* The legislative history shows that Congress not only considered the respective temporal reaches of §§1005(e)(1), (2), and (3) together at every stage, but omitted paragraph (1) from its directive only after having *rejected* earlier proposed versions of the statute that would have included what is now paragraph (1) within that directive's scope. Congress' rejection of the very language that would have achieved the result the Government urges weighs heavily against the Government's interpreta-

tion. See *Doe* v. *Chao,* 540 U. S. 614, 621–623. Pp. 7–20.

2. The Government argues unpersuasively that abstention is appropriate under *Councilman,* which concluded that, as a matter of comity, federal courts should normally abstain from intervening in pending courts-martial against service members, see 420 U. S., at 740. Neither of the comity considerations *Councilman* identified weighs in favor of abstention here. First, the assertion that military discipline and, therefore, the Armed Forces' efficient operation, are best served if the military justice system acts without regular interference from civilian courts, see *id.,* at 752, is inapt because Hamdan is not a service member. Second, the view that federal courts should respect the balance Congress struck when it created "an integrated system of military courts and review procedures" is inapposite, since the tribunal convened to try Hamdan is not part of that integrated system. Rather than *Councilman,* the most relevant precedent is *Ex parte Quirin*, where the Court, far from abstaining pending the conclusion of ongoing military proceedings, expedited its review because of (1) the public importance of the questions raised, (2) the Court's duty, in both peace and war, to preserve the constitutional safeguards of civil liberty, and (3) the public interest in a decision on those questions without delay, 317 U. S, at 19. The Government has identified no countervailing interest that would permit federal courts to depart from their general duty to exercise the jurisdiction Congress has conferred on them. Pp. 20–25.

3. The military commission at issue is not expressly authorized by any congressional Act. *Quirin* held that Congress had, through Article of War 15, sanctioned the use of military commissions to try offenders or offenses against the law of war. 317 U. S., at 28. UCMJ Art. 21, which is substantially identical to the old Art. 15, reads: "The jurisdiction [of] courts-martial shall not be construed as depriving military commissions . . . of concurrent jurisdiction in respect of offenders or offenses that by statute or by the law of war may be tried by such . . . commissions." 10 U. S. C. §821. Contrary to the Government's assertion, even *Quirin* did not view that authorization as a sweeping mandate for the President to invoke military commissions whenever he deems them necessary. Rather, *Quirin* recognized that Congress had simply preserved what power, under the Constitution and the common law of war, the President already had to convene military commissions—with the express condition that he and those under his command comply with the law of war. See 317 U. S., at 28–29. Neither the AUMF nor the DTA can be read to provide specific, overriding authorization for the commission convened to try Hamdan. Assuming the AUMF activated the President's war powers, see *Hamdi* v. *Rumsfeld*, 542 U. S. 507, and that those powers include

authority to convene military commissions in appropriate circum-
stances, see, *e.g., id.*, at 518, there is nothing in the AUMF's text or leg-
islative history even hinting that Congress intended to expand or alter
the authorization set forth in UCMJ Art. 21. Cf. *Ex parte Yerger,* 8
Wall. 85, 105. Likewise, the DTA cannot be read to authorize this
commission. Although the DTA, unlike either Art. 21 or the AUMF,
was enacted after the President convened Hamdan's commission, it
contains no language authorizing that tribunal or any other at Guan-
tanamo Bay. Together, the UCMJ, the AUMF, and the DTA at most
acknowledge a general Presidential authority to convene military
commissions in circumstances where justified under the Constitution
and laws, including the law of war. Absent a more specific congres-
sional authorization, this Court's task is, as it was in *Quirin*, to de-
cide whether Hamdan's military commission is so justified. Pp. 25–
30.

   4. The military commission at issue lacks the power to proceed be-
cause its structure and procedures violate both the UCMJ and the
four Geneva Conventions signed in 1949. Pp. 49–72.

      (a) The commission's procedures, set forth in Commission Order
No. 1, provide, among other things, that an accused and his civilian
counsel may be excluded from, and precluded from ever learning
what evidence was presented during, any part of the proceeding the
official who appointed the commission or the presiding officer decides
to "close." Grounds for closure include the protection of classified in-
formation, the physical safety of participants and witnesses, the pro-
tection of intelligence and law enforcement sources, methods, or ac-
tivities, and "other national security interests." Appointed military
defense counsel must be privy to these closed sessions, but may, at
the presiding officer's discretion, be forbidden to reveal to the client
what took place therein. Another striking feature is that the rules
governing Hamdan's commission permit the admission of *any* evi-
dence that, in the presiding officer's opinion, would have probative
value to a reasonable person. Moreover, the accused and his civilian
counsel may be denied access to classified and other "protected in-
formation," so long as the presiding officer concludes that the evi-
dence is "probative" and that its admission without the accused's
knowledge would not result in the denial of a full and fair trial. Pp.
49–52.

      (b) The Government objects to this Court's consideration of a pro-
cedural challenge at this stage on the grounds, *inter alia,* that Ham-
dan will be able to raise such a challenge following a final decision
under the DTA, and that there is no basis to presume, before the trial
has even commenced, that it will not be conducted in good faith and
according to law. These contentions are unsound. First, because

Hamdan apparently is not subject to the death penalty (at least as matters now stand) and may receive a prison sentence shorter than 10 years, he has no automatic right to federal-court review of the commission's "final decision" under DTA §1005(e)(3). Second, there *is* a basis to presume that the procedures employed during Hamdan's trial will violate the law: He will be, and *indeed already has been*, excluded from his own trial. Thus, review of the procedures in advance of a "final decision" is appropriate. Pp. 52–53.

(c) Because UCMJ Article 36 has not been complied with here, the rules specified for Hamdan's commission trial are illegal. The procedures governing such trials historically have been the same as those governing courts-martial. Although this uniformity principle is not inflexible and does not preclude all departures from courts-martial procedures, any such departure must be tailored to the exigency that necessitates it. That understanding is reflected in Art. 36(b), which provides that the procedural rules the President promulgates for courts-martial and military commissions alike must be "uniform insofar as practicable," 10 U. S. C. §836(b). The "practicability" determination the President has made is insufficient to justify variances from the procedures governing courts-martial. The President here has determined, pursuant to the requirement of *Art. 36(a),* that it is impracticable to apply the rules and principles of law that govern "the trial of criminal cases in the United States district courts" to Hamdan's commission. The President has not, however, made a similar official determination that it is impracticable to apply the rules for courts-martial. And even if subsection (b)'s requirements could be satisfied without an official practicability determination, that subsection's requirements are not satisfied here. Nothing in the record demonstrates that it would be impracticable to apply court-martial rules here. There is no suggestion, *e.g.,* of any logistical difficulty in securing properly sworn and authenticated evidence or in applying the usual principles of relevance and admissibility. It is not evident why the danger posed by international terrorism, considerable though it is, should require, in the case of Hamdan's trial, any variance from the courts-martial rules. The absence of any showing of impracticability is particularly disturbing when considered in light of the clear and admitted failure to apply one of the most fundamental protections afforded not just by the Manual for Courts-Martial but also by the UCMJ itself: The right to be present. See 10 U. S. C. A. §839(c). Because the jettisoning of so basic a right cannot lightly be excused as "practicable," the courts-martial rules must apply. Since it is undisputed that Commission Order No. 1 deviates in many significant respects from those rules, it necessarily violates Art. 36(b). Pp. 53–62.

(d) The procedures adopted to try Hamdan also violate the Geneva Conventions. The D. C. Circuit dismissed Hamdan's challenge in this regard on the grounds, *inter alia,* that the Conventions are not judicially enforceable and that, in any event, Hamdan is not entitled to their protections. Neither of these grounds is persuasive. Pp. 62–68.

(i) The appeals court relied on a statement in *Johnson* v. *Eisentrager,* 339 U. S. 763, 789, n. 14, suggesting that this Court lacked power even to consider the merits of a Convention argument because the political and military authorities had sole responsibility for observing and enforcing prisoners' rights under the Convention. However, *Eisentrager* does not control here because, regardless of the nature of the rights conferred on Hamdan, cf. *United States* v. *Rauscher,* 119 U. S. 407, they are indisputably part of the law of war, see *Hamdi,* 542 U. S., at 520–521, compliance with which is the condition upon which UCMJ Art. 21 authority is granted. Pp. 63–65.

(ii) Alternatively, the appeals court agreed with the Government that the Conventions do not apply because Hamdan was captured during the war with al Qaeda, which is not a Convention signatory, and that conflict is distinct from the war with signatory Afghanistan. The Court need not decide the merits of this argument because there is at least one provision of the Geneva Conventions that applies here even if the relevant conflict is not between signatories. Common Article 3, which appears in all four Conventions, provides that, in a "conflict not of an international character occurring in the territory of one of the High Contracting Parties [*i.e.,* signatories], each Party to the conflict shall be bound to apply, as a minimum," certain provisions protecting "[p]ersons . . . placed *hors de combat* by . . . detention," including a prohibition on "the passing of sentences . . . without previous judgment . . . by a regularly constituted court affording all the judicial guarantees . . . recognized as indispensable by civilized peoples." The D. C. Circuit ruled Common Article 3 inapplicable to Hamdan because the conflict with al Qaeda is international in scope and thus not a "conflict not of an international character. " That reasoning is erroneous. That the quoted phrase bears its literal meaning and is used here in contradistinction to a conflict between nations is demonstrated by Common Article 2, which limits its own application to any armed conflict between signatories and provides that signatories must abide by all terms of the Conventions even if another party to the conflict is a nonsignatory, so long as the nonsignatory "accepts and applies" those terms. Common Article 3, by contrast, affords some minimal protection, falling short of full protection under the Conventions, to individuals associated with neither a signatory nor even a nonsignatory who are involved in a conflict "in the

territory of" a signatory. The latter kind of conflict does not involve a clash between nations (whether signatories or not). Pp. 65–68.

(iii) While Common Article 3 does not define its "regularly constituted court" phrase, other sources define the words to mean an "ordinary military cour[t]" that is "established and organized in accordance with the laws and procedures already in force in a country." The regular military courts in our system are the courts-martial established by congressional statute. At a minimum, a military commission can be "regularly constituted" only if some practical need explains deviations from court-martial practice. No such need has been demonstrated here. Pp. 69–70.

(iv) Common Article 3's requirements are general, crafted to accommodate a wide variety of legal systems, but they are *requirements* nonetheless. The commission convened to try Hamdan does not meet those requirements. P. 72.

(d) Even assuming that Hamden is a dangerous individual who would cause great harm or death to innocent civilians given the opportunity, the Executive nevertheless must comply with the prevailing rule of law in undertaking to try him and subject him to criminal punishment. P. 72.

JUSTICE STEVENS, joined by JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER, concluded in Parts V and VI–D–iv:

1. The Government has not charged Hamdan with an "offense . . . that by the law of war may be tried by military commission," 10 U. S. C. §821. Of the three sorts of military commissions used historically, the law-of-war type used in *Quirin* and other cases is the only model available to try Hamdan. Among the preconditions, incorporated in Article of War 15 and, later, UCMJ Art. 21, for such a tribunal's exercise of jurisdiction are, *inter alia,* that it must be limited to trying offenses committed within the convening commander's field of command, *i.e.,* within the theater of war, and that the offense charged must have been committed during, not before or after, the war. Here, Hamdan is not alleged to have committed any overt act in a theater of war or on any specified date after September 11, 2001. More importantly, the offense alleged is not triable by law-of-war military commission. Although the common law of war may render triable by military commission certain offenses not defined by statute, *Quirin,* 317 U. S., at 30, the precedent for doing so with respect to a particular offense must be plain and unambiguous, cf., *e.g., Loving* v. *United States,* 517 U. S. 748, 771. That burden is far from satisfied here. The crime of "conspiracy" has rarely if ever been tried as such in this country by any law-of-war military commission not exercising some other form of jurisdiction, and does not appear in either the Geneva Conventions or the Hague Conventions—the major trea-

ties on the law of war.  Moreover, that conspiracy is not a recognized
violation of the law of war is confirmed by other international
sources, including, *e.g.,* the International Military Tribunal at Nur-
emberg, which pointedly refused to recognize conspiracy to commit
war crimes as such a violation.  Because the conspiracy charge does
not support the commission's jurisdiction, the commission lacks au-
thority to try Hamdan.  Pp. 30–49.

    2. The phrase "all the guarantees . . . recognized as indispensable
by civilized peoples" in Common Article 3 of the Geneva Conventions
is not defined, but it must be understood to incorporate at least the
barest of the trial protections recognized by customary international
law.  The procedures adopted to try Hamdan deviate from those gov-
erning courts-martial in ways not justified by practical need, and
thus fail to afford the requisite guarantees.  Moreover, various provi-
sions of Commission Order No. 1 dispense with the principles, which
are indisputably part of customary international law, that an accused
must, absent disruptive conduct or consent, be present for his trial
and must be privy to the evidence against him.  Pp. 70–72.

    JUSTICE KENNEDY, agreeing that Hamdan's military commission is
unauthorized under the Uniform Code of Military Justice, 10 U. S. C.
§§836 and 821, and the Geneva Conventions, concluded that there is
therefore no need to decide whether Common Article 3 of the Conven-
tions requires that the accused have the right to be present at all
stages of a criminal trial or to address the validity of the conspiracy
charge against Hamdan.  Pp. 17–19.

    STEVENS, J., announced the judgment of the Court and delivered the
opinion of the Court with respect to Parts I through IV, VI through VI–
D–iii, VI–D–v, and VII, in which KENNEDY, SOUTER, GINSBURG, and
BREYER, JJ., joined, and an opinion with respect to Parts V and VI–D–
iv, in which SOUTER, GINSBURG, and BREYER, JJ., joined.  BREYER, J.,
filed a concurring opinion, in which KENNEDY, SOUTER, and GINSBURG,
JJ., joined.  KENNEDY, J., filed an opinion concurring in part, in which
SOUTER, GINSBURG, and BREYER, JJ., joined as to Parts I and II.  SCALIA,
J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined.
THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, and
in which ALITO, J., joined as to all but Parts I, II–C–1, and III–B–2.
ALITO, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ.,
joined as to Parts I through  III.  ROBERTS, C. J., took no part in the
consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 05–184

————

## SALIM AHMED HAMDAN, PETITIONER *v.* DONALD H. RUMSFELD, SECRETARY OF DEFENSE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 29, 2006]

JUSTICE STEVENS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I through IV, Parts VI through VI–D–iii, Part VI–D–v, and Part VII, and an opinion with respect to Parts V and VI–D–iv, in which JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join.

Petitioner Salim Ahmed Hamdan, a Yemeni national, is in custody at an American prison in Guantanamo Bay, Cuba. In November 2001, during hostilities between the United States and the Taliban (which then governed Afghanistan), Hamdan was captured by militia forces and turned over to the U. S. military. In June 2002, he was transported to Guantanamo Bay. Over a year later, the President deemed him eligible for trial by military commission for then-unspecified crimes. After another year had passed, Hamdan was charged with one count of conspiracy "to commit . . . offenses triable by military commission." App. to Pet. for Cert. 65a.

Hamdan filed petitions for writs of habeas corpus and mandamus to challenge the Executive Branch's intended means of prosecuting this charge. He concedes that a

court-martial constituted in accordance with the Uniform Code of Military Justice (UCMJ), 10 U. S. C. §801 *et seq.* (2000 ed. and Supp. III), would have authority to try him. His objection is that the military commission the President has convened lacks such authority, for two principal reasons: First, neither congressional Act nor the common law of war supports trial by this commission for the crime of conspiracy—an offense that, Hamdan says, is not a violation of the law of war. Second, Hamdan contends, the procedures that the President has adopted to try him violate the most basic tenets of military and international law, including the principle that a defendant must be permitted to see and hear the evidence against him.

The District Court granted Hamdan's request for a writ of habeas corpus. 344 F. Supp. 2d 152 (DC 2004). The Court of Appeals for the District of Columbia Circuit reversed. 415 F. 3d 33 (2005). Recognizing, as we did over a half-century ago, that trial by military commission is an extraordinary measure raising important questions about the balance of powers in our constitutional structure, *Ex parte Quirin,* 317 U. S. 1, 19 (1942), we granted certiorari. 546 U. S. ___ (2005).

For the reasons that follow, we conclude that the military commission convened to try Hamdan lacks power to proceed because its structure and procedures violate both the UCMJ and the Geneva Conventions. Four of us also conclude, see Part V, *infra*, that the offense with which Hamdan has been charged is not an "offens[e] that by . . . the law of war may be tried by military commissions." 10 U. S. C. §821.

I

On September 11, 2001, agents of the al Qaeda terrorist organization hijacked commercial airplanes and attacked the World Trade Center in New York City and the national headquarters of the Department of Defense in

Arlington, Virginia. Americans will never forget the devastation wrought by these acts. Nearly 3,000 civilians were killed.

Congress responded by adopting a Joint Resolution authorizing the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks . . . in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Authorization for Use of Military Force (AUMF), 115 Stat. 224, note following 50 U. S. C. §1541 (2000 ed., Supp. III). Acting pursuant to the AUMF, and having determined that the Taliban regime had supported al Qaeda, the President ordered the Armed Forces of the United States to invade Afghanistan. In the ensuing hostilities, hundreds of individuals, Hamdan among them, were captured and eventually detained at Guantanamo Bay.

On November 13, 2001, while the United States was still engaged in active combat with the Taliban, the President issued a comprehensive military order intended to govern the "Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism," 66 Fed. Reg. 57833 (hereinafter November 13 Order or Order). Those subject to the November 13 Order include any noncitizen for whom the President determines "there is reason to believe" that he or she (1) "is or was" a member of al Qaeda or (2) has engaged or participated in terrorist activities aimed at or harmful to the United States. *Id.*, at 57834. Any such individual "shall, when tried, be tried by military commission for any and all offenses triable by military commission that such individual is alleged to have committed, and may be punished in accordance with the penalties provided under applicable law, including imprisonment or death." *Ibid.* The November 13 Order vested in the Secretary of Defense the power to appoint

military commissions to try individuals subject to the
Order, but that power has since been delegated to John D.
Altenberg, Jr., a retired Army major general and longtime
military lawyer who has been designated "Appointing
Authority for Military Commissions."

On July 3, 2003, the President announced his determi-
nation that Hamdan and five other detainees at Guan-
tanamo Bay were subject to the November 13 Order and
thus triable by military commission. In December 2003,
military counsel was appointed to represent Hamdan.
Two months later, counsel filed demands for charges and
for a speedy trial pursuant to Article 10 of the UCMJ, 10
U. S. C. §810. On February 23, 2004, the legal adviser to
the Appointing Authority denied the applications, ruling
that Hamdan was not entitled to any of the protections of
the UCMJ. Not until July 13, 2004, after Hamdan had
commenced this action in the United States District Court
for the Western District of Washington, did the Govern-
ment finally charge him with the offense for which, a year
earlier, he had been deemed eligible for trial by military
commission.

The charging document, which is unsigned, contains 13
numbered paragraphs. The first two paragraphs recite
the asserted bases for the military commission's jurisdic-
tion—namely, the November 13 Order and the President's
July 3, 2003, declaration that Hamdan is eligible for trial
by military commission. The next nine paragraphs, collec-
tively entitled "General Allegations," describe al Qaeda's
activities from its inception in 1989 through 2001 and
identify Osama bin Laden as the group's leader. Hamdan
is not mentioned in these paragraphs.

Only the final two paragraphs, entitled "Charge: Con-
spiracy," contain allegations against Hamdan. Paragraph
12 charges that "from on or about February 1996 to on or
about November 24, 2001," Hamdan "willfully and know-
ingly joined an enterprise of persons who shared a com-

mon criminal purpose and conspired and agreed with [named members of al Qaeda] to commit the following offenses triable by military commission: attacking civilians; attacking civilian objects; murder by an unprivileged belligerent; and terrorism." App. to Pet. for Cert. 65a. There is no allegation that Hamdan had any command responsibilities, played a leadership role, or participated in the planning of any activity.

Paragraph 13 lists four "overt acts" that Hamdan is alleged to have committed sometime between 1996 and November 2001 in furtherance of the "enterprise and conspiracy": (1) he acted as Osama bin Laden's "bodyguard and personal driver," "believ[ing]" all the while that bin Laden "and his associates were involved in" terrorist acts prior to and including the attacks of September 11, 2001; (2) he arranged for transportation of, and actually transported, weapons used by al Qaeda members and by bin Laden's bodyguards (Hamdan among them); (3) he "drove or accompanied [O]sama bin Laden to various al Qaida-sponsored training camps, press conferences, or lectures," at which bin Laden encouraged attacks against Americans; and (4) he received weapons training at al Qaeda-sponsored camps. *Id.*, at 65a–67a.

After this formal charge was filed, the United States District Court for the Western District of Washington transferred Hamdan's habeas and mandamus petitions to the United States District Court for the District of Columbia. Meanwhile, a Combatant Status Review Tribunal (CSRT) convened pursuant to a military order issued on July 7, 2004, decided that Hamdan's continued detention at Guantanamo Bay was warranted because he was an "enemy combatant."[1] Separately, proceedings before the

_____

[1] An "enemy combatant" is defined by the military order as "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United

military commission commenced.

On November 8, 2004, however, the District Court granted Hamdan's petition for habeas corpus and stayed the commission's proceedings. It concluded that the President's authority to establish military commissions extends only to "offenders or offenses triable by military [commission] under the law of war," 344 F. Supp. 2d, at 158; that the law of war includes the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U. S. T. 3316, T. I. A. S. No. 3364 (Third Geneva Convention); that Hamdan is entitled to the full protections of the Third Geneva Convention until adjudged, in compliance with that treaty, not to be a prisoner of war; and that, whether or not Hamdan is properly classified as a prisoner of war, the military commission convened to try him was established in violation of both the UCMJ and Common Article 3 of the Third Geneva Convention because it had the power to convict based on evidence the accused would never see or hear. 344 F. Supp. 2d, at 158–172.

The Court of Appeals for the District of Columbia Circuit reversed. Like the District Court, the Court of Appeals declined the Government's invitation to abstain from considering Hamdan's challenge. Cf. *Schlesinger* v. *Councilman,* 420 U. S. 738 (1975). On the merits, the panel rejected the District Court's further conclusion that Hamdan was entitled to relief under the Third Geneva Convention. All three judges agreed that the Geneva Conventions were not "judicially enforceable," 415 F. 3d, at 38, and two thought that the Conventions did not in any event apply to Hamdan, *id.*, at 40–42; but see *id.*, at 44 (Williams, J.,

—————

States or its coalition partners." Memorandum from Deputy Secretary of Defense Paul Wolfowitz re: Order Establishing Combatant Status Review Tribunal §*a* (Jul. 7, 2004), available at http://www.defense link.mil/news/Jul2004/d20040707review.pdf (all Internet materials as visited June 26, 2006, and available in Clerk of Court's case file).

concurring). In other portions of its opinion, the court concluded that our decision in *Quirin* foreclosed any separation-of-powers objection to the military commission's jurisdiction, and held that Hamdan's trial before the contemplated commission would violate neither the UCMJ nor U. S. Armed Forces regulations intended to implement the Geneva Conventions. 415 F. 3d, at 38, 42–43.

On November 7, 2005, we granted certiorari to decide whether the military commission convened to try Hamdan has authority to do so, and whether Hamdan may rely on the Geneva Conventions in these proceedings.

## II

On February 13, 2006, the Government filed a motion to dismiss the writ of certiorari. The ground cited for dismissal was the recently enacted Detainee Treatment Act of 2005 (DTA), Pub. L. 109–148, 119 Stat. 2739. We postponed our ruling on that motion pending argument on the merits, 546 U. S. \_\_\_ (2006), and now deny it.

The DTA, which was signed into law on December 30, 2005, addresses a broad swath of subjects related to detainees. It places restrictions on the treatment and interrogation of detainees in U. S. custody, and it furnishes procedural protections for U. S. personnel accused of engaging in improper interrogation. DTA §§1002–1004, 119 Stat. 2739–2740. It also sets forth certain "PROCEDURES FOR STATUS REVIEW OF DETAINEES OUTSIDE THE UNITED STATES." §1005, *id.*, at 2740. Subsections (a) through (d) of §1005 direct the Secretary of Defense to report to Congress the procedures being used by CSRTs to determine the proper classification of detainees held in Guantanamo Bay, Iraq, and Afghanistan, and to adopt certain safeguards as part of those procedures.

Subsection (e) of §1005, which is entitled "JUDICIAL REVIEW OF DETENTION OF ENEMY COMBATANTS," supplies the basis for the Government's jurisdictional argument.

The subsection contains three numbered paragraphs.  The
first paragraph amends the judicial code as follows:

> "(1)  IN GENERAL.—Section 2241 of title 28, United
> States Code, is amended by adding at the end the
> following:
>
> .           .           .           .           .
>
> "'(e)  Except as provided in section 1005 of the De-
> tainee Treatment Act of 2005, no court, justice, or
> judge shall have jurisdiction to hear or consider—
> "'(1)  an application for a writ of habeas corpus filed
> by or on behalf of an alien detained by the Depart-
> ment of Defense at Guantanamo Bay, Cuba; or
> "'(2)  any other action against the United States or
> its agents relating to any aspect of the detention by
> the Department of Defense of an alien at Guantanamo
> Bay, Cuba, who—
> "'(A)  is currently in military custody; or
> "'(B)  has been determined by the United States
> Court of Appeals for the District of Columbia Circuit
> in accordance with the procedures set forth in section
> 1005(e) of the Detainee Treatment Act of 2005 to have
> been properly detained as an enemy combatant.'"
> §1005(e), *id.*, at 2741–2742.

Paragraph (2) of subsection (e) vests in the Court of
Appeals for the District of Columbia Circuit the "exclusive
jurisdiction to determine the validity of any final decision
of a [CSRT] that an alien is properly designated as an
enemy combatant."  Paragraph (2) also delimits the scope
of that review.  See §§1005(e)(2)(C)(i)–(ii), *id.*, at 2742.

Paragraph (3) mirrors paragraph (2) in structure, but
governs judicial review of final decisions of military
commissions, not CSRTs.  It vests in the Court of Appeals
for the District of Columbia Circuit "exclusive jurisdic-
tion to determine the validity of any final decision ren-
dered pursuant to Military Commission Order No. 1,

dated August 31, 2005 (or any successor military order)."
§1005(e)(3)(A), *id.*, at 2743.[2]  Review is as of right for any
alien sentenced to death or a term of imprisonment of 10
years or more, but is at the Court of Appeals' discretion
in all other cases.  The scope of review is limited to the
following inquiries:

> "(i) whether the final decision [of the military com-
> mission] was consistent with the standards and pro-
> cedures specified in the military order referred to in
> subparagraph (A); and
> "(ii) to the extent the Constitution and laws of the
> United States are applicable, whether the use of such
> standards and procedures to reach the final decision
> is consistent with the Constitution and laws of the
> United States." §1005(e)(3)(D), *ibid.*

Finally, §1005 contains an "effective date" provision,
which reads as follows:

> "(1) IN GENERAL.—This section shall take effect on
> the date of the enactment of this Act.
> "(2) REVIEW OF COMBATANT STATUS TRIBUNAL AND
> MILITARY COMMISSION DECISIONS.—Paragraphs (2)
> and (3) of subsection (e) shall apply with respect to
> any claim whose review is governed by one of such
> paragraphs and that is pending on or after the date of
> the enactment of this Act."  §1005(h), *id.*, at 2743–
> 2744.[3]

The Act is silent about whether paragraph (1) of subsec-
tion (e) "shall apply" to claims pending on the date of

_____

[2] The military order referenced in this section is discussed further in
Parts III and VI, *infra*.

[3] The penultimate subsections of §1005 emphasize that the provision
does not "confer any constitutional right on an alien detained as an
enemy combatant outside the United States" and that the "United
States" does not, for purposes of §1005, include Guantanamo Bay.
§§1005(f)–(g).

enactment.

The Government argues that §§1005(e)(1) and 1005(h) had the immediate effect, upon enactment, of repealing federal jurisdiction not just over detainee habeas actions yet to be filed but also over any such actions then pending in any federal court—including this Court. Accordingly, it argues, we lack jurisdiction to review the Court of Appeals' decision below.

Hamdan objects to this theory on both constitutional and statutory grounds. Principal among his constitutional arguments is that the Government's preferred reading raises grave questions about Congress' authority to impinge upon this Court's appellate jurisdiction, particularly in habeas cases. Support for this argument is drawn from *Ex parte Yerger,* 8 Wall. 85 (1869), in which, having explained that "the denial to this court of appellate jurisdiction" to consider an original writ of habeas corpus would "greatly weaken the efficacy of the writ," *id.*, at 102–103, we held that Congress would not be presumed to have effected such denial absent an unmistakably clear statement to the contrary. See *id.*, at 104–105; see also *Felker* v. *Turpin,* 518 U. S. 651 (1996); *Durousseau* v. *United States,* 6 Cranch 307, 314 (1810) (opinion for the Court by Marshall, C. J.) (The "appellate powers of this court" are not created by statute but are "given by the constitution"); *United States* v. *Klein,* 13 Wall. 128 (1872). Cf. *Ex parte McCardle,* 7 Wall. 506, 514 (1869) (holding that Congress had validly foreclosed one avenue of appellate review where its repeal of habeas jurisdiction, reproduced in the margin,[4] could not have been "a plainer instance of posi-

———————
[4] "'*And be it further enacted*, That so much of the act approved February 5, 1867, entitled "An act to amend an act to establish the judicial courts of the United States, approved September 24, 1789," as authorized an appeal from the judgment of the Circuit Court to the Supreme Court of the United States, or the exercise of any such jurisdiction by said Supreme Court, on appeals which have been, or may hereafter be

tive exception"). Hamdan also suggests that, if the Government's reading is correct, Congress has unconstitutionally suspended the writ of habeas corpus.

We find it unnecessary to reach either of these arguments. Ordinary principles of statutory construction suffice to rebut the Government's theory—at least insofar as this case, which was pending at the time the DTA was enacted, is concerned.

The Government acknowledges that only paragraphs (2) and (3) of subsection (e) are expressly made applicable to pending cases, see §1005(h)(2), 119 Stat. 2743–2744, but argues that the omission of paragraph (1) from the scope of that express statement is of no moment. This is so, we are told, because Congress' failure to expressly reserve federal courts' jurisdiction over pending cases erects a presumption against jurisdiction, and that presumption is rebutted by neither the text nor the legislative history of the DTA.

The first part of this argument is not entirely without support in our precedents. We have in the past "applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Landgraf* v. *USI Film Products,* 511 U. S. 244, 274 (1994) (citing *Bruner* v. *United States,* 343 U. S. 112 (1952); *Hallowell* v. *Commons,* 239 U. S. 506 (1916)); see *Republic of Austria* v. *Altmann,* 541 U. S. 677, 693 (2004). But the "presumption" that these cases have applied is more accurately viewed as the nonapplication of another presumption— viz., the presumption against retroactivity—in certain limited circumstances.[5] If a statutory provision "would

––––––––––

taken, be, and the same is hereby repealed.'" 7 Wall., at 508.

[5] See *Hughes Aircraft Co.* v. *United States ex rel. Schumer,* 520 U. S. 939, 951 (1997) ("The fact that courts often apply newly enacted jurisdiction-allocating statutes to pending cases merely evidences certain limited circumstances failing to meet the conditions for our generally

operate retroactively" as applied to cases pending at the
time the provision was enacted, then "our traditional
presumption teaches that it does not govern absent clear
congressional intent favoring such a result." *Landgraf*,
511 U. S., at 280. We have explained, however, that,
unlike other intervening changes in the law, a jurisdiction-
conferring or jurisdiction-stripping statute usually "takes
away no substantive right but simply changes the tribunal
that is to hear the case." *Hallowell*, 239 U. S., at 508. If
that is truly all the statute does, no retroactivity problem
arises because the change in the law does not "impair
rights a party possessed when he acted, increase a party's
liability for past conduct, or impose new duties with re-
spect to transactions already completed." *Landgraf*, 511
U. S., at 280.[6] And if a new rule has no retroactive effect,
the presumption against retroactivity will not prevent its
application to a case that was already pending when the
new rule was enacted.

That does not mean, however, that all jurisdiction-
stripping provisions—or even all such provisions that
truly lack retroactive effect—must apply to cases pending
at the time of their enactment.[7] "[N]ormal rules of con-

_____

applicable presumption against retroactivity . . .").

[6] Cf. *Hughes Aircraft*, 520 U. S., at 951 ("Statutes merely addressing
*which* court shall have jurisdiction to entertain a particular cause of
action can fairly be said merely to regulate the secondary conduct of
litigation and not the underlying primary conduct of the parties"
(emphasis in original)).

[7] In his insistence to the contrary, JUSTICE SCALIA reads too much into
*Bruner* v. *United States*, 343 U. S. 112 (1952), *Hallowell* v. *Commons,*
239 U. S. 506 (1916), and *Insurance Co.* v. *Ritchie,* 5 Wall. 541 (1867).
See *post*, at 2–4 (dissenting opinion). None of those cases says that the
absence of an express provision reserving jurisdiction over pending
cases trumps or renders irrelevant any other indications of congres-
sional intent. Indeed, *Bruner* itself relied on such other indications–
including a negative inference drawn from the statutory text, cf. *infra*,
at 13–to support its conclusion that jurisdiction was not available. The
Court observed that (1) Congress had been put on notice by prior lower

struction," including a contextual reading of the statutory language, may dictate otherwise. *Lindh* v. *Murphy,* 521 U. S. 320, 326 (1997).[8]  A familiar principle of statutory construction, relevant both in *Lindh* and here, is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute.  See *id.*, at 330; see also, *e.g., Russello* v. *United States,* 464 U. S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'").  The Court in *Lindh* relied on this reasoning to conclude that certain limitations on the availability of habeas relief imposed by AEDPA applied only to cases filed after that statute's effective date.  Congress' failure to identify the temporal reach of those limitations, which governed noncapital cases, stood in contrast to its express command in the same legislation that new rules governing habeas petitions in capital cases "apply to cases pending on or after the date of enactment."  §107(c), 110 Stat. 1226; see *Lindh*, 521 U. S., at 329–330.  That contrast, combined with the fact that the amendments at issue "affect[ed] substantive entitlement to relief," *id.*, at 327, warranted

———————

court cases addressing the Tucker Act that it ought to specifically reserve jurisdiction over pending cases, see 343 U. S., at 115, and (2) in contrast to the congressional silence concerning reservation of jurisdiction, reservation *had* been made of "'any rights or liabilities' existing at the effective date of the Act" repealed by another provision of the Act, *ibid.*, n. 7.

[8]The question in *Lindh* was whether new limitations on the availability of habeas relief imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, applied to habeas actions pending on the date of AEDPA's enactment.  We held that they did not.  At the outset, we rejected the State's argument that, in the absence of a clear congressional statement to the contrary, a "procedural" rule must apply to pending cases.  521 U. S., at 326.

drawing a negative inference.

A like inference follows *a fortiori* from *Lindh* in this case. "If . . . Congress was reasonably concerned to ensure that [§§1005(e)(2) and (3)] be applied to pending cases, it should have been just as concerned about [§1005(e)(1)], unless it had the different intent that the latter [section] not be applied to the general run of pending cases." *Id.*, at 329. If anything, the evidence of deliberate omission is stronger here than it was in *Lindh.* In *Lindh*, the provisions to be contrasted had been drafted separately but were later "joined together and . . . considered simultaneously when the language raising the implication was inserted." *Id.*, at 330. We observed that Congress' tandem review and approval of the two sets of provisions strengthened the presumption that the relevant omission was deliberate. *Id.*, at 331; see also *Field* v. *Mans,* 516 U. S. 59, 75 (1995) ("The more apparently deliberate the contrast, the stronger the inference, as applied, for example, to contrasting statutory sections originally enacted simultaneously in relevant respects"). Here, Congress not only considered the respective temporal reaches of paragraphs (1), (2), and (3) of subsection (e) together at every stage, but omitted paragraph (1) from its directive that paragraphs (2) and (3) apply to pending cases only after having *rejected* earlier proposed versions of the statute that would have included what is now paragraph (1) within the scope of that directive. Compare DTA §1005(h)(2), 119 Stat. 2743–2744, with 151 Cong. Rec. S12655 (Nov. 10, 2005) (S. Amdt. 2515); see *id.*, at S14257–S14258 (Dec. 21, 2005) (discussing similar language proposed in both the House and the Senate).[9] Congress' rejection of the very language

————————
[9] That paragraph (1), along with paragraphs (2) and (3), is to "take effect on the date of enactment," DTA §1005(h)(1), 119 Stat. 2743, is not dispositive; "a 'statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.'" *INS* v. *St. Cyr,* 533 U. S.

that would have achieved the result the Government urges here weighs heavily against the Government's interpretation. See *Doe* v. *Chao,* 540 U. S. 614, 621–623 (2004).[10]

_____

289, 317 (2001) (quoting *Landgraf* v. *USI Film Products,* 511 U. S. 244, 257 (1994)). Certainly, the "effective date" provision cannot bear the weight JUSTICE SCALIA would place on it. See *post*, at 5, and n. 1. Congress deemed that provision insufficient, standing alone, to render subsections (e)(2) and (e)(3) applicable to pending cases; hence its adoption of subsection (h)(2). JUSTICE SCALIA seeks to avoid reducing subsection (h)(2) to a mere redundancy—a consequence he seems to acknowledge must otherwise follow from his interpretation—by speculating that Congress had special reasons, not also relevant to subsection (e)(1), to worry that subsections (e)(2) and (e)(3) would be ruled inapplicable to pending cases. As we explain *infra*, at 17, and n. 12, that attempt fails.

[10] We note that statements made by Senators preceding passage of the Act lend further support to what the text of the DTA and its drafting history already make plain. Senator Levin, one of the sponsors of the final bill, objected to earlier versions of the Act's "effective date" provision that would have made subsection (e)(1) applicable to pending cases. See, *e.g.*, 151 Cong. Rec. S12667 (Nov. 10, 2005) (amendment proposed by Sen. Graham that would have rendered what is now subsection (e)(1) applicable to "any application or other action that is pending on or after the date of the enactment of this Act"). Senator Levin urged adoption of an alternative amendment that "would apply only to new habeas cases filed after the date of enactment." *Id.*, at S12802 (Nov. 15, 2005). That alternative amendment became the text of subsection (h)(2). (In light of the extensive discussion of the DTA's effect on pending cases prior to passage of the Act, see, *e.g.*, *id.*, at S12664 (Nov. 10, 2005); *id.*, at S12755 (Nov. 14, 2005); *id.*, at S12799–S12802 (Nov. 15, 2005); *id.*, at S14245, S14252–S14253, S14257–S14258, S14274–S14275 (Dec. 21, 2005), it cannot be said that the changes to subsection (h)(2) were inconsequential. Cf. *post*, at 14 (SCALIA, J., dissenting).)

While statements attributed to the final bill's two other sponsors, Senators Graham and Kyl, arguably contradict Senator Levin's contention that the final version of the Act preserved jurisdiction over pending habeas cases, see 151 Cong. Rec. S14263–S14264 (Dec. 21, 2005), those statements appear to have been inserted into the Congressional Record *after* the Senate debate. See Reply Brief for Petitioner 5, n. 6; see also 151 Cong. Rec. S14260 (statement of Sen. Kyl) ("I would like to say a few words about the *now-completed* National Defense Authorization Act

The Government nonetheless offers two reasons why, in its view, no negative inference may be drawn in favor of jurisdiction. First, it asserts that *Lindh* is inapposite because "Section 1005(e)(1) and (h)(1) remove jurisdiction, while Section 1005(e)(2), (3) and (h)(2) create an exclusive review mechanism and define the nature of that review." Reply Brief in Support of Respondents' Motion to Dismiss 4. Because the provisions being contrasted "address wholly distinct subject matters," *Martin* v. *Hadix,* 527 U. S. 343, 356 (1999), the Government argues, Congress' different treatment of them is of no significance.

This argument must fail because it rests on a false distinction between the "jurisdictional" nature of subsection (e)(1) and the "procedural" character of subsections (e)(2) and (e)(3). In truth, all three provisions govern jurisdiction over detainees' claims; subsection (e)(1) addresses jurisdiction in habeas cases and other actions "relating to any aspect of the detention," while subsections (e)(2) and (3) vest exclusive,[11] but limited, *jurisdiction* in the Court of

———————

for fiscal year 2006" (emphasis added)). All statements made during the debate itself support Senator Levin's understanding that the final text of the DTA would not render subsection (e)(1) applicable to pending cases. See, *e.g.*, *id.*, at S14245, S14252–S14253, S14274–S14275 (Dec. 21, 2005). The statements that JUSTICE SCALIA cites as evidence to the contrary construe *subsection (e)(3)* to strip this Court of jurisdiction, see *post*, at 12, n. 4 (dissenting opinion) (quoting 151 Cong. Rec. S12796 (Nov. 15, 2005) (statement of Sen. Specter))—a construction that the Government has expressly disavowed in this litigation, see n. 11, *infra*. The inapposite November 14, 2005, statement of Senator Graham, which JUSTICE SCALIA cites as evidence of that Senator's "assumption that pending cases are covered," *post*, at 12, and n. 3 (citing 151 Cong. Rec. S12756 (Nov. 14, 2005)), follows directly after the uncontradicted statement of his co-sponsor, Senator Levin, assuring members of the Senate that "the amendment will not strip the courts of jurisdiction over [pending] cases." *Id.*, at S12755.

[11] The District of Columbia Circuit's jurisdiction, while "exclusive" in one sense, would not bar this Court's review on appeal from a decision under the DTA. See Reply Brief in Support of Respondents' Motion to

Appeals for the District of Columbia Circuit to review "final decision[s]" of CSRTs and military commissions.

That subsection (e)(1) strips jurisdiction while subsections (e)(2) and (e)(3) restore it in limited form is hardly a distinction upon which a negative inference must founder. JUSTICE SCALIA, in arguing to the contrary, maintains that Congress had "ample reason" to provide explicitly for application of subsections (e)(2) and (e)(3) to pending cases because "jurisdiction-stripping" provisions like subsection (e)(1) have been treated differently under our retroactivity jurisprudence than "jurisdiction-conferring" ones like subsections (e)(2) and (e)(3). *Post*, at 8 (dissenting opinion); see also Reply Brief in Support of Respondents' Motion to Dismiss 5–6. That theory is insupportable. Assuming *arguendo* that subsections (e)(2) and (e)(3) "confer *new* jurisdiction (in the D. C. Circuit) where there was none before," *post*, at 8 (emphasis in original); but see *Rasul* v. *Bush,* 542 U. S. 466 (2004), and that our precedents can be read to "strongly indicat[e]" that jurisdiction-creating statutes raise special retroactivity concerns not also raised by jurisdiction-stripping statutes, *post*, at 8,[12] subsections (e)(2) and (e)(3) "confer" jurisdiction in a man-

—————

Dismiss 16–17, n. 12 ("While the DTA does not expressly call for Supreme Court review of the District of Columbia Circuit's decisions, Section 1005(e)(2) and (3) . . . do not remove this Court's jurisdiction over such decisions under 28 U. S. C. §1254(1)").

[12] This assertion is itself highly questionable. The cases that JUSTICE SCALIA cites to support his distinction are *Republic of Austria* v. *Altmann,* 541 U. S. 677 (2004), and *Hughes Aircraft Co.* v. *United States ex rel. Schumer,* 520 U. S. 939 (1997). See *post*, at 8. While the Court in both of those cases recognized that statutes "creating" jurisdiction may have retroactive effect if they affect "substantive" rights, see *Altmann*, 541 U. S., at 695, and n. 15; *Hughes Aircraft*, 520 U. S., at 951, we have applied the same analysis to statutes that have jurisdiction-stripping effect, see *Lindh* v. *Murphy*, 521 U. S. 320, 327–328 (1997); *id.*, at 342–343 (Rehnquist, C. J., dissenting) (construing AEDPA's amendments as "ousting jurisdiction").

ner that cannot conceivably give rise to retroactivity questions under our precedents. The provisions impose no additional liability or obligation on any private party or even on the United States, unless one counts the burden of litigating an appeal—a burden not a single one of our cases suggests triggers retroactivity concerns.[13] Moreover, it strains credulity to suggest that the desire to reinforce the application of subsections (e)(2) and (e)(3) to pending cases drove Congress to *exclude* subsection (e)(1) from §1005(h)(2).

The Government's second objection is that applying subsections (e)(2) and (e)(3) but not (e)(1) to pending cases "produces an absurd result" because it grants (albeit only temporarily) dual jurisdiction over detainees' cases in circumstances where the statute plainly envisions that the District of Columbia Circuit will have "*exclusive*" and immediate jurisdiction over such cases. Reply Brief in Support of Respondents' Motion to Dismiss 7. But the premise here is faulty; subsections (e)(2) and (e)(3) grant jurisdiction only over actions to "determine the validity of any final decision" of a CSRT or commission. Because Hamdan, at least, is not contesting any "final decision" of a CSRT or military commission, his action does not fall within the scope of subsection (e)(2) or (e)(3). There is, then, no absurdity.[14]

—————

[13] See *Landgraf*, 511 U. S., at 271, n. 25 (observing that "the great majority of our decisions relying upon the antiretroactivity presumption have involved intervening statutes burdening private parties," though "we have applied the presumption in cases involving *new monetary obligations* that fell only on the government" (emphasis added)); see also *Altmann,* 541 U. S., at 728–729 (KENNEDY, J., dissenting) (explaining that if retroactivity concerns do not arise when a new monetary obligation is imposed on the United States it is because "Congress, by virtue of authoring the legislation, is itself fully capable of protecting the Federal Government from having its rights degraded by retroactive laws").

[14] There may be habeas cases that were pending in the lower courts at

The Government's more general suggestion that Congress can have had no good reason for preserving habeas jurisdiction over cases that had been brought by detainees prior to enactment of the DTA not only is belied by the legislative history, see n. 10, *supra*, but is otherwise without merit. There is nothing absurd about a scheme under which pending habeas actions—particularly those, like this one, that challenge the very legitimacy of the tribunals whose judgments Congress would like to have reviewed—are preserved, and more routine challenges to final decisions rendered by those tribunals are carefully channeled to a particular court and through a particular lens of review.

Finally, we cannot leave unaddressed JUSTICE SCALIA's contentions that the "meaning of §1005(e)(1) is entirely clear," *post*, at 6, and that "the *plain import* of a statute repealing jurisdiction is to eliminate the power to consider and render judgment—in an already pending case no less than in a case yet to be filed," *post*, at 3 (emphasis in original). Only by treating the *Bruner* rule as an inflexible trump (a thing it has never been, see n. 7, *supra*) and ignoring both the rest of §1005's text and its drafting history can one conclude as much. Congress here expressly provided that subsections (e)(2) and (e)(3) applied to pending cases. It chose not to so provide—after having been presented with the option—for subsection (e)(1). The omission is an integral part of the statutory scheme that muddies whatever "plain meaning" may be discerned from blinkered study of subsection (e)(1) alone. The dissent's speculation about what Congress might have intended by the omission not only is counterfactual, cf. n. 10, *supra*

_____

the time the DTA was enacted that do qualify as challenges to "final decision[s]" within the meaning of subsection (e)(2) or (e)(3). We express no view about whether the DTA would require transfer of such an action to the District of Columbia Circuit.

(recounting legislative history), but rests on both a misconstruction of the DTA and an erroneous view our precedents, see *supra*, at 17, and n. 12.

For these reasons, we deny the Government's motion to dismiss.[15]

### III

Relying on our decision in *Councilman,* 420 U. S. 738, the Government argues that, even if we have statutory jurisdiction, we should apply the "judge-made rule that civilian courts should await the final outcome of on-going military proceedings before entertaining an attack on those proceedings." Brief for Respondents 12. Like the District Court and the Court of Appeals before us, we reject this argument.

In *Councilman*, an army officer on active duty was referred to a court-martial for trial on charges that he violated the UCMJ by selling, transferring, and possessing marijuana. 420 U. S., at 739–740. Objecting that the alleged offenses were not "'service connected,'" *id.*, at 740, the officer filed suit in Federal District Court to enjoin the proceedings. He neither questioned the lawfulness of courts-martial or their procedures nor disputed that, as a serviceman, he was subject to court-martial jurisdiction. His sole argument was that the subject matter of his case did not fall within the scope of court-martial authority. See *id.*, at 741, 759. The District Court granted his request for injunctive relief, and the Court of Appeals

---

[15] Because we conclude that §1005(e)(1) does not strip federal courts' jurisdiction over cases pending on the date of the DTA's enactment, we do not decide whether, if it were otherwise, this Court would nonetheless retain jurisdiction to hear Hamdan's appeal. Cf. *supra*, at 10. Nor do we decide the manner in which the canon of constitutional avoidance should affect subsequent interpretation of the DTA. See, *e.g.*, *St. Cyr,* 533 U. S., at 300 (a construction of a statute "that would entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions").

affirmed.

We granted certiorari and reversed. *Id.*, at 761. We did not reach the merits of whether the marijuana charges were sufficiently "service connected" to place them within the subject-matter jurisdiction of a court-martial. Instead, we concluded that, as a matter of comity, federal courts should normally abstain from intervening in pending court-martial proceedings against members of the Armed Forces,[16] and further that there was nothing in the particular circumstances of the officer's case to displace that general rule. See *id.*, at 740, 758.

*Councilman* identifies two considerations of comity that together favor abstention pending completion of ongoing court-martial proceedings against service personnel. See *New* v. *Cohen*, 129 F. 3d 639, 643 (CADC 1997); see also 415 F. 3d, at 36–37 (discussing *Councilman* and *New*). First, military discipline and, therefore, the efficient operation of the Armed Forces are best served if the military justice system acts without regular interference from civilian courts. See *Councilman*, 420 U. S., at 752. Second, federal courts should respect the balance that Congress struck between military preparedness and fairness to individual service members when it created "an integrated system of military courts and review procedures, a

--------

[16]*Councilman* distinguished service personnel from civilians, whose challenges to ongoing military proceedings are cognizable in federal court. See, *e.g.*, *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11 (1955). As we explained in *Councilman*, abstention is not appropriate in cases in which individuals raise "'substantial arguments denying the right of the military to try them at all,'" and in which the legal challenge "turn[s] on the status of the persons as to whom the military asserted its power." 420 U. S., at 759 (quoting *Noyd* v. *Bond,* 395 U. S. 683, 696, n. 8 (1969)). In other words, we do not apply *Councilman* abstention when there is a substantial question whether a military tribunal has personal jurisdiction over the defendant. Because we conclude that abstention is inappropriate for a more basic reason, we need not consider whether the jurisdictional exception recognized in *Councilman* applies here.

critical element of which is the Court of Military Appeals, consisting of civilian judges 'completely removed from all military influence or persuasion . . . .' " *Id.*, at 758 (quoting H. R. Rep. No. 491, 81st Cong., 1st Sess., p. 7 (1949)). Just as abstention in the face of ongoing state criminal proceedings is justified by our expectation that state courts will enforce federal rights, so abstention in the face of ongoing court-martial proceedings is justified by our expectation that the military court system established by Congress—with its substantial procedural protections and provision for appellate review by independent civilian judges—"will vindicate servicemen's constitutional rights," 420 U. S., at 758. See *id.*, at 755–758.[17]

The same cannot be said here; indeed, neither of the comity considerations identified in *Councilman* weighs in favor of abstention in this case. First, Hamdan is not a member of our Nation's Armed Forces, so concerns about military discipline do not apply. Second, the tribunal convened to try Hamdan is not part of the integrated system of military courts, complete with independent review panels, that Congress has established. Unlike the officer in *Councilman*, Hamdan has no right to appeal any conviction to the civilian judges of the Court of Military Appeals (now called the United States Court of Appeals for the Armed Forces, see Pub. L. 103–337, 108 Stat. 2831). Instead, under Dept. of Defense Military Commis-

————————

[17] See also *Noyd*, 395 U. S., at 694–696 (noting that the Court of Military Appeals consisted of "disinterested civilian judges," and concluding that there was no reason for the Court to address an Air Force Captain's argument that he was entitled to remain free from confinement pending appeal of his conviction by court-martial "when the highest military court stands ready to consider petitioner's arguments"). Cf. *Parisi* v. *Davidson,* 405 U. S. 34, 41–43 (1972) ("Under accepted principles of comity, the court should stay its hand only if the relief the petitioner seeks . . . would also be available to him with reasonable promptness and certainty through the machinery of the military judicial system in its processing of the court-martial charge").

sion Order No. 1 (Commission Order No. 1), which was issued by the President on March 21, 2002, and amended most recently on August 31, 2005, and which governs the procedures for Hamdan's commission, any conviction would be reviewed by a panel consisting of three military officers designated by the Secretary of Defense. Commission Order No. 1 §6(H)(4). Commission Order No. 1 provides that appeal of a review panel's decision may be had only to the Secretary of Defense himself, §6(H)(5), and then, finally, to the President, §6(H)(6).[18]

We have no doubt that the various individuals assigned review power under Commission Order No. 1 would strive to act impartially and ensure that Hamdan receive all protections to which he is entitled. Nonetheless, these review bodies clearly lack the structural insulation from military influence that characterizes the Court of Appeals for the Armed Forces, and thus bear insufficient conceptual similarity to state courts to warrant invocation of abstention principles.[19]

In sum, neither of the two comity considerations underlying our decision to abstain in *Councilman* applies to the circumstances of this case. Instead, this Court's decision in *Quirin* is the most relevant precedent. In *Quirin*, seven German saboteurs were captured upon arrival by submarine in New York and Florida. 317 U. S., at 21. The President convened a military commission to try the saboteurs, who then filed habeas corpus petitions in the United

---

[18] If he chooses, the President may delegate this ultimate decision-making authority to the Secretary of Defense. See §6(H)(6).

[19] JUSTICE SCALIA chides us for failing to include the District of Columbia Circuit's review powers under the DTA in our description of the review mechanism erected by Commission Order No. 1. See *post*, at 22. Whether or not the limited review permitted under the DTA may be treated as akin to the plenary review exercised by the Court of Appeals for the Armed Forces, petitioner here is not afforded a right to such review. See *infra*, at 52; §1005(e)(3), 119 Stat. 2743.

States District Court for the District of Columbia challenging their trial by commission. We granted the saboteurs' petition for certiorari to the Court of Appeals before judgment. See *id.*, at 19. Far from abstaining pending the conclusion of military proceedings, which were ongoing, we convened a special Term to hear the case and expedited our review. That course of action was warranted, we explained, "[i]n view of the public importance of the questions raised by [the cases] and of the duty which rests on the courts, in time of war as well as in time of peace, to preserve unimpaired the constitutional safeguards of civil liberty, and because in our opinion the public interest required that we consider and decide those questions without any avoidable delay." *Ibid.*

As the Court of Appeals here recognized, *Quirin* "provides a compelling historical precedent for the power of civilian courts to entertain challenges that seek to interrupt the processes of military commissions." 415 F. 3d, at 36.[20] The circumstances of this case, like those in *Quirin*,

---

[20] Having correctly declined to abstain from addressing Hamdan's challenge to the lawfulness of the military commission convened to try him, the Court of Appeals suggested that *Councilman* abstention nonetheless applied to bar its consideration of one of Hamdan's arguments—namely, that his commission violated Article 3 of the Third Geneva Convention, 6 U. S. T. 3316, 3318. See Part VI, *infra.* Although the Court of Appeals rejected the Article 3 argument on the merits, it also stated that, because the challenge was not "jurisdictional," it did not fall within the exception that *Schlesinger* v. *Councilman*, 420 U. S. 738 (1975), recognized for defendants who raise substantial arguments that a military tribunal lacks personal jurisdiction over them. See 415 F. 3d, at 42.

In reaching this conclusion, the Court of Appeals conflated two distinct inquiries: (1) whether Hamdan has raised a substantial argument that the military commission lacks authority to try him; and, more fundamentally, (2) whether the comity considerations underlying *Councilman* apply to trigger the abstention principle in the first place. As the Court of Appeals acknowledged at the beginning of its opinion, the first question warrants consideration only if the answer to the

simply do not implicate the "obligations of comity" that, under appropriate circumstances, justify abstention. *Quackenbush* v. *Allstate Ins. Co.,* 517 U. S. 706, 733 (1996) (KENNEDY, J., concurring).

Finally, the Government has identified no other "important countervailing interest" that would permit federal courts to depart from their general "duty to exercise the jurisdiction that is conferred upon them by Congress." *Id.*, at 716 (majority opinion). To the contrary, Hamdan and the Government both have a compelling interest in knowing in advance whether Hamdan may be tried by a military commission that arguably is without any basis in law and operates free from many of the procedural rules prescribed by Congress for courts-martial—rules intended to safeguard the accused and ensure the reliability of any conviction. While we certainly do not foreclose the possibility that abstention may be appropriate in some cases seeking review of ongoing military commission proceedings (such as military commissions convened on the battlefield), the foregoing discussion makes clear that, under our precedent, abstention is not justified here. We therefore proceed to consider the merits of Hamdan's challenge.

IV

The military commission, a tribunal neither mentioned in the Constitution nor created by statute, was born of military necessity. See W. Winthrop, Military Law and Precedents 831 (rev. 2d ed. 1920) (hereinafter Winthrop).

––––––––––

second is yes. See 415 F. 3d, at 36–37. Since, as the Court of Appeals properly concluded, the answer to the second question is in fact no, there is no need to consider any exception.

At any rate, it appears that the exception would apply here. As discussed in Part VI, *infra*, Hamdan raises a substantial argument that, because the military commission that has been convened to try him is not a "'regularly constituted court'" under the Geneva Conventions, it is ultra vires and thus lacks jurisdiction over him. Brief for Petitioner 5.

Though foreshadowed in some respects by earlier tribunals like the Board of General Officers that General Washington convened to try British Major John André for spying during the Revolutionary War, the commission "as such" was inaugurated in 1847. *Id.*, at 832; G. Davis, A Treatise on the Military Law of the United States 308 (2d ed. 1909) (hereinafter Davis). As commander of occupied Mexican territory, and having available to him no other tribunal, General Winfield Scott that year ordered the establishment of both "'*military commissions*'" to try ordinary crimes committed in the occupied territory and a "*council of war*" to try offenses against the law of war. Winthrop 832 (emphases in original).

When the exigencies of war next gave rise to a need for use of military commissions, during the Civil War, the dual system favored by General Scott was not adopted. Instead, a single tribunal often took jurisdiction over ordinary crimes, war crimes, and breaches of military orders alike. As further discussed below, each aspect of that seemingly broad jurisdiction was in fact supported by a separate military exigency. Generally, though, the need for military commissions during this period—as during the Mexican War—was driven largely by the then very limited jurisdiction of courts-martial: "The *occasion* for the military commission arises principally from the fact that the jurisdiction of the court-martial proper, in our law, is restricted by statute almost exclusively to members of the military force and to certain specific offences defined in a written code." *Id.*, at 831 (emphasis in original).

Exigency alone, of course, will not justify the establishment and use of penal tribunals not contemplated by Article I, §8 and Article III, §1 of the Constitution unless some other part of that document authorizes a response to the felt need. See *Ex parte Milligan*, 4 Wall. 2, 121 (1866) ("Certainly no part of the judicial power of the country was conferred on [military commissions]"); *Ex parte Val-*

*landigham,* 1 Wall. 243, 251 (1864); see also *Quirin,* 317 U. S., at 25 ("Congress and the President, like the courts, possess no power not derived from the Constitution"). And that authority, if it exists, can derive only from the powers granted jointly to the President and Congress in time of war. See *id.,* at 26–29; *In re Yamashita,* 327 U. S. 1, 11 (1946).

The Constitution makes the President the "Commander in Chief" of the Armed Forces, Art. II, §2, cl. 1, but vests in Congress the powers to "declare War . . . and make Rules concerning Captures on Land and Water," Art. I, §8, cl. 11, to "raise and support Armies," *id.,* cl. 12, to "define and punish . . . Offences against the Law of Nations," *id.,* cl. 10, and "To make Rules for the Government and Regulation of the land and naval Forces," *id.,* cl. 14. The interplay between these powers was described by Chief Justice Chase in the seminal case of *Ex parte Milligan:*

> "The power to make the necessary laws is in Congress; the power to execute in the President. Both powers imply many subordinate and auxiliary powers. Each includes all authorities essential to its due exercise. But neither can the President, in war more than in peace, intrude upon the proper authority of Congress, nor Congress upon the proper authority of the President. . . . Congress cannot direct the conduct of campaigns, nor can the President, or any commander under him, without the sanction of Congress, institute tribunals for the trial and punishment of offences, either of soldiers or civilians, unless in cases of a controlling necessity, which justifies what it compels, or at least insures acts of indemnity from the justice of the legislature." 4 Wall., at 139–140.[21]

---

[21] See also Winthrop 831 ("[I]n general, it is those provisions of the Constitution which empower Congress to 'declare war' and 'raise

Whether Chief Justice Chase was correct in suggesting that the President may constitutionally convene military commissions "without the sanction of Congress" in cases of "controlling necessity" is a question this Court has not answered definitively, and need not answer today. For we held in *Quirin* that Congress had, through Article of War 15, sanctioned the use of military commissions in such circumstances. 317 U. S., at 28 ("By the Articles of War, and especially Article 15, Congress has explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war in appropriate cases"). Article 21 of the UCMJ, the language of which is substantially identical to the old Article 15 and was preserved by Congress after World War II,[22] reads as follows:

> "Jurisdiction of courts-martial not exclusive.
> "The provisions of this code conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions, provost courts, or other military tribunals of concurrent jurisdiction in respect of offenders or offenses that by statute or by the law of war may be tried by such military commissions, provost courts, or other military tribunals." 64 Stat. 115.

We have no occasion to revisit *Quirin*'s controversial characterization of Article of War 15 as congressional authorization for military commissions. Cf. Brief for Legal

--------

armies,' and which, in authorizing the initiation of *war*, authorize the employment of all necessary and proper agencies for its due prosecution, from which this tribunal derives its original sanction" (emphasis in original)).

[22] Article 15 was first adopted as part of the Articles of War in 1916. See Act of Aug. 29, 1916, ch. 418, §3, Art. 15, 39 Stat. 652. When the Articles of War were codified and re-enacted as the UCMJ in 1950, Congress determined to retain Article 15 because it had been "construed by the Supreme Court (*Ex Parte Quirin*, 317 U. S. 1 (1942))." S. Rep. No. 486, 81st Cong., 1st Sess., 13 (1949).

Scholars and Historians as *Amici Curiae* 12–15. Contrary to the Government's assertion, however, even *Quirin* did not view the authorization as a sweeping mandate for the President to "invoke military commissions when he deems them necessary." Brief for Respondents 17. Rather, the *Quirin* Court recognized that Congress had simply preserved what power, under the Constitution and the common law of war, the President had had before 1916 to convene military commissions—with the express condition that the President and those under his command comply with the law of war. See 317 U. S., at 28–29.[23] That much is evidenced by the Court's inquiry, *following* its conclusion that Congress had authorized military commissions, into whether the law of war had indeed been complied with in that case. See *ibid.*

The Government would have us dispense with the inquiry that the *Quirin* Court undertook and find in either the AUMF or the DTA specific, overriding authorization for the very commission that has been convened to try Hamdan. Neither of these congressional Acts, however, expands the President's authority to convene military commissions. First, while we assume that the AUMF activated the President's war powers, see *Hamdi* v. *Rumsfeld*, 542 U. S. 507 (2004) (plurality opinion), and that those powers include the authority to convene military commissions in appropriate circumstances, see *id.*, at 518; *Quirin*, 317 U. S., at 28–29; see also *Yamashita*, 327 U. S., at 11, there is nothing in the text or legislative history of the AUMF even hinting that Congress intended to expand or alter the authorization set forth in Article 21 of the

---

[23] Whether or not the President has independent power, absent congressional authorization, to convene military commissions, he may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers. See *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 637 (1952) (Jackson, J., concurring). The Government does not argue otherwise.

UCMJ. Cf. *Yerger,* 8 Wall., at 105 ("Repeals by implication are not favored").[24]

Likewise, the DTA cannot be read to authorize this commission. Although the DTA, unlike either Article 21 or the AUMF, was enacted after the President had convened Hamdan's commission, it contains no language authorizing that tribunal or any other at Guantanamo Bay. The DTA obviously "recognize[s]" the existence of the Guantanamo Bay commissions in the weakest sense, Brief for Respondents 15, because it references some of the military orders governing them and creates limited judicial review of their "final decision[s]," DTA §1005(e)(3), 119 Stat. 2743. But the statute also pointedly reserves judgment on whether "the Constitution and laws of the United States are applicable" in reviewing such decisions and whether, if they are, the "standards and procedures" used to try Hamdan and other detainees actually violate the "Constitution and laws." *Ibid.*

Together, the UCMJ, the AUMF, and the DTA at most acknowledge a general Presidential authority to convene military commissions in circumstances where justified under the "Constitution and laws," including the law of war. Absent a more specific congressional authorization, the task of this Court is, as it was in *Quirin*, to decide whether Hamdan's military commission is so justified. It is to that inquiry we now turn.

───────────

[24] On this point, it is noteworthy that the Court in *Ex parte Quirin*, 317 U. S. 1 (1942), looked beyond Congress' declaration of war and accompanying authorization for use of force during World War II, and relied instead on Article of War 15 to find that Congress had authorized the use of military commissions in some circumstances. See *id.*, at 26–29. JUSTICE THOMAS' assertion that we commit "error" in reading Article 21 of the UCMJ to place limitations upon the President's use of military commissions, see *post*, at 5 (dissenting opinion), ignores the reasoning in *Quirin*.

Opinion of STEVENS, J.

## V

The common law governing military commissions may be gleaned from past practice and what sparse legal precedent exists. Commissions historically have been used in three situations. See Bradley & Goldsmith, Congressional Authorization and the War on Terrorism, 118 Harv. L. Rev. 2048, 2132–2133 (2005); Winthrop 831–846; Hearings on H. R. 2498 before the Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., 975 (1949). First, they have substituted for civilian courts at times and in places where martial law has been declared. Their use in these circumstances has raised constitutional questions, see *Duncan* v. *Kahanamoku,* 327 U. S. 304 (1946); *Milligan*, 4 Wall., at 121–122, but is well recognized.[25] See Winthrop 822, 836–839. Second, commissions have been established to try civilians "as part of a temporary military government over occupied enemy territory or territory regained from an enemy where civilian government cannot and does not function." *Duncan*, 327 U. S., at 314; see *Milligan*, 4 Wall., at 141–142 (Chase, C. J., concurring in judgment) (distinguishing "MARTIAL LAW PROPER" from "MILITARY GOVERNMENT" in occupied territory). Illustrative of this second kind of commission is

---

[25] The justification for, and limitations on, these commissions were summarized in *Milligan:*

"If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, *then*, on the theatre of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration; for, if this government is continued *after* the courts are reinstated, it is a gross usurpation of power. Martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction. It is also confined to the locality of actual war." 4 Wall., at 127 (emphases in original).

the one that was established, with jurisdiction to apply the German Criminal Code, in occupied Germany following the end of World War II. See *Madsen* v. *Kinsella,* 343 U. S. 341, 356 (1952).[26]

The third type of commission, convened as an "incident to the conduct of war" when there is a need "to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war," *Quirin*, 317 U. S., at 28–29, has been described as "utterly different" from the other two. Bickers, Military Commissions are Constitutionally Sound: A Response to Professors Katyal and Tribe, 34 Tex. Tech. L. Rev. 899, 902 (2002–2003).[27]  Not only is its jurisdiction limited to offenses cognizable during time of war, but its role is primarily a factfinding one—to determine, typically on the battlefield itself, whether the defendant has violated the law of war.  The last time the U. S. Armed Forces

_____

[26] The limitations on these occupied territory or military government commissions are tailored to the tribunals' purpose and the exigencies that necessitate their use.  They may be employed "pending the establishment of civil government," *Madsen,* 343 U. S., at 354–355, which may in some cases extend beyond the "cessation of hostilities," *id.*, at 348.

[27] So much may not be evident on cold review of the Civil War trials often cited as precedent for this kind of tribunal because the commissions established during that conflict operated as both martial law or military government tribunals and law-of-war commissions.  Hence, "military commanders began the practice [during the Civil War] of using the same name, the same rules, and often the same tribunals" to try both ordinary crimes and war crimes.  Bickers, 34 Tex. Tech. L. Rev., at 908.  "For the first time, accused horse thieves and alleged saboteurs found themselves subject to trial by the same military commission." *Id.*, at 909.  The Civil War precedents must therefore be considered with caution; as we recognized in *Quirin,* 317 U. S., at 29, and as further discussed below, commissions convened during time of war but under neither martial law nor military government may try only offenses against the law of war.

used the law-of-war military commission was during World War II. In *Quirin*, this Court sanctioned President Roosevelt's use of such a tribunal to try Nazi saboteurs captured on American soil during the War. 317 U. S. 1. And in *Yamashita*, we held that a military commission had jurisdiction to try a Japanese commander for failing to prevent troops under his command from committing atrocities in the Philippines. 327 U. S. 1.

*Quirin* is the model the Government invokes most frequently to defend the commission convened to try Hamdan. That is both appropriate and unsurprising. Since Guantanamo Bay is neither enemy-occupied territory nor under martial law, the law-of-war commission is the only model available. At the same time, no more robust model of executive power exists; *Quirin* represents the high-water mark of military power to try enemy combatants for war crimes.

The classic treatise penned by Colonel William Winthrop, whom we have called "the 'Blackstone of Military Law,'" *Reid* v. *Covert,* 354 U. S. 1, 19, n. 38 (1957) (plurality opinion), describes at least four preconditions for exercise of jurisdiction by a tribunal of the type convened to try Hamdan. First, "[a] military commission, (except where otherwise authorized by statute), can legally assume jurisdiction only of offenses committed within the field of the command of the convening commander." Winthrop 836. The "field of command" in these circumstances means the "theatre of war." *Ibid.* Second, the offense charged "must have been committed within the period of the war."[28] *Id.*, at 837. No jurisdiction exists to try offenses "committed either before or after the war." *Ibid.* Third, a military commission not established pursuant to martial

---

[28] If the commission is established pursuant to martial law or military government, its jurisdiction extends to offenses committed within "the exercise of military government or martial law." Winthrop 837.

law or an occupation may try only "[i]ndividuals of the enemy's army who have been guilty of illegitimate warfare or other offences in violation of the laws of war" and members of one's own army "who, in time of war, become chargeable with crimes or offences not cognizable, or triable, by the criminal courts or under the Articles of war." *Id.*, at 838. Finally, a law-of-war commission has jurisdiction to try only two kinds of offense: "Violations of the laws and usages of war cognizable by military tribunals only," and "[b]reaches of military orders or regulations for which offenders are not legally triable by court-martial under the Articles of war." *Id.*, at 839.[29]

All parties agree that Colonel Winthrop's treatise accurately describes the common law governing military commissions, and that the jurisdictional limitations he identifies were incorporated in Article of War 15 and, later, Article 21 of the UCMJ. It also is undisputed that Hamdan's commission lacks jurisdiction to try him unless the charge "properly set[s] forth, not only the details of the act charged, but the circumstances conferring *jurisdiction.*" *Id.*, at 842 (emphasis in original). The question is whether the preconditions designed to ensure that a military necessity exists to justify the use of this extraordinary tribunal have been satisfied here.

The charge against Hamdan, described in detail in Part I, *supra*, alleges a conspiracy extending over a number of years, from 1996 to November 2001.[30] All but two months

---

[29] Winthrop adds as a fifth, albeit not-always-complied-with, criterion that "the *trial* must be had within the theatre of war . . . ; that, if held elsewhere, and where the civil courts are open and available, the proceedings and sentence will be *coram non judice.*" *Id.*, at 836. The Government does not assert that Guantanamo Bay is a theater of war, but instead suggests that neither Washington, D. C., in 1942 nor the Philippines in 1945 qualified as a "war zone" either. Brief for Respondents 27; cf. *Quirin,* 317 U. S. 1; *In re Yamashita,* 327 U. S. 1 (1946).

[30] The elements of this conspiracy charge have been defined not by Congress but by the President. See Military Commission Instruction

of that more than 5-year-long period preceded the attacks of September 11, 2001, and the enactment of the AUMF— the Act of Congress on which the Government relies for exercise of its war powers and thus for its authority to convene military commissions.[31]  Neither the purported

———————

No. 2, 32 CFR §11.6 (2005).

[31] JUSTICE THOMAS would treat Osama bin Laden's 1996 declaration of jihad against Americans as the inception of the war.  See *post*, at 7–10 (dissenting opinion).  But even the Government does not go so far; although the United States had for some time prior to the attacks of September 11, 2001, been aggressively pursuing al Qaeda, neither in the charging document nor in submissions before this Court has the Government asserted that the President's *war powers* were activated prior to September 11, 2001.  Cf. Brief for Respondents 25 (describing the events of September 11, 2001, as "an act of war" that "triggered a right to deploy military forces abroad to defend the United States by combating al Qaeda").  JUSTICE THOMAS' further argument that the AUMF is "backward looking" and therefore authorizes *trial by military commission* of crimes that occurred prior to the inception of war is insupportable.  See *post*, at 8, n. 3.  If nothing else, Article 21 of the UCMJ requires that the President comply with the law of war in his use of military commissions.  As explained in the text, the law of war permits trial only of offenses "committed within the period of the war." Winthrop 837; see also *Quirin*, 317 U. S., at 28–29 (observing that law-of-war military commissions may be used to try "those enemies *who in their attempt to thwart or impede our military effort* have violated the law of war" (emphasis added)).  The sources that JUSTICE THOMAS relies on to suggest otherwise simply do not support his position.  Colonel Green's short exegesis on military commissions cites Howland for the proposition that "[o]ffenses committed before a *formal declaration of war* or *before the declaration of martial law* may be tried by military commission."  The Military Commission, 42 Am. J. Int'l L. 832, 848 (1948) (emphases added) (cited *post*, at 9–10).  Assuming that to be true, nothing in our analysis turns on the admitted absence of either a formal declaration of war or a declaration of martial law.  Our focus instead is on the September 11, 2001 attacks that the Government characterizes as the relevant "act[s] of war," and on the measure that authorized the President's deployment of military force—the AUMF. Because we do not question the Government's position that the war commenced with the events of September 11, 2001, the *Prize Cases,* 2 Black 635 (1863) (cited *post*, at 2, 7, 8, and 10 (THOMAS, J., dissenting)),

agreement with Osama bin Laden and others to commit war crimes, nor a single overt act, is alleged to have occurred in a theater of war or on any specified date after September 11, 2001.  None of the overt acts that Hamdan is alleged to have committed violates the law of war.

These facts alone cast doubt on the legality of the charge and, hence, the commission; as Winthrop makes plain, the offense alleged must have been committed both in a theater of war and *during*, not before, the relevant conflict.  But the deficiencies in the time and place allegations also underscore—indeed are symptomatic of—the most serious defect of this charge: The offense it alleges is not triable by law-of-war military commission.  See *Yamashita*, 327 U. S., at 13 ("Neither congressional action nor the military orders constituting the commission authorized it to place petitioner on trial unless the charge proffered against him

are not germane to the analysis.

Finally, JUSTICE THOMAS' assertion that Julius Otto Kuehn's trial by military commission "for conspiring with Japanese officials to betray the United States fleet to the Imperial Japanese Government prior to its attack on Pearl Harbor" stands as authoritative precedent for Hamdan's trial by commission, *post*, at 9, misses the mark in three critical respects.  First, Kuehn was tried for the *federal espionage crimes* under what were then 50 U. S C. §§31, 32, and 34, *not* with common-law violations of the law of war.  See Hearings before the Joint Committee on the Investigation of the Pearl Harbor Attack, 79th Cong., 1st Sess., pt. 30, pp. 3067–3069 (1946).  Second, he was tried by *martial law* commission (a kind of commission JUSTICE THOMAS acknowledges is not relevant to the analysis here, and whose jurisdiction extends to offenses committed within "the exercise of . . . martial law," Winthrop 837, see *supra*, n. 28), *not* a commission established exclusively to try violations of the law of war.  See *ibid.*  Third, the martial law commissions established to try crimes in Hawaii were ultimately declared illegal by this Court.  See *Duncan* v. *Kahanamoku,* 327 U. S. 304, 324 (1946) ("The phrase 'martial law' as employed in [the Hawaiian Organic Act], while intended to authorize the military to act vigorously for the maintenance of an orderly civil government and for the defense of the Islands against actual or threatened rebellion or invasion, was not intended to authorize the supplanting of courts by military tribunals").

is of a violation of the law of war").[32]

————————

[32] JUSTICE THOMAS adopts the remarkable view, not advocated by the Government, that the charging document in this case actually includes more than one charge: Conspiracy *and* several other ill-defined crimes, like "joining an organization" that has a criminal purpose, "'[b]eing a guerilla,'" and aiding the enemy. See *post*, at 16–21, and n. 9. There are innumerable problems with this approach.

First, the crimes JUSTICE THOMAS identifies were not actually charged. It is one thing to observe that charges before a military commission "'need not be stated with the precision of a common law indictment,'" *post*, at 15, n. 7 (citation omitted); it is quite another to say that a crime *not charged* may nonetheless be read into an indictment. Second, the Government plainly had available to it the tools and the time it needed to charge petitioner with the various crimes JUSTICE THOMAS refers to, if it believed they were supported by the allegations. As JUSTICE THOMAS himself observes, see *post*, at 21, the crime of aiding the enemy may, in circumstances where the accused owes allegiance to the party whose enemy he is alleged to have aided, be triable by military commission pursuant to Article 104 of the UCMJ, 10 U. S. C. §904. Indeed, the Government has charged detainees under this provision when it has seen fit to do so. See Brief for David Hicks as *Amicus Curiae* 7.

Third, the cases JUSTICE THOMAS relies on to show that Hamdan may be guilty of violations of the law of war not actually charged do not support his argument. JUSTICE THOMAS begins by blurring the distinction between those categories of "offender" who may be tried by military commission (*e.g.*, jayhawkers and the like) with the "offenses" that may be so tried. Even when it comes to "'being a guerilla,'" cf. *post*, at 18, n. 9 (citation omitted), a label alone does not render a person susceptible to execution or other criminal punishment; the charge of "'being a guerilla'" invariably is accompanied by the allegation that the defendant "'took up arms'" as such. This is because, as explained by Judge Advocate General Holt in a decision upholding the charge of "'being a guerilla'" as one recognized by "the universal usage of the times," the charge is simply shorthand (akin to "being a spy") for "the perpetration of a succession of similar acts" of violence. Record Books of the Judge Advocate General Office, R. 3, 590. The sources cited by JUSTICE THOMAS confirm as much. See cases cited *post*, at 18, n. 9.

Likewise, the suggestion that the Nuremberg precedents support Hamdan's conviction for the (uncharged) crime of joining a criminal organization must fail. Cf. *post*, at 19–21. The convictions of certain high-level Nazi officials for "membership in a criminal organization"

There is no suggestion that Congress has, in exercise of its constitutional authority to "define and punish . . . Offences against the Law of Nations," U. S. Const., Art. I, §8, cl. 10, positively identified "conspiracy" as a war crime.[33]  As we explained in *Quirin*, that is not necessarily fatal to the Government's claim of authority to try the alleged offense by military commission; Congress, through Article 21 of the UCMJ, has "incorporated by reference" the common law of war, which may render triable by military commission certain offenses not defined by statute.  317 U. S., at 30.  When, however, neither the elements of the offense nor the range of permissible punishments is defined by statute or treaty, the precedent must be plain and unambiguous.  To demand any less would be to risk concentrating in military hands a degree of adjudicative and punitive power in excess of that contemplated either by statute or by the Constitution.  Cf. *Loving* v. *United States,* 517 U. S. 748, 771 (1996) (acknowledging that Congress "may not delegate the power to make laws"); *Reid,* 354 U. S., at 23–24 ("The Founders envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds"); The Federalist No. 47, p. 324 (J. Cooke ed. 1961) (J. Madison) ("The accumulation of all powers legislative, executive and judici-

_____

were secured pursuant to specific provisions of the Charter of the International Military Tribunal that permitted indictment of individual organization members following convictions of the organizations themselves.  See Arts. 9 and 10, in 1 Trial of the Major War Criminals Before the International Military Tribunal 12 (1947).  The initial plan to use organizations' convictions as predicates for mass individual trials ultimately was abandoned.  See T. Taylor, Anatomy of the Nuremberg Trials: A Personal Memoir 584–585, 638 (1992).

[33] Cf. 10 U. S. C. §904 (making triable by military commission the crime of aiding the enemy); §906 (same for spying); War Crimes Act of 1996, 18 U. S. C. §2441 (2000 ed. and Supp. III) (listing war crimes); Foreign Operations, Export Financing, and Related Appropriations Act, 1998, §583, 111 Stat. 2436 (same).

ary in the same hands . . . may justly be pronounced the very definition of tyranny").[34]

This high standard was met in *Quirin;* the violation there alleged was, by "universal agreement and practice" both in this country and internationally, recognized as an offense against the law of war.   317 U. S., at 30; see *id.*, at 35–36 ("This precept of the law of war has been so recognized in practice both here and abroad, and has so generally been accepted as valid by authorities on international law that we think it must be regarded as a rule or principle of the law of war recognized by this Government by its enactment of the Fifteenth Article of War" (footnote omitted)).   Although the picture arguably was less clear in *Yamashita*, compare 327 U. S., at 16 (stating that the provisions of the Fourth Hague Convention of 1907, 36 Stat. 2306, "plainly" required the defendant to control the troops under his command), with 327 U. S., at 35 (Murphy, J., dissenting), the disagreement between the majority and the dissenters in that case concerned whether the historic and textual evidence constituted clear precedent—not whether clear precedent was required to justify trial by law-of-war military commission.

At a minimum, the Government must make a substantial showing that the crime for which it seeks to try a

―――――――

[34] While the common law necessarily is "evolutionary in nature," *post*, at 13 (THOMAS, J., dissenting), even in jurisdictions where common law crimes are still part of the penal framework, an act does not become a crime without its foundations having been firmly established in precedent.   See, *e.g.*, *R.* v. *Rimmington*, [2006] 2 All E. R. 257, 275–279 (House of Lords); *id.*, at 279 (while "some degree of vagueness is inevitable and development of the law is a recognised feature of common law courts, . . . the law-making function of the courts must remain within reasonable limits"); see also *Rogers* v. *Tennessee,* 532 U. S. 451, 472– 478 (2001) (SCALIA, J., dissenting).   The caution that must be exercised in the incremental development of common-law crimes by the judiciary is, for the reasons explained in the text, all the more critical when reviewing developments that stem from military action.

defendant by military commission is acknowledged to be
an offense against the law of war. That burden is far from
satisfied here. The crime of "conspiracy" has rarely if ever
been tried as such in this country by any law-of-war mili-
tary commission not exercising some other form of juris-
diction,[35] and does not appear in either the Geneva Con-
ventions or the Hague Conventions—the major treaties on
the law of war.[36] Winthrop explains that under the com-
mon law governing military commissions, it is not enough
to intend to violate the law of war and commit overt acts
in furtherance of that intention unless the overt acts
either are themselves offenses against the law of war or
constitute steps sufficiently substantial to qualify as an
attempt. See Winthrop 841 ("[T]he jurisdiction of the
military commission should be restricted to cases of of-
fence consisting in *overt acts*, *i.e.*, in unlawful commissions
or actual attempts to commit, and not in intentions

_____

[35] The 19th-century trial of the "Lincoln conspirators," even if prop-
erly classified as a trial by law-of-war commission, cf. W. Rehnquist, All
the Laws But One: Civil Liberties in Wartime 165–167 (1998) (analyz-
ing the conspiracy charges in light of ordinary criminal law principles
at the time), is at best an equivocal exception. Although the charge
against the defendants in that case accused them of "combining, con-
federating, and conspiring together" to murder the President, they were
also charged (as we read the indictment, cf. *post*, at 23, n. 14 (THOMAS,
J., dissenting)) with "maliciously, unlawfully, and traitorously murder-
ing the said Abraham Lincoln." H. R. Doc. No. 314, 55th Cong., 1st
Sess., 696 (1899). Moreover, the Attorney General who wrote the
opinion defending the trial by military commission treated the charge
as if it alleged the substantive offense of assassination. See 11 Op.
Atty. Gen. 297 (1865) (analyzing the propriety of trying by military
commission "the offence of having assassinated the President"); see also
*Mudd* v. *Caldera*, 134 F. Supp. 2d 138, 140 (DC 2001).

[36] By contrast, the Geneva Conventions do extend liability for sub-
stantive war crimes to those who "orde[r]" their commission, see Third
Geneva Convention, Art. 129, 6 U. S. T., at 3418, and this Court has
read the Fourth Hague Convention of 1907 to impose "command
responsibility" on military commanders for acts of their subordinates,
see *Yamshita*, 327 U. S., at 15–16.

merely" (emphasis in original)).

The Government cites three sources that it says show otherwise. First, it points out that the Nazi saboteurs in *Quirin* were charged with conspiracy. See Brief for Respondents 27. Second, it observes that Winthrop at one point in his treatise identifies conspiracy as an offense "prosecuted by military commissions." *Ibid.* (citing Winthrop 839, and n. 5). Finally, it notes that another military historian, Charles Roscoe Howland, lists conspiracy "'to violate the laws of war by destroying life or property in aid of the enemy'" as an offense that was tried as a violation of the law of war during the Civil War. Brief for Respondents 27–28 (citing C. Howland, Digest of Opinions of the Judge Advocates General of the Army 1071 (1912) (hereinafter Howland)). On close analysis, however, these sources at best lend little support to the Government's position and at worst undermine it. By any measure, they fail to satisfy the high standard of clarity required to justify the use of a military commission.

That the defendants in *Quirin* were charged with conspiracy is not persuasive, since the Court declined to address whether the offense actually qualified as a violation of the law of war—let alone one triable by military commission. The *Quirin* defendants were charged with the following offenses:

"[I.] Violation of the law of war.
"[II.] Violation of Article 81 of the Articles of War, defining the offense of relieving or attempting to relieve, or corresponding with or giving intelligence to, the enemy.
"[III.] Violation of Article 82, defining the offense of spying.
"[IV.] Conspiracy to commit the offenses alleged in charges [I, II, and III]." 317 U. S., at 23.

The Government, defending its charge, argued that the

conspiracy alleged "constitute[d] an additional violation of the law of war." *Id.*, at 15. The saboteurs disagreed; they maintained that "[t]he charge of conspiracy can not stand if the other charges fall." *Id.*, at 8. The Court, however, declined to resolve the dispute. It concluded, first, that the specification supporting Charge I adequately alleged a "violation of the law of war" that was not "merely colorable or without foundation." *Id.*, at 36. The facts the Court deemed sufficient for this purpose were that the defendants, admitted enemy combatants, entered upon U. S. territory in time of war without uniform "for the purpose of destroying property used or useful in prosecuting the war." That act was "a hostile and warlike" one. *Id.*, at 36, 37. The Court was careful in its decision to identify an overt, "complete" act. Responding to the argument that the saboteurs had "not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations" and therefore had not violated the law of war, the Court responded that they had actually "passed our military and naval lines and defenses or went behind those lines, in civilian dress and with hostile purpose." *Id.*, at 38. "The offense was complete when with that purpose they entered—or, having so entered, they remained upon—our territory in time of war without uniform or other appropriate means of identification." *Ibid.*

Turning to the other charges alleged, the Court explained that "[s]ince the first specification of Charge I sets forth a violation of the law of war, we have no occasion to pass on the adequacy of the second specification of Charge I, or to construe the 81st and 82nd Articles of War for the purpose of ascertaining whether the specifications under Charges II and III allege violations of those Articles or whether if so construed they are constitutional." *Id.*, at 46. No mention was made at all of Charge IV—the conspiracy charge.

If anything, *Quirin* supports Hamdan's argument that conspiracy is not a violation of the law of war. Not only did the Court pointedly omit any discussion of the conspiracy charge, but its analysis of Charge I placed special emphasis on the *completion* of an offense; it took seriously the saboteurs' argument that there can be no violation of a law of war—at least not one triable by military commission—without the actual commission of or attempt to commit a "hostile and warlike act." *Id.*, at 37–38.

That limitation makes eminent sense when one considers the necessity from whence this kind of military commission grew: The need to dispense swift justice, often in the form of execution, to illegal belligerents captured on the battlefield. See S. Rep. No. 130, 64th Cong., 1st Sess., p. 40 (1916) (testimony of Brig. Gen. Enoch H. Crowder) (observing that Article of War 15 preserves the power of "the military commander *in the field in time of war*" to use military commissions (emphasis added)). The same urgency would not have been felt vis-à-vis enemies who had done little more than agree to violate the laws of war. Cf. 31 Op. Atty. Gen. 356, 357, 361 (1918) (opining that a German spy could not be tried by military commission because, having been apprehended before entering "any camp, fortification or other military premises of the United States," he had "committed [his offenses] outside of the field of military operations"). The *Quirin* Court acknowledged as much when it described the President's authority to use law-of-war military commissions as the power to "seize and subject to disciplinary measures those enemies *who in their attempt to thwart or impede our military effort* have violated the law of war." 317 U. S., at 28–29 (emphasis added).

Winthrop and Howland are only superficially more helpful to the Government. Howland, granted, lists "conspiracy by two or more to violate the laws of war by destroying life or property in aid of the enemy" as one of over

20 "offenses against the laws and usages of war" "passed upon and punished by military commissions." Howland 1071. But while the records of cases that Howland cites following his list of offenses against the law of war support inclusion of the other offenses mentioned, they provide no support for the inclusion of conspiracy as a violation of the law of war. See *ibid.* (citing Record Books of the Judge Advocate General Office, R. 2, 144; R. 3, 401, 589, 649; R. 4, 320; R. 5, 36, 590; R. 6, 20; R. 7, 413; R. 8, 529; R. 9, 149, 202, 225, 481, 524, 535; R. 10, 567; R. 11, 473, 513; R. 13, 125, 675; R. 16, 446; R. 21, 101, 280). Winthrop, apparently recognizing as much, excludes conspiracy of any kind from his own list of offenses against the law of war. See Winthrop 839–840.

Winthrop does, unsurprisingly, include "criminal conspiracies" in his list of "[c]rimes and statutory offenses cognizable by State or U. S. courts" and triable by martial law or military government commission. See *id.*, at 839. And, in a footnote, he cites several Civil War examples of "conspiracies of this class, *or of the first and second classes combined.*" *Id.*, at 839, n. 5 (emphasis added). The Government relies on this footnote for its contention that conspiracy was triable both as an ordinary crime (a crime of the "first class") and, independently, as a war crime (a crime of the "second class"). But the footnote will not support the weight the Government places on it.

As we have seen, the military commissions convened during the Civil War functioned at once as martial law or military government tribunals and as law-of-war commissions. See n. 27, *supra.* Accordingly, they regularly tried war crimes and ordinary crimes together. Indeed, as Howland observes, "[n]ot infrequently the crime, as charged and found, was a combination of the two species of offenses." Howland 1071; see also Davis 310, n. 2; Winthrop 842. The example he gives is "'murder in violation of the laws of war.'" Howland 1071–1072. Winthrop's

conspiracy "of the first and second classes combined" is, like Howland's example, best understood as a species of compound offense of the type tried by the hybrid military commissions of the Civil War. It is not a stand-alone offense against the law of war. Winthrop confirms this understanding later in his discussion, when he emphasizes that "*overt acts*" constituting war crimes are the only proper subject at least of those military tribunals not convened to stand in for local courts. Winthrop 841, and nn. 22, 23 (emphasis in original) (citing W. Finlason, Martial Law 130 (1867)).

JUSTICE THOMAS cites as evidence that conspiracy is a recognized violation of the law of war the Civil War indictment against Henry Wirz, which charged the defendant with "'[m]aliciously, willfully, and traitorously . . . combining, confederating, and conspiring [with others] to injure the health and destroy the lives of soldiers in the military service of the United States . . . to the end that the armies of the United States might be weakened and impaired, in violation of the laws and customs of war.'" *Post*, at 24–25 (dissenting opinion) (quoting H. R. Doc. No. 314, 55th Cong., 3d Sess., 785 (1865); emphasis deleted). As shown by the specification supporting that charge, however, Wirz was alleged to have *personally committed* a number of atrocities against his victims, including torture, injection of prisoners with poison, and use of "ferocious and bloodthirsty dogs" to "seize, tear, mangle, and maim the bodies and limbs" of prisoners, many of whom died as a result. *Id.*, at 789–790. Crucially, Judge Advocate General Holt determined that one of Wirz's alleged co-conspirators, R. B. Winder, should *not* be tried by military commission because there was as yet insufficient evidence of his own personal involvement in the atrocities: "[I]n the case of R. B. Winder, *while the evidence at the trial of Wirz was deemed by the court to implicate him in the conspiracy* against the lives of all Federal prisoners in rebel hands, *no*

*such specific overt acts of violation of the laws of war* are as yet fixed upon him as to make it expedient to prefer formal charges and bring him to trial." *Id.*, at 783 (emphases added).[37]

Finally, international sources confirm that the crime charged here is not a recognized violation of the law of war.[38] As observed above, see *supra*, at 40, none of the major treaties governing the law of war identifies conspiracy as a violation thereof. And the only "conspiracy" crimes that have been recognized by international war crimes tribunals (whose jurisdiction often extends beyond war crimes proper to crimes against humanity and crimes against the peace) are conspiracy to commit genocide and common plan to wage aggressive war, which is a crime against the peace and requires for its commission actual participation in a "concrete plan to wage war." 1 Trial of

---

[37] The other examples JUSTICE THOMAS offers are no more availing. The Civil War indictment against Robert Louden, cited *post*, at 25, alleged a conspiracy, but not one in violation of the law of war. See War Dept., General Court Martial Order No. 41, p. 20 (1864). A separate charge of "'[t]ransgression of the laws and customs of war'" made no mention of conspiracy. *Id.*, at 17. The charge against Lenger Grenfel and others for conspiring to release rebel prisoners held in Chicago only supports the observation, made in the text, that the Civil War tribunals often charged hybrid crimes mixing elements of crimes ordinarily triable in civilian courts (like treason) and violations of the law of war. Judge Advocate General Holt, in recommending that Grenfel's death sentence be upheld (it was in fact commuted by Presidential decree, see H. R. Doc. No. 314, at 725), explained that the accused "united himself with traitors and malefactors for the overthrow of our Republic in the interest of slavery." *Id.*, at 689.

[38] The Court in *Quirin* "assume[d] that there are acts regarded in other countries, or by some writers on international law, as offenses against the law of war which would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury." 317 U. S., at 29. We need not test the validity of that assumption here because the international sources only corroborate the domestic ones.

the Major War Criminals Before the International Military Tribunal: Nuremberg, 14 November 1945–1 October 1946, p. 225 (1947). The International Military Tribunal at Nuremberg, over the prosecution's objections, pointedly refused to recognize as a violation of the law of war conspiracy to commit war crimes, see, *e.g.*, 22 *id.*, at 469,[39] and convicted only Hitler's most senior associates of conspiracy to wage aggressive war, see S. Pomorski, Conspiracy and Criminal Organization, in the Nuremberg Trial and International Law 213, 233–235 (G. Ginsburgs & V. Kudriavtsev eds. 1990). As one prominent figure from the Nuremberg trials has explained, members of the Tribunal objected to recognition of conspiracy as a violation of the law of war on the ground that "[t]he Anglo-American concept of conspiracy was not part of European legal systems and arguably not an element of the internationally recognized laws of war." T. Taylor, Anatomy of the Nuremberg Trials: A Personal Memoir 36 (1992); see also *id.*, at 550 (observing that Francis Biddle, who as Attorney General prosecuted the defendants in *Quirin*, thought the French judge had made a "'persuasive argument that conspiracy in the truest sense is not known to international law'").[40]

---

[39] Accordingly, the Tribunal determined to "disregard the charges . . . that the defendants conspired to commit War Crimes and Crimes against Humanity." 22 Trial of the Major War Criminals Before the International Military Tribunal 469 (1947); see also *ibid.* ("[T]he Charter does not define as a separate crime any conspiracy except the one to commit acts of aggressive war").

[40] See also 15 United Nations War Crimes Commissions, Law Reports of Trials of War Criminals 90–91 (1949) (observing that, although a few individuals were charged with conspiracy under European domestic criminal codes following World War II, "the United States Military Tribunals" established at that time did not "recognis[e] as a separate offence conspiracy to commit war crimes or crimes against humanity"). The International Criminal Tribunal for the former Yugoslavia (ICTY), drawing on the Nuremberg precedents, has adopted a "joint criminal

In sum, the sources that the Government and JUSTICE THOMAS rely upon to show that conspiracy to violate the law of war is itself a violation of the law of war in fact demonstrate quite the opposite. Far from making the requisite substantial showing, the Government has failed even to offer a "merely colorable" case for inclusion of conspiracy among those offenses cognizable by law-of-war military commission. Cf. *Quirin*, 317 U. S., at 36. Because the charge does not support the commission's jurisdiction, the commission lacks authority to try Hamdan.

The charge's shortcomings are not merely formal, but are indicative of a broader inability on the Executive's part here to satisfy the most basic precondition—at least in the absence of specific congressional authorization—for establishment of military commissions: military necessity. Hamdan's tribunal was appointed not by a military commander in the field of battle, but by a retired major general stationed away from any active hostilities. Cf. *Rasul* v. *Bush,* 542 U. S., at 487 (KENNEDY, J., concurring in judgment) (observing that "Guantanamo Bay is . . . far removed from any hostilities"). Hamdan is charged not with an overt act for which he was caught redhanded in a theater of war and which military efficiency demands be tried expeditiously, but with an *agreement* the inception of which long predated the attacks of September 11, 2001 and the AUMF. That may well be a crime,[41] but it is not

_____

enterprise" theory of liability, but that is a species of liability for the substantive offense (akin to aiding and abetting), not a crime on its own. See *Prosecutor* v. *Tadić*, Judgment, Case No. IT–94–1–A (ICTY App. Chamber, July 15, 1999); see also *Prosecutor* v. *Milutinović*, Decision on Dragoljub Ojdanić's Motion Challenging Jurisdiction—Joint Criminal Enterprise, Case No. IT–99–37–AR72, ¶26 (ICTY App. Chamber, May 21, 2003) (stating that "[c]riminal liability pursuant to a joint criminal enterprise is not a liability for . . . conspiring to commit crimes").

[41] JUSTICE THOMAS' suggestion that our conclusion precludes the Government from bringing to justice those who conspire to commit acts of

an offense that "by the law of war may be tried by military commissio[n]." 10 U. S. C. §821. None of the overt acts alleged to have been committed in furtherance of the agreement is itself a war crime, or even necessarily occurred during time of, or in a theater of, war. Any urgent need for imposition or execution of judgment is utterly belied by the record; Hamdan was arrested in November 2001 and he was not charged until mid-2004. These simply are not the circumstances in which, by any stretch of the historical evidence or this Court's precedents, a military commission established by Executive Order under the authority of Article 21 of the UCMJ may lawfully try a person and subject him to punishment.

## VI

Whether or not the Government has charged Hamdan with an offense against the law of war cognizable by military commission, the commission lacks power to proceed. The UCMJ conditions the President's use of military commissions on compliance not only with the American common law of war, but also with the rest of the UCMJ itself, insofar as applicable, and with the "rules and precepts of the law of nations," *Quirin*, 317 U. S., at 28—including, *inter alia*, the four Geneva Conventions signed in 1949. See *Yamashita*, 327 U. S., at 20–21, 23–24. The procedures that the Government has decreed will govern Hamdan's trial by commission violate these laws.

## A

The commission's procedures are set forth in Commission Order No. 1, which was amended most recently on

---

terrorism is therefore wide of the mark. See *post*, at 8, n. 3; 28–30. That conspiracy is not a violation of the law of war triable by military commission does not mean the Government may not, for example, prosecute by court-martial or in federal court those caught "plotting terrorist atrocities like the bombing of the Khobar Towers." *Post*, at 29.

August 31, 2005—after Hamdan's trial had already begun. Every commission established pursuant to Commission Order No. 1 must have a presiding officer and at least three other members, all of whom must be commissioned officers. §4(A)(1). The presiding officer's job is to rule on questions of law and other evidentiary and interlocutory issues; the other members make findings and, if applicable, sentencing decisions. §4(A)(5). The accused is entitled to appointed military counsel and may hire civilian counsel at his own expense so long as such counsel is a U. S. citizen with security clearance "at the level SECRET or higher." §§4(C)(2)–(3).

The accused also is entitled to a copy of the charge(s) against him, both in English and his own language (if different), to a presumption of innocence, and to certain other rights typically afforded criminal defendants in civilian courts and courts-martial. See §§5(A)–(P). These rights are subject, however, to one glaring condition: The accused and his civilian counsel may be excluded from, and precluded from ever learning what evidence was presented during, any part of the proceeding that either the Appointing Authority or the presiding officer decides to "close." Grounds for such closure "include the protection of information classified or classifiable . . . ; information protected by law or rule from unauthorized disclosure; the physical safety of participants in Commission proceedings, including prospective witnesses; intelligence and law enforcement sources, methods, or activities; and other national security interests." §6(B)(3).[42] Appointed military defense counsel must be privy to these closed sessions, but may, at the presiding officer's discretion, be forbidden to reveal to his or her client what took place therein. *Ibid.*

---

[42] The accused also may be excluded from the proceedings if he "engages in disruptive conduct." §5(K).

Another striking feature of the rules governing Hamdan's commission is that they permit the admission of *any* evidence that, in the opinion of the presiding officer, "would have probative value to a reasonable person." §6(D)(1). Under this test, not only is testimonial hearsay and evidence obtained through coercion fully admissible, but neither live testimony nor witnesses' written statements need be sworn. See §§6(D)(2)(b), (3). Moreover, the accused and his civilian counsel may be denied access to evidence in the form of "protected information" (which includes classified information as well as "information protected by law or rule from unauthorized disclosure" and "information concerning other national security interests," §§6(B)(3), 6(D)(5)(a)(v)), so long as the presiding officer concludes that the evidence is "probative" under §6(D)(1) and that its admission without the accused's knowledge would not "result in the denial of a full and fair trial." §6(D)(5)(b).[43] Finally, a presiding officer's determination that evidence "would not have probative value to a reasonable person" may be overridden by a majority of the other commission members. §6(D)(1).

Once all the evidence is in, the commission members (not including the presiding officer) must vote on the accused's guilt. A two-thirds vote will suffice for both a verdict of guilty and for imposition of any sentence not including death (the imposition of which requires a unanimous vote). §6(F). Any appeal is taken to a three-member review panel composed of military officers and designated by the Secretary of Defense, only one member of which need have

---

[43] As the District Court observed, this section apparently permits reception of testimony from a confidential informant in circumstances where "Hamdan will not be permitted to hear the testimony, see the witness's face, or learn his name. If the government has information developed by interrogation of witnesses in Afghanistan or elsewhere, it can offer such evidence in transcript form, or even as summaries of transcripts." 344 F. Supp. 2d 152, 168 (DC 2004).

experience as a judge. §6(H)(4). The review panel is directed to "disregard any variance from procedures specified in this Order or elsewhere that would not materially have affected the outcome of the trial before the Commission." *Ibid.* Once the panel makes its recommendation to the Secretary of Defense, the Secretary can either remand for further proceedings or forward the record to the President with his recommendation as to final disposition. §6(H)(5). The President then, unless he has delegated the task to the Secretary, makes the "final decision." §6(H)(6). He may change the commission's findings or sentence only in a manner favorable to the accused. *Ibid.*

B

Hamdan raises both general and particular objections to the procedures set forth in Commission Order No. 1. His general objection is that the procedures' admitted deviation from those governing courts-martial itself renders the commission illegal. Chief among his particular objections are that he may, under the Commission Order, be convicted based on evidence he has not seen or heard, and that any evidence admitted against him need not comply with the admissibility or relevance rules typically applicable in criminal trials and court-martial proceedings.

The Government objects to our consideration of any procedural challenge at this stage on the grounds that (1) the abstention doctrine espoused in *Councilman*, 420 U. S. 738, precludes pre-enforcement review of procedural rules, (2) Hamdan will be able to raise any such challenge following a "final decision" under the DTA, and (3) "there is . . . no basis to presume, before the trial has even commenced, that the trial will not be conducted in good faith and according to law." Brief for Respondents 45–46, nn. 20–21. The first of these contentions was disposed of in Part III, *supra*, and neither of the latter two is sound.

First, because Hamdan apparently is not subject to the

death penalty (at least as matters now stand) and may receive a sentence shorter than 10 years' imprisonment, he has no automatic right to review of the commission's "final decision"[44] before a federal court under the DTA. See §1005(e)(3), 119 Stat. 2743. Second, contrary to the Government's assertion, there *is* a "basis to presume" that the procedures employed during Hamdan's trial will violate the law: The procedures are described with particularity in Commission Order No. 1, and implementation of some of them has already occurred. One of Hamdan's complaints is that he will be, and *indeed already has been*, excluded from his own trial. See Reply Brief for Petitioner 12; App. to Pet. for Cert. 45a. Under these circumstances, review of the procedures in advance of a "final decision"— the timing of which is left entirely to the discretion of the President under the DTA—is appropriate. We turn, then, to consider the merits of Hamdan's procedural challenge.

C

In part because the difference between military commissions and courts-martial originally was a difference of jurisdiction alone, and in part to protect against abuse and ensure evenhandedness under the pressures of war, the procedures governing trials by military commission historically have been the same as those governing courts-martial. See, *e.g.*, 1 The War of the Rebellion 248 (2d series 1894) (General Order 1 issued during the Civil War required military commissions to "be constituted in a similar manner and their proceedings be conducted according to the same general rules as courts-martial in order to prevent abuses which might otherwise arise"). Accounts of commentators from Winthrop through General Crowder—who drafted Article of War 15 and whose

––––––––––

[44] Any decision of the commission is not "final" until the President renders it so. See Commission Order No. 1 §6(H)(6).

views have been deemed "authoritative" by this Court, *Madsen*, 343 U. S., at 353—confirm as much.[45] As recently as the Korean and Vietnam wars, during which use of military commissions was contemplated but never made, the principle of procedural parity was espoused as a background assumption. See Paust, Antiterrorism Military Commissions: Courting Illegality, 23 Mich. J. Int'l L. 1, 3–5 (2001–2002).

There is a glaring historical exception to this general rule. The procedures and evidentiary rules used to try General Yamashita near the end of World War II deviated in significant respects from those then governing courts-martial. See 327 U. S. 1. The force of that precedent, however, has been seriously undermined by post-World War II developments.

Yamashita, from late 1944 until September 1945, was Commanding General of the Fourteenth Army Group of the Imperial Japanese Army, which had exercised control over the Philippine Islands. On September 3, 1945, after American forces regained control of the Philippines, Yamashita surrendered. Three weeks later, he was charged with violations of the law of war. A few weeks after that, he was arraigned before a military commission convened in the Philippines. He pleaded not guilty, and his trial lasted for two months. On December 7, 1945, Yamashita was convicted and sentenced to hang. See *id.*, at 5; *id.*, at 31–34 (Murphy, J., dissenting). This Court upheld the

--------

[45] See Winthrop 835, and n. 81 ("military commissions are constituted and composed, and their proceedings are conducted, similarly to general courts-martial"); *id.*, at 841–842; S. Rep. No. 130, 64th Cong., 1st Sess., 40 (1916) (testimony of Gen. Crowder) ("Both classes of courts have the same procedure"); see also, *e.g.*, H. Coppée, Field Manual of Courts-Martial, p. 104 (1863) ("[Military] commissions are appointed by the same authorities as those which may order courts-martial. They are constituted in a manner similar to such courts, and their proceedings are conducted in exactly the same way, as to form, examination of witnesses, etc.").

denial of his petition for a writ of habeas corpus.

The procedures and rules of evidence employed during Yamashita's trial departed so far from those used in courts-martial that they generated an unusually long and vociferous critique from two Members of this Court. See *id.*, at 41–81 (Rutledge, J., joined by Murphy, J., dissenting).[46] Among the dissenters' primary concerns was that the commission had free rein to consider all evidence "which in the commission's opinion 'would be of assistance in proving or disproving the charge,' without any of the usual modes of authentication." *Id.*, at 49 (Rutledge, J.).

The majority, however, did not pass on the merits of Yamashita's procedural challenges because it concluded that his status disentitled him to any protection under the Articles of War (specifically, those set forth in Article 38, which would become Article 36 of the UCMJ) or the Geneva Convention of 1929, 47 Stat. 2021 (1929 Geneva Convention). The Court explained that Yamashita was neither a "person made subject to the Articles of War by Article 2" thereof, 327 U. S., at 20, nor a protected prisoner of war being tried for crimes committed during his detention, *id.*, at 21.

At least partially in response to subsequent criticism of General Yamashita's trial, the UCMJ's codification of the Articles of War after World War II expanded the category of persons subject thereto to include defendants in Yama-

―――――――

[46] The dissenters' views are summarized in the following passage:

"It is outside our basic scheme to condemn men without giving reasonable opportunity for preparing defense; in capital or other serious crimes to convict on 'official documents . . .; affidavits; . . . documents or translations thereof; diaries . . ., photographs, motion picture films, and . . . newspapers" or on hearsay, once, twice or thrice removed, more particularly when the documentary evidence or some of it is prepared *ex parte* by the prosecuting authority and includes not only opinion but conclusions of guilt. Nor in such cases do we deny the rights of confrontation of witnesses and cross-examination." *Yamashita,* 327 U. S., at 44 (footnotes omitted).

shita's (and Hamdan's) position,[47] and the Third Geneva Convention of 1949 extended prisoner-of-war protections to individuals tried for crimes committed before their capture. See 3 Int'l Comm. of Red Cross,[48] Commentary: Geneva Convention Relative to the Treatment of Prisoners of War 413 (1960) (hereinafter GCIII Commentary) (explaining that Article 85, which extends the Convention's protections to "[p]risoners of war prosecuted under the laws of the Detaining Power for acts committed prior to capture," was adopted in response to judicial interpretations of the 1929 Convention, including this Court's decision in *Yamashita*). The most notorious exception to the principle of uniformity, then, has been stripped of its precedential value.

The uniformity principle is not an inflexible one; it does not preclude all departures from the procedures dictated for use by courts-martial. But any departure must be tailored to the exigency that necessitates it. See Winthrop 835, n. 81. That understanding is reflected in Article 36 of the UCMJ, which provides:

_____

[47] Article 2 of the UCMJ now reads:

"(a) The following persons are subject to [the UCMJ]:

"(9) Prisoners of war in custody of the armed forces.

"(12) Subject to any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, persons within an area leased by or otherwise reserved or acquired for the use of the United States which is under the control of the Secretary concerned and which is outside the United States and outside the Commonwealth of Puerto Rico, Guam, and the Virgin Islands." 10 U. S. C. §802(a).

Guantanamo Bay is such a leased area. See *Rasul* v. *Bush,* 542 U. S. 466, 471 (2004).

[48] The International Committee of the Red Cross is referred to by name in several provisions of the 1949 Geneva Conventions and is the body that drafted and published the official commentary to the Conventions. Though not binding law, the commentary is, as the parties recognize, relevant in interpreting the Conventions' provisions.

"(a) The procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter.

"(b) All rules and regulations made under this article shall be uniform insofar as practicable and shall be reported to Congress." 70A Stat. 50.

Article 36 places two restrictions on the President's power to promulgate rules of procedure for courts-martial and military commissions alike. First, no procedural rule he adopts may be "contrary to or inconsistent with" the UCMJ—however practical it may seem. Second, the rules adopted must be "uniform insofar as practicable." That is, the rules applied to military commissions must be the same as those applied to courts-martial unless such uniformity proves impracticable.

Hamdan argues that Commission Order No. 1 violates both of these restrictions; he maintains that the procedures described in the Commission Order are inconsistent with the UCMJ and that the Government has offered no explanation for their deviation from the procedures governing courts-martial, which are set forth in the Manual for Courts-Martial, United States (2005 ed.) (Manual for Courts-Martial). Among the inconsistencies Hamdan identifies is that between §6 of the Commission Order, which permits exclusion of the accused from proceedings and denial of his access to evidence in certain circumstances, and the UCMJ's requirement that "[a]ll . . . proceedings" other than votes and deliberations by courts-martial "shall be made a part of the record and shall be in

the presence of the accused." 10 U. S. C. A. §839(c) (Supp. 2006). Hamdan also observes that the Commission Order dispenses with virtually all evidentiary rules applicable in courts-martial.

The Government has three responses. First, it argues, only 9 of the UCMJ's 158 Articles—the ones that expressly mention "military commissions"[49]—actually apply to commissions, and Commission Order No. 1 sets forth no procedure that is "contrary to or inconsistent with" those 9 provisions. Second, the Government contends, military commissions would be of no use if the President were hamstrung by those provisions of the UCMJ that govern courts-martial. Finally, the President's determination that "the danger to the safety of the United States and the nature of international terrorism" renders it impracticable "to apply in military commissions . . . the principles of law and rules of evidence generally recognized in the trial of criminal cases in the United States district courts," November 13 Order §1(f), is, in the Government's view, explanation enough for any deviation from court-martial procedures. See Brief for Respondents 43–47, and n. 22.

---

[49] Aside from Articles 21 and 36, discussed at length in the text, the other seven Articles that expressly reference military commissions are: (1) 28 (requiring appointment of reporters and interpreters); (2) 47 (making it a crime to refuse to appear or testify "before a court-martial, military commission, court of inquiry, or any other military court or board"); (3) 48 (allowing a "court-martial, provost court, or military commission" to punish a person for contempt); (4) 49(d) (permitting admission into evidence of a "duly authenticated deposition taken upon reasonable notice to the other parties" *only* if "admissible under the rules of evidence" and *only* if the witness is otherwise unavailable); (5) 50 (permitting admission into evidence of records of courts of inquiry "if otherwise admissible under the rules of evidence," and if certain other requirements are met); (6) 104 (providing that a person accused of aiding the enemy may be sentenced to death or other punishment by military commission or court-martial); and (7) 106 (mandating the death penalty for spies convicted before military commission or court-martial).

Hamdan has the better of this argument. Without reaching the question whether any provision of Commission Order No. 1 is strictly "contrary to or inconsistent with" other provisions of the UCMJ, we conclude that the "practicability" determination the President has made is insufficient to justify variances from the procedures governing courts-martial. Subsection (b) of Article 36 was added after World War II, and requires a different showing of impracticability from the one required by subsection (a). Subsection (a) requires that the rules the President promulgates for courts-martial, provost courts, and military commissions alike conform to those that govern procedures in *Article III courts*, "so far as *he considers* practicable." 10 U. S. C. §836(a) (emphasis added). Subsection (b), by contrast, demands that the rules applied in courts-martial, provost courts, and military commissions— whether or not they conform with the Federal Rules of Evidence—be "uniform *insofar as practicable*." §836(b) (emphasis added). Under the latter provision, then, the rules set forth in the Manual for Courts-Martial must apply to military commissions unless impracticable.[50]

The President here has determined, pursuant to subsection (a), that it is impracticable to apply the rules and principles of law that govern "the trial of criminal cases in

_____

[50] JUSTICE THOMAS relies on the legislative history of the UCMJ to argue that Congress' adoption of Article 36(b) in the wake of World War II was "motivated" solely by a desire for "uniformity across the separate branches of the armed services." *Post*, at 35. But even if Congress was concerned with ensuring uniformity across service branches, that does not mean it did not also intend to codify the longstanding practice of procedural parity between courts-martial and other military tribunals. Indeed, the suggestion that Congress did *not* intend uniformity across tribunal types is belied by the textual proximity of subsection (a) (which requires that the rules governing criminal trials in federal district courts apply, absent the President's determination of impracticability, to courts-martial, provost courts, and *military commissions* alike) and subsection (b) (which imposes the uniformity requirement).

the United States district courts," §836(a), to Hamdan's commission. We assume that complete deference is owed that determination. The President has not, however, made a similar official determination that it is impracticable to apply the rules for courts-martial.[51] And even if subsection (b)'s requirements may be satisfied without such an official determination, the requirements of that subsection are not satisfied here.

Nothing in the record before us demonstrates that it would be impracticable to apply court-martial rules in this case. There is no suggestion, for example, of any logistical difficulty in securing properly sworn and authenticated evidence or in applying the usual principles of relevance and admissibility. Assuming *arguendo* that the reasons articulated in the President's Article 36(a) determination ought to be considered in evaluating the impracticability of applying court-martial rules, the only reason offered in support of that determination is the danger posed by international terrorism.[52] Without for one moment underestimating that danger, it is not evident to us why it

_____

[51] We may assume that such a determination would be entitled to a measure of deference. For the reasons given by JUSTICE KENNEDY, see *post*, at 5 (opinion concurring in part), however, the level of deference accorded to a determination made under subsection (b) presumably would not be as high as that accorded to a determination under subsection (a).

[52] JUSTICE THOMAS looks not to the President's official Article 36(a) determination, but instead to press statements made by the Secretary of Defense and the Under Secretary of Defense for Policy. See *post*, at 36–38 (dissenting opinion). We have not heretofore, in evaluating the legality of Executive action, deferred to comments made by such officials to the media. Moreover, the only additional reason the comments provide—aside from the general danger posed by international terrorism—for departures from court-martial procedures is the need to protect classified information. As we explain in the text, and as JUSTICE KENNEDY elaborates in his separate opinion, the structural and procedural defects of Hamdan's commission extend far beyond rules preventing access to classified information.

should require, in the case of Hamdan's trial, any variance from the rules that govern courts-martial.

The absence of any showing of impracticability is particularly disturbing when considered in light of the clear and admitted failure to apply one of the most fundamental protections afforded not just by the Manual for Courts-Martial but also by the UCMJ itself: the right to be present. See 10 U. S. C. A. §839(c) (Supp. 2006). Whether or not that departure technically is "contrary to or inconsistent with" the terms of the UCMJ, 10 U. S. C. §836(a), the jettisoning of so basic a right cannot lightly be excused as "practicable."

Under the circumstances, then, the rules applicable in courts-martial must apply. Since it is undisputed that Commission Order No. 1 deviates in many significant respects from those rules, it necessarily violates Article 36(b).

The Government's objection that requiring compliance with the court-martial rules imposes an undue burden both ignores the plain meaning of Article 36(b) and misunderstands the purpose and the history of military commissions. The military commission was not born of a desire to dispense a more summary form of justice than is afforded by courts-martial; it developed, rather, as a tribunal of necessity to be employed when courts-martial lacked jurisdiction over either the accused or the subject matter. See Winthrop 831. Exigency lent the commission its legitimacy, but did not further justify the wholesale jettisoning of procedural protections. That history explains why the military commission's procedures typically have been the ones used by courts-martial. That the jurisdiction of the two tribunals today may sometimes overlap, see *Madsen*, 343 U. S., at 354, does not detract from the force of this history;[53] Article 21 did not trans-

_____

[53]JUSTICE THOMAS relies extensively on *Madsen* for the proposition

form the military commission from a tribunal of true
exigency into a more convenient adjudicatory tool. Article
36, confirming as much, strikes a careful balance between
uniform procedure and the need to accommodate exigen-
cies that may sometimes arise in a theater of war. That
Article not having been complied with here, the rules
specified for Hamdan's trial are illegal.[54]

D

The procedures adopted to try Hamdan also violate the
Geneva Conventions. The Court of Appeals dismissed
Hamdan's Geneva Convention challenge on three inde-
pendent grounds: (1) the Geneva Conventions are not judi-
cially enforceable; (2) Hamdan in any event is not entitled
to their protections; and (3) even if he is entitled to their
protections, *Councilman* abstention is appropriate. Judge
Williams, concurring, rejected the second ground but
agreed with the majority respecting the first and the last.
As we explained in Part III, *supra*, the abstention rule
applied in *Councilman*, 420 U. S. 738, is not applicable
here.[55]   And for the reasons that follow, we hold that

that the President has free rein to set the procedures that govern
military commissions. See *post*, at 30, 31, 33, n. 16, 34, and 45. That
reliance is misplaced. Not only did *Madsen* not involve a law-of-war
military commission, but (1) the petitioner there did not challenge the
procedures used to try her, (2) the UCMJ, with its new Article 36(b),
did not become effective until May 31, 1951, *after* the petitioner's trial,
see 343 U. S., at 345, n. 6, and (3) the procedures used to try the peti-
tioner actually afforded *more* protection than those used in courts-
martial, see *id.*, at 358–360; see also *id.*, at 358 ("[T]he Military Gov-
ernment Courts for Germany . . . have had a less military character
than that of courts-martial").

[54] Prior to the enactment of Article 36(b), it may well have been the
case that a deviation from the rules governing courts-martial would not
have rendered the military commission "'*illegal*.'" *Post*, at 30–31, n. 16
(THOMAS, J., dissenting) (quoting Winthrop 841). Article 36(b), how-
ever, imposes a statutory command that must be heeded.

[55] JUSTICE THOMAS makes the different argument that Hamdan's

Opinion of the Court

neither of the other grounds the Court of Appeals gave for its decision is persuasive.

i

The Court of Appeals relied on *Johnson* v. *Eisentrager,* 339 U. S. 763 (1950), to hold that Hamdan could not invoke the Geneva Conventions to challenge the Government's plan to prosecute him in accordance with Commission Order No. 1. *Eisentrager* involved a challenge by 21 German nationals to their 1945 convictions for war crimes by a military tribunal convened in Nanking, China, and to their subsequent imprisonment in occupied Germany. The petitioners argued, *inter alia*, that the 1929 Geneva Convention rendered illegal some of the procedures employed during their trials, which they said deviated impermissibly from the procedures used by courts-martial to try American soldiers. See *id.*, at 789. We rejected that claim on the merits because the petitioners (unlike Hamdan here) had failed to identify any prejudicial disparity "between the Commission that tried [them] and those that would try an offending soldier of the American forces of like rank," and in any event could claim no protection, under the 1929 Convention, during trials for crimes that occurred before their confinement as prisoners of war. *Id.*, at 790.[56]

Buried in a footnote of the opinion, however, is this curious statement suggesting that the Court lacked power even to consider the merits of the Geneva Convention argument:

---

Geneva Convention challenge is not yet "ripe" because he has yet to be sentenced. See *post*, at 43–45. This is really just a species of the abstention argument we have already rejected. See Part III, *supra*. The text of the Geneva Conventions does not direct an accused to wait until sentence is imposed to challenge the legality of the tribunal that is to try him.

[56] As explained in Part VI–C, *supra*, that is no longer true under the 1949 Conventions.

"We are not holding that these prisoners have no right which the military authorities are bound to respect. The United States, by the Geneva Convention of July 27, 1929, 47 Stat. 2021, concluded with forty-six other countries, including the German Reich, an agreement upon the treatment to be accorded captives. These prisoners claim to be and are entitled to its protection. It is, however, the obvious scheme of the Agreement that responsibility for observance and enforcement of these rights is upon political and military authorities. Rights of alien enemies are vindicated under it only through protests and intervention of protecting powers as the rights of our citizens against foreign governments are vindicated only by Presidential intervention." *Id.*, at 789, n. 14.

The Court of Appeals, on the strength of this footnote, held that "the 1949 Geneva Convention does not confer upon Hamdan a right to enforce its provisions in court." 415 F. 3d, at 40.

Whatever else might be said about the *Eisentrager* footnote, it does not control this case. We may assume that "the obvious scheme" of the 1949 Conventions is identical in all relevant respects to that of the 1929 Convention,[57] and even that that scheme would, absent some other provision of law, preclude Hamdan's invocation of the Convention's provisions as an independent source of law binding the Government's actions and furnishing petitioner with any enforceable right.[58] For, regardless of

---

[57] But see, *e.g.*, 4 Int'l Comm. of Red Cross, Commentary: Geneva Convention Relative to the Protection of Civilian Persons in Time of War 21 (1958) (hereinafter GCIV Commentary) (the 1949 Geneva Conventions were written "first and foremost to protect individuals, and not to serve State interests"); GCIII Commentary 91 ("It was not . . . until the Conventions of 1949 . . . that the existence of 'rights' conferred in prisoners of war was affirmed").

[58] But see generally Brief for Louis Henkin et al. as *Amici Curiae;* 1

the nature of the rights conferred on Hamdan, cf. *United States* v. *Rauscher,* 119 U. S. 407 (1886), they are, as the Government does not dispute, part of the law of war. See *Hamdi,* 542 U. S., at 520–521 (plurality opinion). And compliance with the law of war is the condition upon which the authority set forth in Article 21 is granted.

ii

For the Court of Appeals, acknowledgment of that condition was no bar to Hamdan's trial by commission. As an alternative to its holding that Hamdan could not invoke the Geneva Conventions at all, the Court of Appeals concluded that the Conventions did not in any event apply to the armed conflict during which Hamdan was captured. The court accepted the Executive's assertions that Hamdan was captured in connection with the United States' war with al Qaeda and that that war is distinct from the war with the Taliban in Afghanistan. It further reasoned that the war with al Qaeda evades the reach of the Geneva Conventions. See 415 F. 3d, at 41–42. We, like Judge Williams, disagree with the latter conclusion.

The conflict with al Qaeda is not, according to the Government, a conflict to which the full protections afforded detainees under the 1949 Geneva Conventions apply because Article 2 of those Conventions (which appears in all four Conventions) renders the full protections applicable only to "all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties." 6 U. S. T., at 3318.[59] Since Hamdan

—————

Int'l Comm. for the Red Cross, Commentary: Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field 84 (1952) ("It should be possible in States which are parties to the Convention . . . for the rules of the Convention to be evoked before an appropriate national court by the protected person who has suffered a violation"); GCII Commentary 92; GCIV Commentary 79.

[59] For convenience's sake, we use citations to the Third Geneva Convention only.

was captured and detained incident to the conflict with al Qaeda and not the conflict with the Taliban, and since al Qaeda, unlike Afghanistan, is not a "High Contracting Party"—*i.e.*, a signatory of the Conventions, the protections of those Conventions are not, it is argued, applicable to Hamdan.[60]

We need not decide the merits of this argument because there is at least one provision of the Geneva Conventions that applies here even if the relevant conflict is not one between signatories.[61] Article 3, often referred to as Common Article 3 because, like Article 2, it appears in all four Geneva Conventions, provides that in a "conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party[62] to the conflict shall be bound to apply, as a minimum," certain provisions protecting "[p]ersons taking no active part in the hostilities, including members of armed forces who have laid

---

[60] The President has stated that the conflict with the Taliban is a conflict to which the Geneva Conventions apply. See White House Memorandum, Humane Treatment of Taliban and al Qaeda Detainees 2 (Feb. 7, 2002), available at http://www.justicescholars.org/pegc/archive/White_House/bush_memo_20020207_ed.pdf (hereinafter White House Memorandum).

[61] Hamdan observes that Article 5 of the Third Geneva Convention requires that if there be "any doubt" whether he is entitled to prisoner-of-war protections, he must be afforded those protections until his status is determined by a "competent tribunal." 6 U. S. T., at 3324. See also Headquarters Depts. of Army, Navy, Air Force, and Marine Corps, Army Regulation 190–8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees (1997), App. 116. Because we hold that Hamdan may not, in any event, be tried by the military commission the President has convened pursuant to the November 13 Order and Commission Order No. 1, the question whether his potential status as a prisoner of war independently renders illegal his trial by military commission may be reserved.

[62] The term "Party" here has the broadest possible meaning; a Party need neither be a signatory of the Convention nor "even represent a legal entity capable of undertaking international obligations." GCIII Commentary 37.

down their arms and those placed *hors de combat* by . . . detention." *Id.*, at 3318. One such provision prohibits "the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Ibid.*

The Court of Appeals thought, and the Government asserts, that Common Article 3 does not apply to Hamdan because the conflict with al Qaeda, being "'international in scope,'" does not qualify as a "'conflict not of an international character.'" 415 F. 3d, at 41. That reasoning is erroneous. The term "conflict not of an international character" is used here in contradistinction to a conflict between nations. So much is demonstrated by the "fundamental logic [of] the Convention's provisions on its application." *Id.*, at 44 (Williams, J., concurring). Common Article 2 provides that "the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties." 6 U. S. T., at 3318 (Art. 2, ¶1). High Contracting Parties (signatories) also must abide by all terms of the Conventions vis-à-vis one another even if one party to the conflict is a nonsignatory "Power," and must so abide vis-à-vis the nonsignatory if "the latter accepts and applies" those terms. *Ibid.* (Art. 2, ¶3). Common Article 3, by contrast, affords some minimal protection, falling short of full protection under the Conventions, to individuals associated with neither a signatory nor even a nonsignatory "Power" who are involved in a conflict "in the territory of" a signatory. The latter kind of conflict is distinguishable from the conflict described in Common Article 2 chiefly because it does not involve a clash between nations (whether signatories or not). In context, then, the phrase "not of an international character" bears its literal meaning. See, *e.g.*, J. Bentham, Introduction to

the Principles of Morals and Legislation 6, 296 (J. Burns & H. Hart eds. 1970) (using the term "international law" as a "new though not inexpressive appellation" meaning "betwixt nation and nation"; defining "international" to include "mutual transactions between sovereigns as such"); Commentary on the Additional Protocols to the Geneva Conventions of 12 August 1949, p. 1351 (1987) ("[A] non-international armed conflict is distinct from an international armed conflict because of the legal status of the entities opposing each other").

Although the official commentaries accompanying Common Article 3 indicate that an important purpose of the provision was to furnish minimal protection to rebels involved in one kind of "conflict not of an international character," *i.e.*, a civil war, see GCIII Commentary 36–37, the commentaries also make clear "that the scope of the Article must be as wide as possible," *id.*, at 36.[63]  In fact, limiting language that would have rendered Common Article 3 applicable "especially [to] cases of civil war, colonial conflicts, or wars of religion," was omitted from the final version of the Article, which coupled broader scope of application with a narrower range of rights than did earlier proposed iterations.  See GCIII Commentary 42–43.

––––––––––

[63] See also GCIII Commentary 35 (Common Article 3 "has the merit of being simple and clear. . . . Its observance does not depend upon preliminary discussions on the nature of the conflict"); GCIV Commentary 51 ("[N]obody in enemy hands can be outside the law"); U. S. Army Judge Advocate General's Legal Center and School, Dept. of the Army, Law of War Handbook 144 (2004) (Common Article 3 "serves as a 'minimum yardstick of protection in all conflicts, not just internal armed conflicts'" (quoting *Nicaragua* v. *United States*, 1986 I. C. J. 14, ¶218, 25 I. L. M. 1023)); *Prosecutor* v. *Tadić*, Case No. IT–94–1, Decision on the Defence Motion for Interlocutory Appeal on Jurisdiction, ¶102 (ICTY App. Chamber, Oct. 2, 1995) (stating that "the character of the conflict is irrelevant" in deciding whether Common Article 3 applies).

### iii

Common Article 3, then, is applicable here and, as indicated above, requires that Hamdan be tried by a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 6 U. S. T., at 3320 (Art. 3, ¶1(d)). While the term "regularly constituted court" is not specifically defined in either Common Article 3 or its accompanying commentary, other sources disclose its core meaning. The commentary accompanying a provision of the Fourth Geneva Convention, for example, defines "'regularly constituted'" tribunals to include "ordinary military courts" and "definitely exclud[e] all special tribunals." GCIV Commentary 340 (defining the term "properly constituted" in Article 66, which the commentary treats as identical to "regularly constituted");[64] see also *Yamashita*, 327 U. S., at 44 (Rutledge, J., dissenting) (describing military commission as a court "specially constituted for a particular trial"). And one of the Red Cross' own treatises defines "regularly constituted court" as used in Common Article 3 to mean "established and organized in accordance with the laws and procedures already in force in a country." Int'l Comm. of Red Cross, 1 Customary International Humanitarian Law 355 (2005); see also GCIV Commentary 340 (observing that "ordinary military courts" will "be set up in accordance with the recognized principles governing the administration of justice").

The Government offers only a cursory defense of Hamdan's military commission in light of Common Article 3. See Brief for Respondents 49–50. As JUSTICE KENNEDY explains, that defense fails because "[t]he regular military courts in our system are the courts-martial established by

---

[64] The commentary's assumption that the terms "properly constituted" and "regularly constituted" are interchangeable is beyond reproach; the French version of Article 66, which is equally authoritative, uses the term "régulièrement constitués" in place of "properly constituted."

congressional statutes." *Post*, at 8 (opinion concurring in part). At a minimum, a military commission "can be 'regularly constituted' by the standards of our military justice system only if some practical need explains deviations from court-martial practice." *Post*, at 10. As we have explained, see Part VI–C, *supra*, no such need has been demonstrated here.[65]

iv

Inextricably intertwined with the question of regular constitution is the evaluation of the procedures governing the tribunal and whether they afford "all the judicial guarantees which are recognized as indispensable by civilized peoples." 6 U. S. T., at 3320 (Art. 3, ¶1(d)). Like the phrase "regularly constituted court," this phrase is not defined in the text of the Geneva Conventions. But it must be understood to incorporate at least the barest of those trial protections that have been recognized by customary international law. Many of these are described in Article 75 of Protocol I to the Geneva Conventions of 1949, adopted in 1977 (Protocol I). Although the United States declined to ratify Protocol I, its objections were not to Article 75 thereof. Indeed, it appears that the Government "regard[s] the provisions of Article 75 as an articulation of safeguards to which all persons in the hands of an enemy are entitled." Taft, The Law of Armed Conflict After 9/11: Some Salient Features, 28 Yale J. Int'l L. 319, 322 (2003). Among the rights set forth in Article 75 is the "right to be tried in [one's] presence." Protocol I, Art. 75(4)(e).[66]

───────────

[65] Further evidence of this tribunal's irregular constitution is the fact that its rules and procedures are subject to change midtrial, at the whim of the Executive. See Commission Order No. 1, §11 (providing that the Secretary of Defense may change the governing rules "from time to time").

[66] Other international instruments to which the United States is a

Opinion of STEVENS, J.

We agree with JUSTICE KENNEDY that the procedures adopted to try Hamdan deviate from those governing courts-martial in ways not justified by any "evident practical need," *post*, at 11, and for that reason, at least, fail to afford the requisite guarantees. See *post*, at 8, 11–17. We add only that, as noted in Part VI–A, *supra*, various provisions of Commission Order No. 1 dispense with the principles, articulated in Article 75 and indisputably part of the customary international law, that an accused must, absent disruptive conduct or consent, be present for his trial and must be privy to the evidence against him. See §§6(B)(3), (D).[67] That the Government has a compelling interest in

————————

signatory include the same basic protections set forth in Article 75. See, *e.g.*, International Covenant on Civil and Political Rights, Art. 14, ¶3(*d*), Mar. 23, 1976, 999 U. N. T. S. 171 (setting forth the right of an accused "[t]o be tried in his presence, and to defend himself in person or through legal assistance of his own choosing"). Following World War II, several defendants were tried and convicted by military commission for violations of the law of war in their failure to afford captives fair trials before imposition and execution of sentence. In two such trials, the prosecutors argued that the defendants' failure to apprise accused individuals of all evidence against them constituted violations of the law of war. See 5 U. N. War Crimes Commission 30 (trial of Sergeant-Major Shigeru Ohashi), 75 (trial of General Tanaka Hisakasu).

[67] The Government offers no defense of these procedures other than to observe that the defendant may not be barred from access to evidence if such action would deprive him of a "full and fair trial." Commission Order No. 1, §6(D)(5)(b). But the Government suggests no circumstances in which it would be "fair" to convict the accused based on evidence he has not seen or heard. Cf. *Crawford* v. *Washington,* 541 U. S. 36, 49 (2004) ("'It is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine'" (quoting *State* v. *Webb*, 2 N. C. 103, 104 (Super. L. & Eq. 1794) *(per curiam)*); *Diaz* v. *United States,* 223 U. S. 442, 455 (1912) (describing the right to be present as "scarcely less important to the accused than the right of trial itself"); *Lewis* v. *United States,* 146 U. S. 370, 372 (1892) (exclusion of defendant from part of proceedings is "contrary to the dictates of humanity" (internal quotation marks omitted)); *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123, 170, n. 17, 171 (1951) (Frankfurter, J., concurring) ("[t]he

denying Hamdan access to certain sensitive information is
not doubted.  Cf. *post*, at 47–48 (THOMAS, J., dissenting).
But, at least absent express statutory provision to the
contrary, information used to convict a person of a crime
must be disclosed to him.

v

Common Article 3 obviously tolerates a great degree of
flexibility in trying individuals captured during armed
conflict; its requirements are general ones, crafted to
accommodate a wide variety of legal systems.  But *re-
quirements* they are nonetheless.  The commission that
the President has convened to try Hamdan does not meet
those requirements.

VII

We have assumed, as we must, that the allegations
made in the Government's charge against Hamdan are
true.  We have assumed, moreover, the truth of the mes-
sage implicit in that charge—viz., that Hamdan is a dan-
gerous individual whose beliefs, if acted upon, would cause
great harm and even death to innocent civilians, and who
would act upon those beliefs if given the opportunity.  It
bears emphasizing that Hamdan does not challenge, and
we do not today address, the Government's power to de-
tain him for the duration of active hostilities in order to
prevent such harm.  But in undertaking to try Hamdan
and subject him to criminal punishment, the Executive is
bound to comply with the Rule of Law that prevails in this
jurisdiction.

The judgment of the Court of Appeals is reversed, and

---

plea that evidence of guilt must be secret is abhorrent to free men"
(internal quotation marks omitted)).  More fundamentally, the legality
of a tribunal under Common Article 3 cannot be established by bare
assurances that, whatever the character of the court or the procedures
it follows, individual adjudicators will act fairly.

the case is remanded for further proceedings.

*It is so ordered.*

THE CHIEF JUSTICE took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 05–184

SALIM AHMED HAMDAN, PETITIONER *v.* DONALD
H. RUMSFELD, SECRETARY OF DEFENSE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 29, 2006]

JUSTICE BREYER, with whom JUSTICE KENNEDY,
JUSTICE SOUTER, and JUSTICE GINSBURG join, concurring.

The dissenters say that today's decision would "sorely
hamper the President's ability to confront and defeat a
new and deadly enemy." *Post*, at 29 (opinion of THOMAS,
J.). They suggest that it undermines our Nation's ability
to "preven[t] future attacks" of the grievous sort that we
have already suffered. *Post*, at 48. That claim leads me to
state briefly what I believe the majority sets forth both
explicitly and implicitly at greater length. The Court's
conclusion ultimately rests upon a single ground: Congress
has not issued the Executive a "blank check." Cf. *Hamdi*
v. *Rumsfeld,* 542 U. S. 507, 536 (2004) (plurality opinion).
Indeed, Congress has denied the President the legisla-
tive authority to create military commissions of the kind
at issue here. Nothing prevents the President from re-
turning to Congress to seek the authority he believes
necessary.

Where, as here, no emergency prevents consultation
with Congress, judicial insistence upon that consultation
does not weaken our Nation's ability to deal with danger.
To the contrary, that insistence strengthens the Nation's
ability to determine—through democratic means—how
best to do so. The Constitution places its faith in those
democratic means. Our Court today simply does the same.

# SUPREME COURT OF THE UNITED STATES

No. 05–184

SALIM AHMED HAMDAN, PETITIONER *v.* DONALD
H. RUMSFELD, SECRETARY OF DEFENSE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 29, 2006]

JUSTICE KENNEDY, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join as to Parts I and II, concurring in part.

Military Commission Order No. 1, which governs the military commission established to try petitioner Salim Hamdan for war crimes, exceeds limits that certain statutes, duly enacted by Congress, have placed on the President's authority to convene military courts. This is not a case, then, where the Executive can assert some unilateral authority to fill a void left by congressional inaction. It is a case where Congress, in the proper exercise of its powers as an independent branch of government, and as part of a long tradition of legislative involvement in matters of military justice, has considered the subject of military tribunals and set limits on the President's authority. Where a statute provides the conditions for the exercise of governmental power, its requirements are the result of a deliberative and reflective process engaging both of the political branches. Respect for laws derived from the customary operation of the Executive and Legislative Branches gives some assurance of stability in time of crisis. The Constitution is best preserved by reliance on standards tested over time and insulated from the pressures of the moment.

These principles seem vindicated here, for a case that

may be of extraordinary importance is resolved by ordinary rules. The rules of most relevance here are those pertaining to the authority of Congress and the interpretation of its enactments.

It seems appropriate to recite these rather fundamental points because the Court refers, as it should in its exposition of the case, to the requirement of the Geneva Conventions of 1949 that military tribunals be "regularly constituted" *ante,* at 69—a requirement that controls here, if for no other reason, because Congress requires that military commissions like the ones at issue conform to the "law of war," 10 U. S. C. §821. Whatever the substance and content of the term "regularly constituted" as interpreted in this and any later cases, there seems little doubt that it relies upon the importance of standards deliberated upon and chosen in advance of crisis, under a system where the single power of the Executive is checked by other constitutional mechanisms. All of which returns us to the point of beginning—that domestic statutes control this case. If Congress, after due consideration, deems it appropriate to change the controlling statutes, in conformance with the Constitution and other laws, it has the power and prerogative to do so.

I join the Court's opinion, save Parts V and VI–D–iv. To state my reasons for this reservation, and to show my agreement with the remainder of the Court's analysis by identifying particular deficiencies in the military commissions at issue, this separate opinion seems appropriate.

I

Trial by military commission raises separation-of-powers concerns of the highest order. Located within a single branch, these courts carry the risk that offenses will be defined, prosecuted, and adjudicated by executive officials without independent review. Cf. *Loving* v. *United States,* 517 U. S. 748, 756–758, 760 (1996). Concentration of

power puts personal liberty in peril of arbitrary action by officials, an incursion the Constitution's three-part system is designed to avoid. It is imperative, then, that when military tribunals are established, full and proper authority exists for the Presidential directive.

The proper framework for assessing whether Executive actions are authorized is the three-part scheme used by Justice Jackson in his opinion in *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579 (1952). "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.,* at 635. "When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.,* at 637. And "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb." *Ibid.*

In this case, as the Court observes, the President has acted in a field with a history of congressional participation and regulation. *Ante*, at 28–30, 55–57. In the Uniform Code of Military Justice (UCMJ), 10 U. S. C. §801 *et seq.*, which Congress enacted, building on earlier statutes, in 1950, see Act of May 5, 1950, ch. 169, 64 Stat. 107, and later amended, see, *e.g.,* Military Justice Act of 1968, 82 Stat. 1335, Congress has set forth governing principles for military courts. The UCMJ as a whole establishes an intricate system of military justice. It authorizes courts-martial in various forms, 10 U. S. C. §§816–820 (2000 ed. and Supp. III); it regulates the organization and procedure of those courts, *e.g.,* §§822–835, 851–854; it defines offenses, §§877–934, and rights for the accused, *e.g.,* §§827(b)–(c), 831, 844, 846, 855 (2000 ed.); and it provides mechanisms for appellate review, §§859–876b (2000 ed.

and Supp. III). As explained below, the statute further recognizes that special military commissions may be convened to try war crimes. See *infra*, at 5–6; §821 (2000 ed.). While these laws provide authority for certain forms of military courts, they also impose limitations, at least two of which control this case. If the President has exceeded these limits, this becomes a case of conflict between Presidential and congressional action—a case within Justice Jackson's third category, not the second or first.

One limit on the President's authority is contained in §836 of the UCMJ. That section provides:

"(a) Pretrial, trial, and post-trial procedures, including modes of proof, for cases arising under this chapter triable in courts-martial, military commissions and other military tribunals, and procedures for courts of inquiry, may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter.

"(b) All rules and regulations made under this article shall be uniform insofar as practicable." 10 U. S. C. §836 (2000 ed.).

In this provision the statute allows the President to implement and build on the UCMJ's framework by adopting procedural regulations, subject to three requirements: (1) Procedures for military courts must conform to district-court rules insofar as the President "considers practicable"; (2) the procedures may not be contrary to or inconsistent with the provisions of the UCMJ; and (3) "insofar as practicable" all rules and regulations under §836 must be uniform, a requirement, as the Court points out, that indicates the rules must be the same for military commissions as for courts-martial unless such uniformity is im-

practicable, *ante*, at 57, 59, and n. 50.

As the Court further instructs, even assuming the first and second requirements of §836 are satisfied here—a matter of some dispute, see *ante*, at 57–59—the third requires us to compare the military-commission procedures with those for courts-martial and determine, to the extent there are deviations, whether greater uniformity would be practicable. *Ante*, at 59–62. Although we can assume the President's practicability judgments are entitled to some deference, the Court observes that Congress' choice of language in the uniformity provision of 10 U. S. C. §836(b) contrasts with the language of §836(a). This difference suggests, at the least, a lower degree of deference for §836(b) determinations. *Ante*, at 59–60. The rules for military courts may depart from federal-court rules whenever the President "considers" conformity impracticable, §836(a); but the statute requires procedural uniformity across different military courts "insofar as [uniformity is] practicable," §836(b), not insofar as the President considers it to be so. The Court is right to conclude this is of relevance to our decision. Further, as the Court is also correct to conclude, *ante*, at 60, the term "practicable" cannot be construed to permit deviations based on mere convenience or expedience. "Practicable" means "feasible," that is, "possible to practice or perform" or "capable of being put into practice, done, or accomplished." Webster's Third New International Dictionary 1780 (1961). Congress' chosen language, then, is best understood to allow the selection of procedures based on logistical constraints, the accommodation of witnesses, the security of the proceedings, and the like. Insofar as the "[p]retrial, trial, and post-trial procedures" for the military commissions at issue deviate from court-martial practice, the deviations must be explained by some such practical need.

In addition to §836, a second UCMJ provision, 10

U. S. C. §821, requires us to compare the commissions at issue to courts-martial. This provision states:

> "The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals."

In §821 Congress has addressed the possibility that special military commissions—criminal courts other than courts-martial—may at times be convened. At the same time, however, the President's authority to convene military commissions is limited: It extends only to "offenders or offenses" that "by statute or by the law of war may be tried by" such military commissions. *Ibid.;* see also *ante*, at 28–29. The Government does not claim to base the charges against Hamdan on a statute; instead it invokes the law of war. That law, as the Court explained in *Ex parte Quirin,* 317 U. S. 1 (1942), derives from "rules and precepts of the law of nations"; it is the body of international law governing armed conflict. *Id.*, at 28. If the military commission at issue is illegal under the law of war, then an offender cannot be tried "by the law of war" before that commission.

The Court is correct to concentrate on one provision of the law of war that is applicable to our Nation's armed conflict with al Qaeda in Afghanistan and, as a result, to the use of a military commission to try Hamdan. *Ante*, at 65–70; see also 415 F. 3d 33, 44 (CADC 2005) (Williams, J., concurring). That provision is Common Article 3 of the four Geneva Conventions of 1949. It prohibits, as relevant here, "[t]he passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guar-

antees which are recognized as indispensable by civilized peoples." See, *e.g.,* Article 3 of the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U. S. T. 3316, 3318, T. I. A. S. No. 3364. The provision is part of a treaty the United States has ratified and thus accepted as binding law. See *id.*, at 3316. By Act of Congress, moreover, violations of Common Article 3 are considered "war crimes," punishable as federal offenses, when committed by or against United States nationals and military personnel. See 18 U. S. C. §2441. There should be no doubt, then, that Common Article 3 is part of the law of war as that term is used in §821.

The dissent by JUSTICE THOMAS argues that Common Article 3 nonetheless is irrelevant to this case because in *Johnson* v. *Eisentrager,* 339 U. S. 763 (1950), it was said to be the "obvious scheme" of the 1929 Geneva Convention that "[r]ights of alien enemies are vindicated under it only through protests and intervention of protecting powers," *i.e.*, signatory states, *id.*, at 789, n. 14. As the Court explains, *ante*, at 63–65, this language from *Eisentrager* is not controlling here. Even assuming the *Eisentrager* analysis has some bearing upon the analysis of the broader 1949 Conventions and that, in consequence, rights are vindicated "under [those Conventions]" only through protests and intervention, 339 U. S., at 789, n. 14, Common Article 3 is nonetheless relevant to the question of authorization under §821. Common Article 3 is part of the law of war that Congress has directed the President to follow in establishing military commissions. *Ante*, at 66–67. Consistent with that view, the *Eisentrager* Court itself considered on the merits claims that "procedural irregularities" under the 1929 Convention "deprive[d] the Military Commission of jurisdiction." 339 U. S., at 789, 790.

In another military commission case, *In re Yamashita,* 327 U. S. 1 (1946), the Court likewise considered on the merits—without any caveat about remedies under the

Convention—a claim that an alleged violation of the 1929 Convention "establish[ed] want of authority in the commission to proceed with the trial." *Id.,* at 23, 24. That is the precise inquiry we are asked to perform here.

Assuming the President has authority to establish a special military commission to try Hamdan, the commission must satisfy Common Article 3's requirement of a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," 6 U. S. T., at 3318. The terms of this general standard are yet to be elaborated and further defined, but Congress has required compliance with it by referring to the "law of war" in §821. The Court correctly concludes that the military commission here does not comply with this provision.

Common Article 3's standard of a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," *ibid.*, supports, at the least, a uniformity principle similar to that codified in §836(b). The concept of a "regularly constituted court" providing "indispensable" judicial guarantees requires consideration of the system of justice under which the commission is established, though no doubt certain minimum standards are applicable. See *ante*, at 69–70; 1 Int'l Committee of the Red Cross, Customary International Humanitarian Law 355 (2005) (explaining that courts are "regularly constituted" under Common Article 3 if they are "established and organised in accordance with the laws and procedures already in force in a country").

The regular military courts in our system are the courts-martial established by congressional statutes. Acts of Congress confer on those courts the jurisdiction to try "any person" subject to war crimes prosecution. 10 U. S. C. §818. As the Court explains, moreover, while special military commissions have been convened in previous armed conflicts—a practice recognized in §821—those

military commissions generally have adopted the structure and procedure of courts-martial. See, *e.g.,* 1 The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies 248 (2d series 1894) (Civil War general order requiring that military commissions "be constituted in a similar manner and their proceedings be conducted according to the same general rules as courts-martial in order to prevent abuses which might otherwise arise"); W. Winthrop, Military Law and Precedents 835, n. 81 (rev. 2d ed. 1920) ("[M]ilitary commissions are constituted and composed, and their proceedings are conducted, similarly to general courts-martial"); 1 United Nations War Crimes Commission, Law Reports of Trials of War Criminals 116–117 (1947) (reprint 1997) (hereinafter Law Reports) (discussing post-World War II regulations requiring that military commissions "hav[e] regard for" rules of procedure and evidence applicable in general courts-martial); see also *ante*, at 53–57; *post*, at 31, n. 15 (THOMAS, J., dissenting). Today, moreover, §836(b)—which took effect after the military trials in the World War II cases invoked by the dissent, see *Madsen* v. *Kinsella,* 343 U. S. 341, 344–345, and n. 6 (1952); *Yamashita, supra,* at 5; *Quirin,* 317 U. S., at 23—codifies this presumption of uniformity at least as to "[p]retrial, trial, and post-trial procedures." Absent more concrete statutory guidance, this historical and statutory background—which suggests that some practical need must justify deviations from the court-martial model—informs the understanding of which military courts are "regularly constituted" under United States law.

In addition, whether or not the possibility, contemplated by the regulations here, of midtrial procedural changes could by itself render a military commission impermissibly irregular, *ante*, at 70, n. 65; see also Military Commission Order No. 1, §11 (Aug. 31, 2005), App. to Brief for Petitioner 46a–72a (hereinafter MCO), an acceptable degree of

independence from the Executive is necessary to render a commission "regularly constituted" by the standards of our Nation's system of justice. And any suggestion of Executive power to interfere with an ongoing judicial process raises concerns about the proceedings' fairness. Again, however, courts-martial provide the relevant benchmark. Subject to constitutional limitations, see *Ex parte Milligan,* 4 Wall. 2 (1866), Congress has the power and responsibility to determine the necessity for military courts, and to provide the jurisdiction and procedures applicable to them. The guidance Congress has provided with respect to courts-martial indicates the level of independence and procedural rigor that Congress has deemed necessary, at least as a general matter, in the military context.

At a minimum a military commission like the one at issue—a commission specially convened by the President to try specific persons without express congressional authorization—can be "regularly constituted" by the standards of our military justice system only if some practical need explains deviations from court-martial practice. In this regard the standard of Common Article 3, applied here in conformity with §821, parallels the practicability standard of §836(b). Section 836, however, is limited by its terms to matters properly characterized as procedural—that is, "[p]retrial, trial, and post-trial procedures"—while Common Article 3 permits broader consideration of matters of structure, organization, and mechanisms to promote the tribunal's insulation from command influence. Thus the combined effect of the two statutes discussed here—§§836 and 821—is that considerations of practicability must support departures from court-martial practice. Relevant concerns, as noted earlier, relate to logistical constraints, accommodation of witnesses, security of the proceedings, and the like, not mere expedience or convenience. This determination, of course, must be made with due regard for the constitu-

tional principle that congressional statutes can be controlling, including the congressional direction that the law of war has a bearing on the determination.

These principles provide the framework for an analysis of the specific military commission at issue here.

## II

In assessing the validity of Hamdan's military commission the precise circumstances of this case bear emphasis. The allegations against Hamdan are undoubtedly serious. Captured in Afghanistan during our Nation's armed conflict with the Taliban and al Qaeda—a conflict that continues as we speak—Hamdan stands accused of overt acts in furtherance of a conspiracy to commit terrorism: delivering weapons and ammunition to al Qaeda, acquiring trucks for use by Osama bin Laden's bodyguards, providing security services to bin Laden, and receiving weapons training at a terrorist camp. App. to Pet. for Cert. 65a–67a. Nevertheless, the circumstances of Hamdan's trial present no exigency requiring special speed or precluding careful consideration of evidence. For roughly four years, Hamdan has been detained at a permanent United States military base in Guantanamo Bay, Cuba. And regardless of the outcome of the criminal proceedings at issue, the Government claims authority to continue to detain him based on his status as an enemy combatant.

Against this background, the Court is correct to conclude that the military commission the President has convened to try Hamdan is unauthorized. *Ante*, at 62, 69–70, 72. The following analysis, which expands on the Court's discussion, explains my reasons for reaching this conclusion.

To begin with, the structure and composition of the military commission deviate from conventional court-martial standards. Although these deviations raise questions about the fairness of the trial, no evident practical

need explains them.

Under the UCMJ, courts-martial are organized by a "convening authority"—either a commanding officer, the Secretary of Defense, the Secretary concerned, or the President. 10 U. S. C. §§822–824 (2000 ed. and Supp. III). The convening authority refers charges for trial, Manual for Courts-Martial, United States, Rule for Courts-Martial 401 (2005 ed.) (hereinafter R. C. M.), and selects the court-martial members who vote on the guilt or innocence of the accused and determine the sentence, 10 U. S. C. §§825(d)(2), 851–852 (2000 ed.); R. C. M. 503(a). Paralleling this structure, under Military Commission Order No. 1 an "'Appointing Authority'"—either the Secretary of Defense or the Secretary's "designee"—establishes commissions subject to the order, MCO No. 1, §2, approves and refers charges to be tried by those commissions, §4(B)(2)(a), and appoints commission members who vote on the conviction and sentence, §§4(A)(1–3). In addition the Appointing Authority determines the number of commission members (at least three), oversees the chief prosecutor, provides "investigative or other resources" to the defense insofar as he or she "deems necessary for a full and fair trial," approves or rejects plea agreements, approves or disapproves communications with news media by prosecution or defense counsel (a function shared by the General Counsel of the Department of Defense), and issues supplementary commission regulations (subject to approval by the General Counsel of the Department of Defense, unless the Appointing Authority is the Secretary of Defense). See MCO No. 1, §§4(A)(2), 5(H), 6(A)(4), 7(A); Military Commission Instruction No. 3, §5(C) (July 15, 2005) (hereinafter MCI), available at www.defenselink.mil/news/Aug2005/d20050811MC13.pdf; MCI No. 4, §5(C) (Sept. 16, 2005), available at www.defenselink.mil/news/Oct2005/d20051003MCI4.pdf MCI No. 6, §3(B)(3) (April 15, 2004), available at www.

defenselink.mil/news/Apr2004/d20040420ins6.pdf (all In-
ternet materials as visited June 27, 2006, and available in
Clerk of Court's case file).

Against the background of these significant powers for
the Appointing Authority, which in certain respects at
least conform to ordinary court-martial standards, the
regulations governing the commissions at issue make
several noteworthy departures. At a general court-
martial—the only type authorized to impose penalties of
more than one year's incarceration or to adjudicate of-
fenses against the law of war, R. C. M. 201(f); 10 U. S. C.
§§818–820 (2000 ed. and Supp. III)—the presiding officer
who rules on legal issues must be a military judge.
R. C. M. 501(a)(1), 801(a)(4)–(5); 10 U. S. C. §816(1) (2000
ed., Supp. III); see also R. C. M. 201(f)(2)(B)(ii) (likewise
requiring a military judge for certain other courts-
martial); 10 U. S. C. §819 (2000 ed. and Supp. III) (same).
A military judge is an officer who is a member of a state or
federal bar and has been specially certified for judicial
duties by the Judge Advocate General for the officer's
Armed Service. R. C. M. 502(c); 10 U. S. C. §826(b). To
protect their independence, military judges at general
courts-martial are "assigned and directly responsible to
the Judge Advocate General or the Judge Advocate Gen-
eral's designee." R. C. M. 502(c). They must be detailed to
the court, in accordance with applicable regulations, "by a
person assigned as a military judge and directly responsi-
ble to the Judge Advocate General or the Judge Advocate
General's designee." R. C. M. 503(b); see also 10 U. S. C.
§826(c); see generally *Weiss* v. *United States,* 510 U. S. 163,
179–181 (1994) (discussing provisions that "insulat[e] mili-
tary judges from the effects of command influence" and thus
"preserve judicial impartiality"). Here, by contrast, the
Appointing Authority selects the presiding officer, MCO
No. 1, §§4(A)(1), (A)(4); and that officer need only be a
judge advocate, that is, a military lawyer, §4(A)(4).

The Appointing Authority, moreover, exercises supervisory powers that continue during trial. Any interlocutory question "the disposition of which would effect a termination of proceedings with respect to a charge" is subject to decision not by the presiding officer, but by the Appointing Authority. §4(A)(5)(e) (stating that the presiding officer "shall certify" such questions to the Appointing Authority). Other interlocutory questions may be certified to the Appointing Authority as the presiding officer "deems appropriate." *Ibid.* While in some circumstances the Government may appeal certain rulings at a court-martial—including "an order or ruling that terminates the proceedings with respect to a charge or specification," R. C. M. 908(a); see also 10 U. S. C. §862(a)—the appeals go to a body called the Court of Criminal Appeals, not to the convening authority. R. C. M. 908; 10 U. S. C. §862(b); see also R. C. M. 1107 (requiring the convening authority to approve or disapprove the findings and sentence of a court-martial but providing for such action only after entry of sentence and restricting actions that increase penalties); 10 U. S. C. §860 (same); cf. §837(a) (barring command influence on court-martial actions). The Court of Criminal Appeals functions as the military's intermediate appeals court; it is established by the Judge Advocate General for each Armed Service and composed of appellate military judges. R. C. M. 1203; 10 U. S. C. §866. This is another means in which, by structure and tradition, the court-martial process is insulated from those who have an interest in the outcome of the proceedings.

Finally, in addition to these powers with respect to the presiding officer, the Appointing Authority has greater flexibility in appointing commission members. While a general court-martial requires, absent a contrary election by the accused, at least five members, R. C. M. 501(a)(1); 10 U. S. C. §816(1) (2000 ed. and Supp. III), the Appointing Authority here is free, as noted earlier, to select as few

as three. MCO No. 1, §4(A)(2). This difference may affect the deliberative process and the prosecution's burden of persuasion.

As compared to the role of the convening authority in a court-martial, the greater powers of the Appointing Authority here—including even the resolution of dispositive issues in the middle of the trial—raise concerns that the commission's decisionmaking may not be neutral. If the differences are supported by some practical need beyond the goal of constant and ongoing supervision, that need is neither apparent from the record nor established by the Government's submissions.

It is no answer that, at the end of the day, the Detainee Treatment Act of 2005 (DTA), 119 Stat. 2739, affords military-commission defendants the opportunity for judicial review in federal court. As the Court is correct to observe, the scope of that review is limited, DTA §1005(e)(3)(D), *id.,* at 2743; see also *ante*, at 8–9, and the review is not automatic if the defendant's sentence is under 10 years, §1005(e)(3)(B), *ibid*. Also, provisions for review of legal issues after trial cannot correct for structural defects, such as the role of the Appointing Authority, that can cast doubt on the factfinding process and the presiding judge's exercise of discretion during trial. Before military-commission defendants may obtain judicial review, furthermore, they must navigate a military review process that again raises fairness concerns. At the outset, the Appointing Authority (unless the Appointing Authority is the Secretary of Defense) performs an "administrative review" of undefined scope, ordering any "supplementary proceedings" deemed necessary. MCO No. 1 §6(H)(3). After that the case is referred to a three-member Review Panel composed of officers selected by the Secretary of Defense. §6(H)(4); MCI No. 9, §4(B) (Oct. 11, 2005), available at www.defenselink.mil/news/Oct2005/d20051014MCI9.pdf. Though the Review Panel may

return the case for further proceedings only if a majority
"form[s] a definite and firm conviction that a material
error of law occurred," MCO No. 1, §6(H)(4); MCI No. 9,
§4(C)(1)(a), only one member must have "experience as a
judge," MCO No. 1, §6(H)(4); nothing in the regulations
requires that other panel members have legal training.
By comparison to the review of court-martial judgments
performed by such independent bodies as the Judge Advo-
cate General, the Court of Criminal Appeals, and the
Court of Appeals for the Armed Forces, 10 U. S. C. §§862,
864, 866, 867, 869, the review process here lacks struc-
tural protections designed to help ensure impartiality.

These structural differences between the military com-
missions and courts-martial—the concentration of func-
tions, including legal decisionmaking, in a single executive
official; the less rigorous standards for composition of the
tribunal; and the creation of special review procedures in
place of institutions created and regulated by Congress—
remove safeguards that are important to the fairness of
the proceedings and the independence of the court. Con-
gress has prescribed these guarantees for courts-martial;
and no evident practical need explains the departures
here. For these reasons the commission cannot be consid-
ered regularly constituted under United States law and
thus does not satisfy Congress' requirement that military
commissions conform to the law of war.

Apart from these structural issues, moreover, the basic
procedures for the commissions deviate from procedures
for courts-martial, in violation of §836(b). As the Court
explains, *ante*, at 51, 61, the Military Commission Order
abandons the detailed Military Rules of Evidence, which
are modeled on the Federal Rules of Evidence in confor-
mity with §836(a)'s requirement of presumptive compli-
ance with district-court rules.

Instead, the order imposes just one evidentiary rule:
"Evidence shall be admitted if . . . the evidence would have

probative value to a reasonable person," MCO No. 1, §6(D)(1). Although it is true some military commissions applied an amorphous evidence standard in the past, see, *e.g.,* 1 Law Reports 117–118 (discussing World War II military commission orders); Exec. Order No. 9185, 7 Fed. Reg. 5103 (1942) (order convening military commission to try Nazi saboteurs), the evidentiary rules for those commissions were adopted before Congress enacted the uniformity requirement of 10 U. S. C. §836(b) as part of the UCMJ, see Act of May 5, 1950, ch. 169, 64 Stat. 107, 120, 149. And while some flexibility may be necessary to permit trial of battlefield captives like Hamdan, military statutes and rules already provide for introduction of deposition testimony for absent witnesses, 10 U. S. C. §849(d); R. C. M. 702, and use of classified information, Military Rule Evid. 505. Indeed, the deposition-testimony provision specifically mentions military commissions and thus is one of the provisions the Government concedes must be followed by the commission at issue. See *ante*, at 58. That provision authorizes admission of deposition testimony only if the witness is absent for specified reasons, §849(d)—a requirement that makes no sense if military commissions may consider all probative evidence. Whether or not this conflict renders the rules at issue "contrary to or inconsistent with" the UCMJ under §836(a), it creates a uniformity problem under §836(b).

The rule here could permit admission of multiple hearsay and other forms of evidence generally prohibited on grounds of unreliability. Indeed, the commission regulations specifically contemplate admission of unsworn written statements, MCO No. 1, §6(D)(3); and they make no provision for exclusion of coerced declarations save those "established to have been made as a result of torture," MCI No. 10, §3(A) (Mar. 24, 2006), available at www. defenselink.mil/news/Mar2006/d20060327MCI10.pdf; cf. Military Rule Evid. 304(c)(3) (generally barring use of

statements obtained "through the use of coercion, unlaw-ful influence, or unlawful inducement"); 10 U. S. C. §831(d) (same). Besides, even if evidence is deemed non-probative by the presiding officer at Hamdan's trial, the military-commission members still may view it. In an-other departure from court-martial practice the military commission members may object to the presiding officer's evidence rulings and determine themselves, by majority vote, whether to admit the evidence. MCO No. 1, §6(D)(1); cf. R. C. M. 801(a)(4), (e)(1) (providing that the military judge at a court-martial determines all questions of law).

As the Court explains, the Government has made no demonstration of practical need for these special rules and procedures, either in this particular case or as to the military commissions in general, *ante*, at 59–61; nor is any such need self-evident. For all the Government's regula-tions and submissions reveal, it would be feasible for most, if not all, of the conventional military evidence rules and procedures to be followed.

In sum, as presently structured, Hamdan's military commission exceeds the bounds Congress has placed on the President's authority in §§836 and 821 of the UCMJ. Because Congress has prescribed these limits, Congress can change them, requiring a new analysis consistent with the Constitution and other governing laws. At this time, however, we must apply the standards Congress has provided. By those standards the military commission is deficient.

## III

In light of the conclusion that the military commission here is unauthorized under the UCMJ, I see no need to consider several further issues addressed in the plurality opinion by JUSTICE STEVENS and the dissent by JUSTICE THOMAS.

First, I would not decide whether Common Article 3's

standard—a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," 6 U. S. T., at 3320 (¶(1)(d))— necessarily requires that the accused have the right to be present at all stages of a criminal trial. As JUSTICE STEVENS explains, Military Commission Order No. 1 authorizes exclusion of the accused from the proceedings if the presiding officer determines that, among other things, protection of classified information so requires. See §§6(B)(3), (D)(5); *ante*, at 50. JUSTICE STEVENS observes that these regulations create the possibility of a conviction and sentence based on evidence Hamdan has not seen or heard—a possibility the plurality is correct to consider troubling. *Ante*, at 71–72, n. 67 (collecting cases); see also *In re Oliver,* 333 U. S. 257, 277 (1948) (finding "no support for sustaining petitioner's conviction of contempt of court upon testimony given in petitioner's absence").

As the dissent by JUSTICE THOMAS points out, however, the regulations bar the presiding officer from admitting secret evidence if doing so would deprive the accused of a "full and fair trial." MCO No. 1, §6(D)(5)(b); see also *post*, at 47. This fairness determination, moreover, is unambiguously subject to judicial review under the DTA. See §1005(e)(3)(D)(i), 119 Stat. 2743 (allowing review of compliance with the "standards and procedures" in Military Commission Order No. 1). The evidentiary proceedings at Hamdan's trial have yet to commence, and it remains to be seen whether he will suffer any prejudicial exclusion.

There should be reluctance, furthermore, to reach unnecessarily the question whether, as the plurality seems to conclude, *ante*, at 70, Article 75 of Protocol I to the Geneva Conventions is binding law notwithstanding the earlier decision by our Government not to accede to the Protocol. For all these reasons, and without detracting from the importance of the right of presence, I would rely on other deficiencies noted here and in the opinion by the Court—

deficiencies that relate to the structure and procedure of the commission and that inevitably will affect the proceedings—as the basis for finding the military commissions lack authorization under 10 U. S. C. §836 and fail to be regularly constituted under Common Article 3 and §821.

I likewise see no need to address the validity of the conspiracy charge against Hamdan—an issue addressed at length in Part V of JUSTICE STEVENS' opinion and in Part II–C of JUSTICE THOMAS' dissent. See *ante*, at 36–49; *post*, at 12–28. In light of the conclusion that the military commissions at issue are unauthorized Congress may choose to provide further guidance in this area. Congress, not the Court, is the branch in the better position to undertake the "sensitive task of establishing a principle not inconsistent with the national interest or international justice." *Banco Nacional de Cuba* v. *Sabbatino,* 376 U. S. 398, 428 (1964).

Finally, for the same reason, I express no view on the merits of other limitations on military commissions described as elements of the common law of war in Part V of JUSTICE STEVENS' opinion. See *ante*, at 31–36, 48–49; *post*, at 6–12.

With these observations I join the Court's opinion with the exception of Parts V and VI–D–iv.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 05–184

―――――――

## SALIM AHMED HAMDAN, PETITIONER *v.* DONALD H. RUMSFELD, SECRETARY OF DEFENSE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 29, 2006]

JUSTICE SCALIA, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting.

On December 30, 2005, Congress enacted the Detainee Treatment Act (DTA). It unambiguously provides that, as of that date, "no court, justice, or judge" shall have jurisdiction to consider the habeas application of a Guantanamo Bay detainee. Notwithstanding this plain directive, the Court today concludes that, on what it calls the statute's *most natural* reading, *every* "court, justice, or judge" before whom such a habeas application was pending on December 30 has jurisdiction to hear, consider, and render judgment on it. This conclusion is patently erroneous. And even if it were not, the jurisdiction supposedly retained should, in an exercise of sound equitable discretion, not be exercised.

I

A

The DTA provides: "[N]o court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba." §1005(e)(1), 119 Stat. 2742 (internal division omitted). This provision "t[ook] effect on the date of the enactment of this Act," §1005(h)(1), *id.*, at 2743, which was

December 30, 2005.  As of that date, then, *no* court had
jurisdiction to "hear or consider" the merits of petitioner's
habeas application.  This repeal of jurisdiction is simply
not ambiguous as between pending and future cases.  It
prohibits *any* exercise of jurisdiction, and it became effec-
tive as to *all* cases last December 30.  It is also perfectly
clear that the phrase "no court, *justice*, or judge" includes
this Court and its Members, and that by exercising our
appellate jurisdiction in this case we are "hear[ing] or
consider[ing] . . . an application for a writ of habeas
corpus."

An ancient and unbroken line of authority attests that
statutes ousting jurisdiction unambiguously apply to cases
pending at their effective date.  For example, in *Bruner* v.
*United States*, 343 U. S. 112 (1952), we granted certiorari
to consider whether the Tucker Act's provision denying
district court jurisdiction over suits by "officers" of the
United States barred a suit by an *employee* of the United
States.  After we granted certiorari, Congress amended
the Tucker Act by adding suits by "'employees'" to the
provision barring jurisdiction over suits by officers.  *Id.*, at
114.  This statute narrowing the jurisdiction of the district
courts "became effective" while the case was pending
before us, *ibid.*, and made no explicit reference to pending
cases.  Because the statute "did not reserve jurisdiction
over pending cases," *id.*, at 115, we held that it clearly
ousted jurisdiction over them.  Summarizing centuries of
practice, we said: "This rule—that, when a law conferring
jurisdiction is repealed without any reservation as to
pending cases, all cases fall with the law—has been ad-
hered to consistently by this Court."  *Id.*, at 116–117.  See
also *Landgraf* v. *USI Film Products*, 511 U. S. 244, 274
(1994) (opinion for the Court by STEVENS, J.) ("We have
regularly applied intervening statutes conferring or oust-
ing jurisdiction, whether or not jurisdiction lay when the
underlying conduct occurred or when the suit was filed").

This venerable rule that statutes ousting jurisdiction terminate jurisdiction in pending cases is not, as today's opinion for the Court would have it, a judge-made "presumption against jurisdiction," *ante*, at 11, that we have invented to resolve an ambiguity in the statutes. It is simple recognition of the reality that the *plain import* of a statute repealing jurisdiction is to eliminate the power to consider and render judgment—in an already pending case no less than in a case yet to be filed.

> "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause. *And this is not less clear upon authority than upon principle.*" *Ex parte McCardle*, 7 Wall. 506, 514 (1869) (emphasis added).

To alter this plain meaning, our cases have required an explicit reservation of pending cases in the jurisdiction-repealing statute. For example, *Bruner*, as mentioned, looked to whether Congress made "any reservation as to pending cases." 343 U. S., at 116–117; see also *id.*, at 115 ("Congress made no provision for cases pending at the effective date of the Act withdrawing jurisdiction and, for this reason, Courts of Appeals ordered pending cases terminated for want of jurisdiction"). Likewise, in *Hallowell* v. *Commons*, 239 U. S. 506 (1916), Justice Holmes relied on the fact that the jurisdiction-ousting provision "made no exception for pending litigation, but purported to be universal," *id.*, at 508. And in *Insurance Co.* v. *Ritchie*, 5 Wall. 541 (1867), we again relied on the fact that the jurisdictional repeal was made "without any saving of such causes as that before us," *id.*, at 544. As in *Bruner*, *Hallowell*, and *Ritchie*, the DTA's directive that "no court, justice, or judge shall have jurisdiction," §1005(e)(1), 119 Stat. 2742, is made "without any reservation as to pending

cases" and "purport[s] to be universal." What we stated in
an earlier case remains true here: "[W]hen, if it had been
the intention to confine the operation of [the jurisdictional
repeal] . . . to cases not pending, it would have been so
easy to have said so, we must presume that Congress
meant the language employed should have its usual and
ordinary signification, and that the old law should be
unconditionally repealed." *Railroad Co.* v. *Grant*, 98 U. S.
398, 403 (1879).

The Court claims that I "rea[d] too much into" the
*Bruner* line of cases, *ante*, at 12, n. 7, and that "the *Bruner*
rule" has never been "an inflexible trump," *ante*, at 19.
But the Court sorely misdescribes *Bruner*—as if it were a
kind of early-day *Lindh* v. *Murphy*, 521 U. S. 320 (1997),
resolving statutory ambiguity by oblique negative infer-
ence. On the contrary, as described above, *Bruner* stated
its holding as an unqualified "rule," which "has been ad-
hered to consistently by this Court." 343 U. S., at 116–
117. Though *Bruner* referred to an express savings clause
elsewhere in the statute, *id.,* at 115, n. 7, it disavowed any
reliance on such oblique indicators to vary the plain mean-
ing, quoting *Ritchie* at length: " 'It is quite possible that
this effect of the [jurisdiction-stripping statute] was not
contemplated by Congress. . . . [B]ut when terms are
unambiguous we may not speculate on probabilities of
intention.' " 343 U. S., at 116 (quoting 5 Wall., at 544–
545).

The Court also attempts to evade the *Bruner* line of
cases by asserting that "the 'presumption' [of application
to pending cases] that these cases have applied is more
accurately viewed as the nonapplication of another pre-
sumption—viz., the presumption against retroactivity—in
certain limited circumstances." *Ante*, at 11. I have al-
ready explained that what the Court calls a "presumption"
is simply the acknowledgment of the unambiguous mean-
ing of such provisions. But even taking it to be what the

Court says, the effect upon the present case would be the same. *Prospective* applications of a statute are "effective" upon the statute's effective date; that is what an effective-date provision like §1005(h)(1) *means*.[1]   " '[S]hall take effect upon enactment' is presumed to mean 'shall have prospective effect upon enactment,' and that presumption is too strong to be overcome by any negative inference [drawn from other provisions of the statute]." *Landgraf*, 511 U. S., at 288 (SCALIA, J., concurring in judgments). The Court's "nonapplication of . . . the presumption against retroactivity" to §1005(e)(1) is thus just another way of stating that the statute takes immediate effect in pending cases.

Though the Court resists the *Bruner* rule, it cannot cite a *single case* in the history of Anglo-American law (before today) in which a jurisdiction-stripping provision was denied immediate effect in pending cases, absent an explicit statutory reservation. By contrast, the cases granting such immediate effect are legion, and they repeatedly rely on the plain language of the jurisdictional repeal as an "inflexible trump," *ante*, at 19, by requiring an express

---

[1] The Court apparently believes that the effective-date provision means nothing at all. "That paragraph (1), along with paragraphs (2) and (3), is to 'take effect on the date of enactment,' DTA §1005(h)(1), 119 Stat. 2743, is not dispositive," says the Court, *ante*, at 14, n. 9. The Court's authority for this conclusion is its quote from *INS* v. *St. Cyr*, 533 U. S. 289, 317 (2001), to the effect that "a statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct *that occurred at an earlier date*." *Ante*, at 14, n. 9 (emphasis added, internal quotation marks omitted). But this quote merely restates the obvious: An effective-date provision does not render a statute applicable to "conduct that occurred at an *earlier* date," but of course it renders the statute applicable to conduct that occurs *on the effective date and all future dates*—such as the Court's exercise of jurisdiction here. The Court seems to suggest that, because the effective-date provision does not authorize retroactive application, it also fails to authorize prospective application (and is thus useless verbiage). This cannot be true.

reservation to save pending cases. See, *e.g.*, *Bruner*, *supra*, at 115; *Kline* v. *Burke Constr. Co.*, 260 U. S. 226, 234 (1922); *Hallowell*, 239 U. S., at 508; *Gwin* v. *United States*, 184 U. S. 669, 675 (1902); *Gurnee* v. *Patrick County*, 137 U. S. 141, 144 (1890); *Sherman* v. *Grinnell*, 123 U. S. 679, 680 (1887); *Railroad Co.* v. *Grant*, *supra,* at 403, *Assessors* v. *Osbornes*, 9 Wall. 567, 575 (1870); *Ex parte McCardle*, 7 Wall., at 514; *Ritchie*, *supra*, at 544; *Norris* v. *Crocker*, 13 How. 429, 440 (1852); *Yeaton* v. *United States*, 5 Cranch 281 (1809) (Marshall, C. J.), discussed in *Gwin, supra,* at 675; *King* v. *Justices of the Peace of London*, 3 Burr. 1456, 1457, 97 Eng. Rep. 924, 925 (K. B. 1764). Cf. *National Exchange Bank of Baltimore* v. *Peters*, 144 U. S. 570, 572 (1892).

### B

Disregarding the plain meaning of §1005(e)(1) and the requirement of explicit exception set forth in the foregoing cases, the Court instead favors "a negative inference . . . from the exclusion of language from one statutory provision that is included in other provisions of the same statute," *ante*, at 13. Specifically, it appeals to the fact that §1005(e)(2) and (e)(3) are explicitly made applicable to pending cases (by §1005(h)(2)). A negative inference of the sort the Court relies upon might clarify the meaning of an ambiguous provision, but since the meaning of §1005(e)(1) is entirely clear, the omitted language in that context would have been redundant.

Even if §1005(e)(1) were at all ambiguous in its application to pending cases, the "negative inference" from §1005(h)(2) touted by the Court would have no force. The numerous cases in the *Bruner* line would at least create a powerful default "presumption against jurisdiction," *ante*, at 11. The negative inference urged by the Court would be a particularly awkward and indirect way of rebutting such a longstanding and consistent practice. This is especially

true since the negative inference that might be drawn from §1005(h)(2)'s specification that certain provisions *shall* apply to pending cases is matched by a negative inference in the opposite direction that might be drawn from §1005(b)(2), which provides that certain provisions shall *not* apply to pending cases.

The Court's reliance on our opinion in *Lindh* v. *Murphy*, 521 U. S. 320 (1997), is utterly misplaced. *Lindh* involved two provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA): a set of amendments to chapter 153 of the federal habeas statute that redefined the scope of collateral review by federal habeas courts; and a provision creating a new chapter 154 in the habeas statute specially to govern federal collateral review of state capital cases. See 521 U. S., at 326–327. The latter provision explicitly rendered the new chapter 154 applicable to cases pending at the time of AEDPA's enactment; the former made no specific reference to pending cases. *Id.*, at 327. In *Lindh*, we drew a negative inference from chapter 154's explicit reference to pending cases, to conclude that the chapter 153 amendments did *not* apply in pending cases. It was essential to our reasoning, however, that both provisions appeared to be *identically difficult* to classify under our retroactivity cases. First, we noted that, after *Landgraf*, there was reason for Congress to suppose that an explicit statement was required to render the amendments to chapter 154 applicable in pending cases, because the new chapter 154 "will have substantive as well as purely procedural effects." 521 U. S., at 327. The next step—and the critical step—in our reasoning was that Congress had *identical* reason to suppose that an explicit statement would be required to apply the chapter 153 amendments to pending cases, but did not provide it. *Id.*, at 329. The negative inference of *Lindh* rested on the fact that "[n]othing . . . but a different intent explain[ed] the different treatment." *Ibid.*

Here, by contrast, there is ample reason for the different treatment. The exclusive-review provisions of the DTA, unlike both §1005(e)(1) and the AEDPA amendments in *Lindh*, confer *new* jurisdiction (in the D. C. Circuit) where there was none before. For better or for worse, our recent cases have contrasted jurisdiction-*creating* provisions with jurisdiction-*ousting* provisions, retaining the venerable rule that the latter are not retroactive even when applied in pending cases, but strongly indicating that the former are typically retroactive. For example, we stated in *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939, 951 (1997), that a statute "that *creates* jurisdiction where none previously existed" is "as much subject to our presumption against retroactivity as any other." See also *Republic of Austria* v. *Altmann*, 541 U. S. 677, 695 (2004) (opinion for the Court by STEVENS, J.); *id.*, at 722 (KENNEDY, J., dissenting). The Court gives our retroactivity jurisprudence a dazzling clarity in asserting that "subsections (e)(2) and (e)(3) 'confer' jurisdiction in a manner that cannot conceivably give rise to retroactivity questions under our precedents."[2] *Ante*, at 17–18. This statement

---

[2] A comparison with *Lindh* v. *Murphy,* 521 U. S. 320 (1997), shows this not to be true. Subsections (e)(2) and (e)(3) of §1005 resemble the provisions of AEDPA at issue in *Lindh* (whose retroactivity as applied to pending cases the *Lindh* majority did not rule upon, see 521 U. S., at 326), in that they "g[o] beyond 'mere' procedure," *id.*, at 327. They impose novel and unprecedented disabilities on the Executive Branch in its conduct of military affairs. Subsection (e)(2) imposes judicial review on the Combatant Status Review Tribunals (CSRTs), whose implementing order did not subject them to review by Article III courts. See Memorandum from Deputy Secretary of Defense Paul Wolfowitz re: Order Establishing Combatant Status Review Tribunals, at 3 §*h* (July 7, 2004), available at http://www.defenselink.mil/news/Jul2004/d20040707review.pdf (all Internet materials as visited June 27, 2006, and available in Clerk of Court's case file). Subsection (e)(3) authorizes the D. C. Circuit to review "the validity of any final decision rendered pursuant to Military Commission Order No. 1," §1005(e)(3)(A), 119 Stat. 2743.

rises to the level of sarcasm when one considers its au-
thor's description of the governing test of our retroactivity
jurisprudence:

> "The conclusion that a particular rule operates 'retro-
> actively' comes at the end of a process of judgment
> concerning the nature and extent of the change in the
> law and the degree of connection between the opera-
> tion of the new rule and a relevant past event. Any
> test of retroactivity will leave room for disagreement
> in hard cases, and is unlikely to classify the enormous
> variety of legal changes with perfect philosophical
> clarity. However, retroactivity is a matter on which
> judges tend to have 'sound . . . instinct[s],' . . . and fa-
> miliar considerations of fair notice, reasonable reli-
> ance, and settled expectations offer sound guidance."
> *Landgraf*, 511 U. S., at 270 (opinion for the Court by
> STEVENS, J.).

The only "familiar consideration," "reasonable reliance,"
and "settled expectation" I am aware of pertaining to the
present case is the rule of *Bruner*—applicable to
§1005(e)(1), but not to §1005(e)(2) and (3)—which the

---

Historically, federal courts have *never* reviewed the validity of the final
decision of any military commission; their jurisdiction has been re-
stricted to considering the commission's "lawful *authority* to hear,
decide and condemn," *In re Yamashita*, 327 U. S. 1, 8 (1946) (emphasis
added). See also *Johnson* v. *Eisentrager*, 339 U. S. 763, 786–787 (1950).
Thus, contrary to the Court's suggestion, *ante*, at 17, subsections (e)(2)
and (e)(3) confer new jurisdiction: They impose judicial oversight on a
traditionally unreviewable exercise of military authority by the Com-
mander in Chief. They arguably "spea[k] not just to the power of a
particular court but to . . . substantive rights . . . as well," *Hughes
Aircraft Co.* v. *United States ex rel. Shumer,* 520 U. S. 939, 951 (1997)—
namely, the unreviewable powers of the President. Our recent cases
had reiterated that the Executive is protected by the presumption
against retroactivity in such comparatively trivial contexts as suits for
tax refunds and increased pay, see *Landgraf* v. *USI Film Products,* 511
U. S. 244, 271, n. 25 (1994).

Court stubbornly disregards.  It is utterly beyond question that §1005(e)(2)'s and (3)'s application to pending cases (without explicit specification) was not as clear as §1005(e)(1)'s.  That is alone enough to explain the difference in treatment.

Another obvious reason for the specification was to stave off any Suspension Clause problems raised by the immediately effective ouster of jurisdiction brought about by subsection (e)(1).  That is to say, specification of the immediate effectiveness of subsections (e)(2) and (e)(3) (which, unlike subsection (e)(1), would not fall within the *Bruner* rule and would not *automatically* be deemed applicable in pending cases) could reasonably have been thought essential to be sure of replacing the habeas jurisdiction that subsection (e)(1) eliminated in pending cases with an adequate substitute.  See *infra*, at 16–18.

These considerations by no means prove that an explicit statement would be *required* to render subsections (e)(2) and (e)(3) applicable in pending cases.  But they surely gave Congress ample reason to *doubt* that their application in pending cases would unfold as naturally as the Court glibly assumes.  In any event, even if it were true that subsections (e)(2) and (e)(3) "'confer' jurisdiction in a manner that cannot conceivably give rise to retroactivity questions," *ante*, at 17–18, this would merely establish that subsection (h)(2)'s reference to pending cases was wholly superfluous when applied to subsections (e)(2) and (e)(3), just as it would have been for subsection (e)(1).  *Lindh*'s negative inference makes sense only when Congress would have perceived "the wisdom of being explicit" with respect to the immediate application of *both* of two statutory provisions, 521 U. S., at 328, but chose to be explicit only for one of them—not when it would have perceived *no need* to be explicit for both, but enacted a redundancy only for one.

In short, it is simply untrue that Congress "'should have been just as concerned about'" specifying the application of §1005(e)(1) to pending cases, *ante*, at 14 (quoting *Lindh*, 521 U. S., at 329). In fact, the negative-inference approach of *Lindh* is particularly inappropriate in this case, because the negative inference from §1005(h)(2) would tend to defeat the purpose of the very provisions that *are* explicitly rendered applicable in pending cases, §1005(e)(2) and (3). Those provisions purport to vest "exclusive" jurisdiction in the D. C. Circuit to consider the claims raised by petitioners here. See *infra*, at 16–18. By drawing a negative inference *à la Lindh*, the Court supplants this exclusive-review mechanism with a dual-review mechanism for petitioners who were expeditious enough to file applications challenging the CSRTs or military commissions before December 30, 2005. Whatever the force of *Lindh*'s negative inference in other cases, it surely should not apply here to defeat the purpose of the very provision from which the negative inference is drawn.

C

Worst of all is the Court's reliance on the legislative history of the DTA to buttress its implausible reading of §1005(e)(1). We have repeatedly held that such reliance is impermissible where, as here, the statutory language is unambiguous. But the Court nevertheless relies both on floor statements from the Senate and (quite heavily) on the drafting history of the DTA. To begin with floor statements: The Court urges that some "statements made by Senators preceding passage of the Act lend further support to" the Court's interpretation, citing excerpts from the floor debate that support its view, *ante*, 15–16, n. 10. The Court immediately goes on to discount numerous floor statements by the DTA's sponsors that flatly contradict its view, because "those statements appear to have been inserted into the Congressional Record *after* the Senate

debate." *Ibid.* Of course this observation, even if true, makes no difference unless one indulges the fantasy that Senate floor speeches are attended (like the Philippics of Demosthenes) by throngs of eager listeners, instead of being delivered (like Demosthenes' practice sessions on the beach) alone into a vast emptiness. Whether the floor statements are spoken where no Senator hears, or written where no Senator reads, they represent at most the views of a single Senator. In any event, the Court greatly exaggerates the one-sidedness of the portions of the floor debate that clearly occurred before the DTA's enactment. Some of the statements of Senator Graham, a sponsor of the bill, only make sense on the assumption that pending cases are covered.[3] And at least one opponent of the DTA unmistakably expressed his understanding that it would terminate our jurisdiction in this very case.[4] (Of course in its discussion of legislative history the Court wholly ignores the President's signing statement, which explicitly set forth *his* understanding that the DTA ousted jurisdic-

—————

[3] "Because I have described how outrageous these claims are—about the exercise regime, the reading materials—most Americans would be highly offended to know that terrorists are suing us in our own courts about what they read." 151 Cong. Rec. S12756 (Nov. 14, 2005). "Instead of having unlimited habeas corpus opportunities under the Constitution, we give every enemy combatant, all 500, a chance to go to Federal court, the Circuit Court of Appeals for the District of Columbia. . . . It will be a one-time deal." *Id.,* at S12754. "This Levin-Graham-Kyl amendment allows every detainee under our control to have their day in court. They are allowed to appeal their convictions." *Id.,* at S12801 (Nov. 15, 2005); see also *id.,* at S12799 (rejecting the notion that "an enemy combatant terrorist al-Qaida member should be able to have access to our Federal courts under habeas like an American citizen").

[4] "An earlier part of the amendment provides that no court, justice, or judge shall have jurisdiction to consider the application for writ of habeas corpus. . . . Under the language of exclusive jurisdiction in the DC Circuit, the U. S. Supreme Court would not have jurisdiction to hear the Hamdan case . . . ." *Id.,* at S12796 (statement of Sen. Specter).

tion over pending cases.[5])

But selectivity is not the greatest vice in the Court's use of floor statements to resolve today's case. These statements were made when Members of Congress were fully aware that our continuing jurisdiction *over this very case* was at issue. The question was divisive, and floor statements made on both sides were undoubtedly opportunistic and crafted *solely* for use in the briefs in this very litigation. See, *e.g.*, 151 Cong. Rec. S14257–S14258 (Dec. 21, 2005) (statement of Sen. Levin) (arguing against a reading that would "stri[p] the Federal courts of jurisdiction to consider pending cases, *including the Hamdan case now pending in the Supreme Court*," and urging that *Lindh* requires the same negative inference that the Court indulges today (emphasis added)). The Court's reliance on such statements cannot avoid the appearance of similar opportunism. In a virtually identical context, the author of today's opinion has written for the Court that "[t]he legislative history discloses some frankly partisan statements about the meaning of the final effective date language, but those statements cannot plausibly be read as reflecting any general agreement." *Landgraf*, 511 U. S., at 262 (opinion for the Court by STEVENS, J.). Likewise, the handful of floor statements that the Court treats as authoritative do not "reflec[t] any general agreement." They reflect the now-common tactic—which the Court once again rewards—of pursuing through floor-speech *ipse dixit*

---

[5] "[T]he executive branch shall construe section 1005 to preclude the Federal courts from exercising subject matter jurisdiction over any existing or future action, including applications for writs of habeas corpus, described in section 1005." President's Statement on Signing of H. R. 2863, the "Department of Defense, Emergency Supplemental Appropriations to Address Hurricanes in the Gulf of Mexico, and Pandemic Influenza Act, 2006" (Dec. 30, 2005), available at http://www.whitehouse.gov/news/releases/2005/12/print/200512308.html.

what could not be achieved through the constitutionally prescribed method of putting language into a bill that a majority of both Houses vote for and the President signs.

With regard to the floor statements, at least the Court shows some semblance of seemly shame, tucking away its reference to them in a half-hearted footnote. Not so for its reliance on the DTA's drafting history, which is displayed prominently, see *ante*, at 14–15. I have explained elsewhere that such drafting history is no more legitimate or reliable an indicator of the objective meaning of a statute than any other form of legislative history. This case presents a textbook example of its unreliability. The Court, *ante*, at 14, trumpets the fact that a bill considered in the Senate included redundant language, not included in the DTA as passed, reconfirming that the abolition of habeas jurisdiction "shall apply to any application or other action that is pending on or after the date of the enactment of this Act." 151 Cong. Rec. S12655 (Nov. 10, 2005). But this earlier version of the bill also differed from the DTA in other material respects. Most notably, it provided for postdecision review by the D. C. Circuit only of the decisions of *CSRTs*, not military commissions, *ibid.;* and it limited that review to whether "the status determination . . . was consistent with the procedures and standards specified by the Secretary of Defense," *ibid.,* not whether "the use of such standards and procedures . . . is consistent with the Constitution and laws of the United States," DTA §1005(e)(2)(C)(ii), 119 Stat. 2742. To say that what moved Senators to reject this earlier bill was the "action that is pending" provision surpasses the intuitive powers of even this Court's greatest Justices.[6] And to think that the House and the President also had this rejection firmly in

---

[6] The Court asserts that "it cannot be said that the changes to subsection (h)(2) were inconsequential," *ante*, at 15, n. 10, but the Court's sole evidence is the self-serving floor statements that it selectively cites.

mind is absurd. As always—but *especially* in the context of strident, partisan legislative conflict of the sort that characterized enactment of this legislation—the language of the statute that was actually passed by both Houses of Congress and signed by the President is our only authoritative and only reliable guidepost.

D

A final but powerful indication of the fact that the Court has made a mess of this statute is the nature of the consequences that ensue. Though this case concerns a habeas application challenging a trial by military commission, DTA §1005(e)(1) strips the courts of jurisdiction to hear or consider *any* "application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba." The vast majority of pending petitions, no doubt, do not relate to military commissions at all, but to more commonly challenged aspects of "detention" such as the terms and conditions of confinement. See *Rasul* v. *Bush*, 542 U. S. 466, 498 (2004) (SCALIA, J., dissenting). The Solicitor General represents that "[h]abeas petitions have been filed on behalf of a purported 600 [Guantanamo Bay] detainees," including one that "seek[s] relief on behalf of every Guantanamo detainee who has not already filed an action," Respondents' Motion to Dismiss for Lack of Jurisdiction 20, n. 10 (hereinafter Motion to Dismiss). The Court's interpretation transforms a provision abolishing jurisdiction over *all* Guantanamo-related habeas petitions into a provision that retains jurisdiction over cases sufficiently numerous to keep the courts busy for years to come.

II

Because I would hold that §1005(e)(1) unambiguously terminates the jurisdiction of all courts to "hear or consider" pending habeas applications, I must confront peti-

tioner's arguments that the provision, so interpreted, violates the Suspension Clause. This claim is easily dispatched. We stated in *Johnson* v. *Eisentrager*, 339 U. S. 763, 768 (1950):

> "We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right, nor does anything in our statutes."

Notwithstanding the ill-considered dicta in the Court's opinion in *Rasul*, 542 U. S., at 480–481, it is clear that Guantanamo Bay, Cuba, is outside the sovereign "territorial jurisdiction" of the United States. See *id.*, at 500–505 (SCALIA, J., dissenting). Petitioner, an enemy alien detained abroad, has no rights under the Suspension Clause.

But even if petitioner were fully protected by the Clause, the DTA would create no suspension problem. This Court has repeatedly acknowledged that "the substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus." *Swain* v. *Pressley*, 430 U. S. 372, 381 (1977); see also *INS* v. *St. Cyr*, 533 U. S. 289, 314, n. 38 (2006) ("Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals").

Petitioner has made no showing that the postdecision exclusive review by the D. C. Circuit provided in §1005(e)(3) is inadequate to test the legality of his trial by military commission. His principal argument is that the exclusive-review provisions are inadequate because they foreclose review of the claims he raises here. Though petitioner's brief does not parse the statutory language,

his argument evidently rests on an erroneously narrow reading of DTA §1005(e)(3)(D)(ii), 119 Stat. 2743. That provision grants the D. C. Circuit authority to review, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to reach the final decision is consistent with the Constitution and laws of the United States." In the quoted text, the phrase "such standards and procedures" refers to "the standards and procedures specified in the military order referred to in subparagraph (A)," namely "Military Commission Order No. 1, dated August 31, 2005 (or any successor military order)." DTA §1005(e)(3)(D)(i), (e)(3)(A), *ibid.* This Military Commission Order (Order No. 1) is the Department of Defense's fundamental implementing order for the President's order authorizing trials by military commission. Order No. 1 establishes commissions, §2; delineates their jurisdiction, §3; provides for their officers, §4(A); provides for their prosecution and defense counsel, §4(B), (C); lays out all their procedures, both pretrial and trial, §5(A)–(P), §6(A)–(G); and provides for posttrial military review through the Secretary of Defense and the President, §6(H). In short, the "standards and procedures specified in" Order No. 1 include *every aspect* of the military commissions, including the fact of their existence and every respect in which they differ from courts-martial. Petitioner's claims that the President lacks legal authority to try him before a military commission constitute claims that "the use of such standards and procedures," as specified in Order No. 1, is "[in]consistent with the Constitution and laws of the United States," DTA §1005(e)(3)(D)(ii), 119 Stat. 2743. The D. C. Circuit thus retains jurisdiction to consider these claims on postdecision review, and the Government does not dispute that the DTA leaves unaffected our certiorari jurisdiction under 28 U. S. C. §1254(1) to review the D. C. Circuit's decisions. Motion to Dismiss 16, n. 8. Thus, the DTA merely *defers*

our jurisdiction to consider petitioner's claims; it does not eliminate that jurisdiction. It constitutes neither an "inadequate" nor an "ineffective" substitute for petitioner's pending habeas application.[7]

Though it does not squarely address the issue, the Court hints ominously that "the Government's preferred reading" would "rais[e] grave questions about Congress' authority to impinge upon this Court's appellate jurisdiction, particularly in habeas cases." *Ante*, at 10–11 (citing *Ex parte Yerger*, 8 Wall. 85 (1869); *Felker* v. *Turpin*, 518 U. S. 651 (1996); *Durousseau* v. *United States*, 6 Cranch 307 (1810); *United States* v. *Klein*, 13 Wall. 128 (1872); and *Ex parte McCardle*, 7 Wall. 506). It is not clear how there could be any such lurking questions, in light of the aptly named "*Exceptions* Clause" of Article III, §2, which, in making our appellate jurisdiction subject to "such Exceptions, and under such Regulations as the Congress shall make," explicitly permits exactly what Congress has done here. But any doubt our prior cases might have created on this score is surely chimerical in *this* case. As just noted, the exclusive-review provisions provide a substitute for habeas review adequate to satisfy the Suspension Clause,

---

[7] Petitioner also urges that he could be subject to indefinite delay if military officials and the President are deliberately dilatory in reviewing the decision of his commission. In reviewing the constitutionality of legislation, we generally presume that the Executive will implement its provisions in good faith. And it is unclear in any event that delay would inflict any injury on petitioner, who (after an adverse determination by his CSRT, see 344 F. Supp. 2d 152, 161 (DC 2004)) is *already* subject to indefinite detention under our decision in *Hamdi* v. *Rumsfeld*, 542 U. S. 507 (2004). Moreover, the mere possibility of delay does not render an alternative remedy "inadequate [o]r ineffective to test the legality" of a military commission trial. *Swain* v. *Pressley*, 430 U. S. 372, 381 (1977). In an analogous context, we discounted the notion that postponement of relief until postconviction review inflicted any cognizable injury on a serviceman charged before a military court-martial. *Schlesinger* v. *Councilman*, 420 U. S. 738, 754–755 (1975); see also *Younger* v. *Harris*, 401 U. S. 37, 46 (1971).

which *forbids* the suspension of the writ of habeas corpus. *A fortiori* they provide a substitute adequate to satisfy any implied substantive limitations, whether real or imaginary, upon the Exceptions Clause, which *authorizes* such exceptions as §1005(e)(1).

## III

Even if Congress had not clearly and constitutionally eliminated jurisdiction over this case, neither this Court nor the lower courts ought to exercise it. Traditionally, equitable principles govern both the exercise of habeas jurisdiction and the granting of the injunctive relief sought by petitioner. See *Schlesinger* v. *Councilman*, 420 U. S. 738, 754 (1975); *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 311 (1982). In light of Congress's provision of an alternate avenue for petitioner's claims in §1005(e)(3), those equitable principles counsel that we abstain from exercising jurisdiction in this case.

In requesting abstention, the Government relies principally on *Councilman*, in which we abstained from considering a serviceman's claim that his charge for marijuana possession was not sufficiently "service-connected" to trigger the subject-matter jurisdiction of the military courts-martial. See 420 U. S., at 740, 758. Admittedly, *Councilman* does not squarely control petitioner's case, but it provides the closest analogue in our jurisprudence. As the Court describes, *ante*, at 21, *Councilman* "identifie[d] two considerations of comity that together favor[ed] abstention pending completion of ongoing court-martial proceedings against service personnel." But the Court errs in finding these considerations inapplicable to this case. Both of them, and a third consideration not emphasized in *Councilman*, all cut in favor of abstention here.

First, the Court observes that *Councilman* rested in part on the fact that "military discipline and, therefore, the efficient operation of the Armed Forces are best served

if the military justice system acts without regular inter-
ference from civilian courts," and concludes that "Hamdan
is not a member of our Nation's Armed Forces, so concerns
about military discipline do not apply." *Ante*, at 22. This
is true enough. But for some reason, the Court fails to
make any inquiry into whether military commission trials
might involve *other* "military necessities" or "unique mili-
tary exigencies," 420 U. S., at 757, comparable in gravity
to those at stake in *Councilman.* To put this in context:
The charge against the respondent in *Councilman* was the
off-base possession and sale of marijuana while he was
stationed in Fort Sill, Oklahoma, see *id.,* at 739–740. The
charge against the petitioner here is joining and actively
abetting the murderous conspiracy that slaughtered thou-
sands of innocent American civilians without warning on
September 11, 2001. While *Councilman* held that the
prosecution of the former charge involved "military neces-
sities" counseling against our interference, the Court *does
not even ponder the same question* for the latter charge.

The reason for the Court's "blinkered study" of this
question, *ante*, at 19, is not hard to fathom. The principal
opinion on the merits makes clear that it does not believe
that the trials by military commission involve any "mili-
tary necessity" *at all:* "The charge's shortcomings . . . are
indicative of a broader inability on the Executive's part
here to satisfy the most basic precondition . . . for estab-
lishment of military commissions: military necessity."
*Ante*, at 48. This is quite at odds with the views on this
subject expressed by our political branches. Because of
"military necessity," a joint session of Congress authorized
the President to "use all necessary and appropriate force,"
including military commissions, "against those nations,
organizations, or persons [such as petitioner] he deter-
mines planned, authorized, committed, or aided the terror-
ist attacks that occurred on September 11, 2001." Au-
thorization for Use of Military Force, §2(a), 115 Stat. 224,

note following 50 U. S. C. §1541 (2000 ed., Supp. III). In keeping with this authority, the President has determined that "[t]o protect the United States and its citizens, and for the effective conduct of military operations and prevention of terrorist attacks, it is necessary for individuals subject to this order . . . to be detained, and, when tried, to be tried for violations of the laws of war and other applicable laws by military tribunals." Military Order of Nov. 13, 2001, 3 CFR §918(e) (2002). It is not clear where the Court derives the authority—or the audacity—to contradict this determination. If "military necessities" relating to "duty" and "discipline" required abstention in *Councilman, supra*, at 757, military necessities relating to the disabling, deterrence, and punishment of the mass-murdering terrorists of September 11 require abstention all the more here.

The Court further seeks to distinguish *Councilman* on the ground that "the tribunal convened to try Hamdan is not part of the integrated system of military courts, complete with independent review panels, that Congress has established." *Ante*, at 22. To be sure, *Councilman* emphasized that "Congress created an integrated system of military courts and review procedures, a critical element of which is the Court of Military Appeals consisting of civilian judges completely removed from all military influence or persuasion, who would gain over time thorough familiarity with military problems." 420 U. S., at 758 (internal quotation marks and footnote omitted). The Court contrasts this "integrated system" insulated from military influence with the review scheme established by Order No. 1, which "provides that appeal of a review panel's decision may be had only to the Secretary of Defense himself, §6(H)(5), and then, finally, to the President, §6(H)(6)." *Ante*, at 23.

Even if we were to accept the Court's extraordinary assumption that the President "lack[s] the structural

insulation from military influence that characterizes the Court of Appeals for the Armed Forces," *ante*, at 23,[8] the Court's description of the review scheme here is anachronistic. As of December 30, 2005, the "fina[l]" review of decisions by military commissions is now conducted by the D. C. Circuit pursuant to §1005(e)(3) of the DTA, and by this Court under 28 U. S. C. §1254(1). This provision for review by Article III courts creates, if anything, a review scheme *more* insulated from Executive control than that in *Councilman*.[9] At the time we decided *Councilman*, Congress had not "conferred on any Art[icle] III court jurisdiction directly to review court-martial determinations." 420 U. S., at 746. The final arbiter of direct appeals was the Court of Military Appeals (now the Court of Appeals for

───────────

[8] The very purpose of Article II's creation of a *civilian* Commander in Chief in the President of the United States was to generate "structural insulation from military influence." See The Federalist No. 28 (A. Hamilton); *id.*, No. 69 (same). We do not live under a military junta. It is a disservice to both those in the Armed Forces and the President to suggest that the President is subject to the undue control of the military.

[9] In rejecting our analysis, the Court observes that appeals to the D. C. Circuit under subsection (e)(3) are discretionary, rather than as of right, when the military commission imposes a sentence less than 10 years' imprisonment, see *ante*, at 23, n. 19, 52–53; §1005(e)(3)(B), 119 Stat. 2743. The relevance of this observation to the abstention question is unfathomable. The fact that Article III review is discretionary does not mean that it lacks "structural insulation from military influence," *ante*, at 23, and its discretionary nature presents no obstacle to the courts' future review these cases.

The Court might more cogently have relied on the discretionary nature of review to argue that the statute provides an inadequate substitute for habeas review under the Suspension Clause. See *supra*, at 16–18. But this argument would have no force, even if *all* appeals to the D. C. Circuit were discretionary. The exercise of habeas jurisdiction has traditionally been entirely a matter of the court's equitable discretion, see *Withrow* v. *Williams*, 507 U. S. 680, 715–718 (1993) (SCALIA, J., concurring in part and dissenting in part), so the fact that habeas jurisdiction is replaced by discretionary appellate review does not render the substitution "inadequate." *Swain*, 430 U. S., at 381.

the Armed Forces), an Article I court whose members possessed neither life tenure, nor salary protection, nor the constitutional protection from removal provided to federal judges in Article III, §1. See 10 U. S. C. §867(a)(2) (1970 ed.).

Moreover, a third consideration counsels strongly in favor of abstention in this case. *Councilman* reasoned that the "considerations of comity, the necessity of respect for coordinate judicial systems" that motivated our decision in *Younger* v. *Harris*, 401 U. S. 37 (1971), were inapplicable to courts-martial, because "the particular demands of federalism are not implicated." 420 U. S., at 756, 757. Though military commissions likewise do not implicate "the particular demands of federalism," considerations of *interbranch* comity at the federal level weigh heavily against our exercise of equity jurisdiction in this case. Here, apparently for the first time in history, see Motion to Dismiss 6, a District Court enjoined ongoing military commission proceedings, which had been deemed "necessary" by the President "[t]o protect the United States and its citizens, and for the effective conduct of military operations and prevention of terrorist attacks." Military Order of Nov. 13, 3 CFR §918(e). Such an order brings the Judicial Branch into direct conflict with the Executive in an area where the Executive's competence is maximal and ours is virtually nonexistent. We should exercise our equitable discretion to *avoid* such conflict. Instead, the Court rushes headlong to meet it. Elsewhere, we have deferred exercising habeas jurisdiction until state courts have "the first opportunity to review" a petitioner's claim, merely to "reduc[e] friction between the state and federal court systems." *O'Sullivan* v. *Boerckel*, 526 U. S. 838, 844, 845 (1999). The "friction" created today between this Court and the Executive Branch is many times more serious.

In the face of such concerns, the Court relies heavily on

*Ex parte Quirin,* 317 U. S. 1 (1942): "Far from abstaining pending the conclusion of military proceedings, which were ongoing, [in *Quirin*] we convened a special Term to hear the case and expedited our review." *Ante*, at 24. It is likely that the Government in *Quirin*, unlike here, preferred a hasty resolution of the case in this Court, so that it could swiftly execute the sentences imposed, see *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 569 (2004) (SCALIA, J., dissenting). But the Court's reliance on *Quirin* suffers from a more fundamental defect: Once again, it ignores the DTA, which creates an avenue for the consideration of petitioner's claims that did not exist at the time of *Quirin*. Collateral application for habeas review was the *only* vehicle available. And there was no compelling reason to postpone consideration of the *Quirin* application until the termination of military proceedings, because the only cognizable claims presented were general challenges to the authority of the commissions that would not be affected by the specific proceedings. See *supra*, at 8–9, n. 2. In the DTA, by contrast, Congress has expanded the scope of Article III review and has channeled it exclusively through a single, postverdict appeal to Article III courts. Because Congress has created a novel unitary scheme of Article III review of military commissions that was absent in 1942, *Quirin* is no longer governing precedent.

I would abstain from exercising our equity jurisdiction, as the Government requests.

* * *

For the foregoing reasons, I dissent.

# SUPREME COURT OF THE UNITED STATES

No. 05–184

SALIM AHMED HAMDAN, PETITIONER *v.* DONALD
H. RUMSFELD, SECRETARY OF DEFENSE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 29, 2006]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, and
with whom JUSTICE ALITO joins in all but Parts I, II–C–1,
and III–B–2, dissenting.

For the reasons set forth in JUSTICE SCALIA's dissent, it
is clear that this Court lacks jurisdiction to entertain
petitioner's claims, see *ante*, at 1–11. The Court having
concluded otherwise, it is appropriate to respond to the
Court's resolution of the merits of petitioner's claims
because its opinion openly flouts our well-established duty
to respect the Executive's judgment in matters of military
operations and foreign affairs. The Court's evident belief
that *it* is qualified to pass on the "[m]ilitary necessity,"
*ante*, at 48, of the Commander in Chief's decision to em-
ploy a particular form of force against our enemies is so
antithetical to our constitutional structure that it simply
cannot go unanswered. I respectfully dissent.

I

Our review of petitioner's claims arises in the context of
the President's wartime exercise of his commander-in-
chief authority in conjunction with the complete support of
Congress. Accordingly, it is important to take measure of
the respective roles the Constitution assigns to the three
branches of our Government in the conduct of war.

As I explained in *Hamdi* v. *Rumsfeld,* 542 U. S. 507

(2004), the structural advantages attendant to the Executive Branch—namely, the decisiveness, "'activity, secrecy, and dispatch'" that flow from the Executive's "'unity,'" *id.*, at 581 (dissenting opinion) (quoting The Federalist No. 70, p. 472 (J. Cooke ed. 1961) (A. Hamilton))—led the Founders to conclude that the "President ha[s] primary responsibility—along with the necessary power—to protect the national security and to conduct the Nation's foreign relations." 542 U. S., at 580. Consistent with this conclusion, the Constitution vests in the President "[t]he executive Power," Art. II, §1, provides that he "shall be Commander in Chief" of the Armed Forces, §2, and places in him the power to recognize foreign governments, §3. This Court has observed that these provisions confer upon the President broad constitutional authority to protect the Nation's security in the manner he deems fit. See, *e.g.*, *Prize Cases,* 2 Black 635, 668 (1863) ("If a war be made by invasion of a foreign nation, the President is not only authorized but bound to resist force by force . . . without waiting for any special legislative authority"); *Fleming* v. *Page,* 9 How. 603, 615 (1850) (acknowledging that the President has the authority to "employ [the Nation's Armed Forces] in the manner he may deem most effectual to harass and conquer and subdue the enemy").

Congress, to be sure, has a substantial and essential role in both foreign affairs and national security. But "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act," and "[s]uch failure of Congress . . . does not, 'especially . . . in the areas of foreign policy and national security,' imply 'congressional disapproval' of action taken by the Executive." *Dames & Moore* v. *Regan,* 453 U. S. 654, 678 (1981) (quoting *Haig* v. *Agee,* 453 U. S. 280, 291 (1981)). Rather, in these domains, the fact that Congress has provided the President with broad authorities does not imply—and the

Judicial Branch should not infer—that Congress intended to deprive him of particular powers not specifically enumerated. See *Dames & Moore*, 453 U. S., at 678 ("[T]he enactment of legislation closely related to the question of the President's authority in a particular case which evinces legislative intent to accord the President broad discretion may be considered to invite measures on independent presidential responsibility" (internal quotation marks omitted)).

When "the President acts pursuant to an express or implied authorization from Congress," his actions are "'supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion . . . rest[s] heavily upon any who might attack it.'" *Id.*, at 668 (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 637 (1952) (Jackson, J., concurring)). Accordingly, in the very context that we address today, this Court has concluded that "the detention and trial of petitioners—ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of grave public danger— are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted." *Ex parte Quirin,* 317 U. S. 1, 25 (1942).

Under this framework, the President's decision to try Hamdan before a military commission for his involvement with al Qaeda is entitled to a heavy measure of deference. In the present conflict, Congress has authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons *he determines* planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001 . . . in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Authorization for Use of Military Force

(AUMF) 115 Stat. 224, note following 50 U. S. C. §1541
(2000 ed., Supp. III) (emphasis added). As a plurality of
the Court observed in *Hamdi*, the "capture, detention, and
*trial* of unlawful combatants, by 'universal agreement and
practice,' are 'important incident[s] of war,'" *Hamdi*, 542
U. S., at 518 (quoting *Quirin, supra*, at 28, 30; emphasis
added), and are therefore "an exercise of the 'necessary
and appropriate force' Congress has authorized the Presi-
dent to use." *Hamdi,* 542 U. S., at 518; *id.*, at 587 (THO-
MAS, J., dissenting). *Hamdi*'s observation that military
commissions are included within the AUMF's authoriza-
tion is supported by this Court's previous recognition that
"[a]n important incident to the conduct of war is the adop-
tion of measures by the military commander, not only to
repel and defeat the enemy, but to seize and subject to
disciplinary measures those enemies who, in their attempt
to thwart or impede our military effort, have violated the
law of war." *In re Yamashita,* 327 U. S. 1, 11 (1946); see
also *Quirin*, *supra*, at 28–29; *Madsen* v. *Kinsella,* 343 U. S.
341, 354, n. 20 (1952) ("'[T]he military commission . . . is
an institution of the greatest importance in the period of
war and should be preserved'" (quoting S. Rep. No. 229,
63d Cong., 2d Sess., 53 (1914) (testimony of Gen. Crowder))).

Although the Court concedes the legitimacy of the Presi-
dent's use of military commissions in certain circum-
stances, *ante,* at 28, it suggests that the AUMF has no
bearing on the scope of the President's power to utilize
military commissions in the present conflict, *ante,* at 29–
30. Instead, the Court determines the scope of this power
based exclusively on Article 21 of the Uniform Code of
Military Justice (UCMJ), 10 U. S. C. §821, the successor to
Article 15 of the Articles of War, which *Quirin* held "au-
thorized trial of offenses against the law of war before
[military] commissions." 317 U. S., at 29. As I shall dis-
cuss below, Article 21 alone supports the use of commis-
sions here. Nothing in the language of Article 21, how-

ever, suggests that it outlines the entire reach of congressional authorization of military commissions in all conflicts—quite the contrary, the language of Article 21 presupposes the existence of military commissions under an independent basis of authorization.[1] Indeed, consistent with *Hamdi*'s conclusion that the AUMF itself authorizes the trial of unlawful combatants, the original sanction for military commissions historically derived from congressional authorization of "the initiation of war" with its attendant authorization of "the employment of all necessary and proper agencies for its due prosecution." W. Winthrop, Military Law and Precedents 831 (2d ed. 1920) (hereinafter Winthrop). Accordingly, congressional authorization for military commissions pertaining to the instant conflict derives not only from Article 21 of the UCMJ, but also from the more recent, and broader, authorization contained in the AUMF.[2]

I note the Court's error respecting the AUMF not because it is necessary to my resolution of this case—Hamdan's military commission can plainly be sustained solely under Article 21—but to emphasize the complete congressional sanction of the President's exercise of his commander-in-chief authority to conduct the present war. In such circumstances, as previously noted, our duty to

—————

　[1] As previously noted, Article 15 of the Articles of War was the predecessor of Article 21 of the UCMJ. Article 21 provides as follows: "The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals." 10 U. S. C. §821.

　[2] Although the President very well may have inherent authority to try unlawful combatants for violations of the law of war before military commissions, we need not decide that question because Congress has authorized the President to do so. Cf. *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 587 (2004) (Thomas, J., dissenting) (same conclusion respecting detention of unlawful combatants).

defer to the Executive's military and foreign policy judg-
ment is at its zenith; it does not countenance the kind of
second-guessing the Court repeatedly engages in today.
Military and foreign policy judgments

> "'are and should be undertaken only by those directly
> responsible to the people whose welfare they advance
> or imperil.  They are decisions of a kind for which the
> Judiciary has neither aptitude, facilities nor responsi-
> bility and which has long been held to belong in the
> domain of political power not subject to judicial intru-
> sion or inquiry.'" *Hamdi*, *supra*, at 582–583 (THOMAS,
> J., dissenting) (quoting *Chicago & Southern Air Lines,
> Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103, 111 (1948)).

It is within this framework that the lawfulness of Ham-
dan's commission should be examined.

## II

The plurality accurately describes some aspects of the
history of military commissions and the prerequisites for
their use.  Thus, I do not dispute that military commis-
sions have historically been "used in three [different]
situations," *ante*, at 31–32, and that the only situation
relevant to the instant case is the use of military commis-
sions "'to seize and subject to disciplinary measures those
enemies who . . . have violated the law of war,'" *ante*, at 32
(quoting *Quirin, supra*, at 28–29).  Similarly, I agree with
the plurality that Winthrop's treatise sets forth the four
relevant considerations for determining the scope of a
military commission's jurisdiction, considerations relating
to the (1) time and (2) place of the offense, (3) the status of
the offender, and (4) the nature of the offense charged.
Winthrop 836–840.  The Executive has easily satisfied
these considerations here.  The plurality's contrary con-
clusion rests upon an incomplete accounting and an un-
faithful application of those considerations.

A

The first two considerations are that a law-of-war military commission may only assume jurisdiction of "offences committed within the field of the command of the convening commander," and that such offenses "must have been committed within the period of the war." See *id.*, at 836, 837; *ante*, at 33. Here, as evidenced by Hamdan's charging document, the Executive has determined that the theater of the present conflict includes "Afghanistan, Pakistan and other countries" where al Qaeda has established training camps, App. to Pet. for Cert. 64a, and that the duration of that conflict dates back (at least) to Usama bin Laden's August 1996 "*Declaration of Jihad Against the Americans,*" *ibid.* Under the Executive's description of the conflict, then, every aspect of the charge, which alleges overt acts in "Afghanistan, Pakistan, Yemen and other countries" taking place from 1996 to 2001, satisfies the temporal and geographic prerequisites for the exercise of law-of-war military commission jurisdiction. *Id.*, at 65a–67a. And these judgments pertaining to the scope of the theater and duration of the present conflict are committed solely to the President in the exercise of his commander-in-chief authority. See *Prize Cases,* 2 Black, at 670 (concluding that the President's commander-in-chief judgment about the nature of a particular conflict was "a question to be decided *by him*, and this Court must be governed by the decisions and acts of the political department of the Government to which this power was entrusted").

Nevertheless, the plurality concludes that the legality of the charge against Hamdan is doubtful because "Hamdan is charged not with an overt act for which he was caught redhanded in a theater of war . . . but with an *agreement* the inception of which long predated . . . the [relevant armed conflict]." *Ante*, at 48 (emphasis in original). The plurality's willingness to second-guess the Executive's judgments in this context, based upon little more than its un-

supported assertions, constitutes an unprecedented depar-
ture from the traditionally limited role of the courts with
respect to war and an unwarranted intrusion on executive
authority. And even if such second-guessing were appropri-
ate, the plurality's attempt to do so is unpersuasive.

As an initial matter, the plurality relies upon the date of
the AUMF's enactment to determine the beginning point
for the "period of the war," Winthrop 836, thereby suggest-
ing that petitioner's commission does not have jurisdiction
to try him for offenses committed prior to the AUMF's
enactment. *Ante*, at 34–36, 48. But this suggestion be-
trays the plurality's unfamiliarity with the realities of
warfare and its willful blindness to our precedents. The
starting point of the present conflict (or indeed any con-
flict) is not determined by congressional enactment, but
rather by the initiation of hostilities. See *Prize Cases,
supra,* at 668 (recognizing that war may be initiated by
"invasion of a foreign nation," and that such initiation, and
the President's response, usually *precedes* congressional
action). Thus, Congress' enactment of the AUMF did not
mark the beginning of this Nation's conflict with al Qaeda,
but instead authorized the President to use force in the
midst of an ongoing conflict. Moreover, while the Presi-
dent's "war powers" may not have been activated until the
AUMF was passed, *ante*, 35, n. 31, the date of such activa-
tion has never been used to determine the scope of a mili-
tary commission's jurisdiction.[3] Instead, the traditional

———————
[3] Even if the formal declaration of war were generally the determina-
tive act in ascertaining the temporal reach of the jurisdiction of a
military commission, the AUMF itself is inconsistent with the plural-
ity's suggestion that such a rule is appropriate in this case. See *ante*, at
34–36, 48. The text of the AUMF is backward looking, authorizing the
use of "all necessary and appropriate force against those nations,
organizations, or persons he determines planned, authorized, commit-
ted, or aided the terrorist attacks that occurred on September 11,
2001." Thus, the President's decision to try Hamdan by military
commission—a use of force authorized by the AUMF—for Hamdan's

rule is that "[o]ffenses committed before a formal declara-
tion of war or before the declaration of martial law may be
tried by military commission." Green, The Military Com-
mission, 42 Am. J. Int'l L. 832, 848 (1948) (hereinafter
Green); see also C. Howland, Digest of Opinions of the
Judge-Advocates General of the Army 1067 (1912) (here-
inafter Howland) ("A military commission . . . exercising
. . . jurisdiction . . . under the laws of war . . . may take
cognizance of offenses committed, during the war, *before*
the initiation of the military government or martial law"
(emphasis in original));[4] cf. *Yamashita*, 327 U. S., at 13
("The extent to which the power to prosecute violations of
the law of war shall be exercised before peace is declared
rests, not with the courts, but with the political branch of
the Government"). Consistent with this principle, on facts
virtually identical to those here, a military commission
tried Julius Otto Kuehn for conspiring with Japanese
officials to betray the United States Fleet to the Imperial
Japanese Government prior to its attack on Pearl Harbor.
Green 848.[5]

———————

involvement with al Qaeda prior to September 11, 2001, fits comforta-
bly within the framework of the AUMF. In fact, bringing the Septem-
ber 11 conspirators to justice is the *primary point* of the AUMF. By
contrast, on the plurality's logic, the AUMF would not grant the Presi-
dent the authority to try Usama bin Laden himself for his involvement
in the events of September 11, 2001.

[4] The plurality suggests these authorities are inapplicable because
nothing in its "analysis turns on the admitted absence of either a
formal declaration of war or a declaration of martial law. Our focus
instead is on the . . . AUMF." *Ante,* at 35, n. 31. The difference identi-
fied by the plurality is purely semantic. Both Green and Howland
confirm that the date of the enactment that establishes a legal basis for
forming military commissions—whether it be a declaration of war, a
declaration of martial law, *or* an authorization to use military force—
does not limit the jurisdiction of military commissions to offenses
committed after that date.

[5] The plurality attempts to evade the import of this historical example
by observing that Kuehn was tried before a martial law commission for

Moreover, the President's determination that the present conflict dates at least to 1996 is supported by overwhelming evidence. According to the State Department, al Qaeda *declared war* on the United States as early as August 1996. See Dept. of State Fact Sheet: Usama bin Ladin (Aug. 21, 1998); Dept. of State Fact Sheet: The Charges against International Terrorist Usama Bin Laden (Dec. 20, 2000); cf. *Prize Cases*, 2 Black, at 668 (recognizing that a state of war exists even if "the declaration of it be *unilateral*" (emphasis in original)). In February 1998, al Qaeda leadership issued another statement ordering the indiscriminate—and, even under the laws of war as applied to legitimate nation-states, plainly illegal—killing of American civilians and military personnel alike. See Jihad Against Jews and Crusaders: World Islamic Front

_____

a violation of federal espionage statutes. *Ibid.* As an initial matter, the fact that Kuehn was tried before a martial law commission for an offense committed prior to the establishment of martial law provides strong support for the President's contention that he may try Hamdan for offenses committed prior to the enactment of the AUMF. Here the AUMF serves the same function as the declaration of martial law in Hawaii in 1941, establishing legal authority for the constitution of military commissions. Moreover, Kuehn was not tried and punished "by statute, but by the laws and usages of war." *United States* v. *Bernard Julius Otto Kuehn*, Board of Review 5 (Office of the Military Governor, Hawaii 1942). Indeed, in upholding the imposition of the death penalty, a sentence "not authorized by the Espionage statutes," *ibid.*, Kuehn's Board of Review explained that "[t]he fact that persons may be tried and punished . . . by a military commission for committing acts defined as offenses by . . . federal statutes does not mean that such persons are being tried for violations of such . . . statutes; they are, instead, being tried for acts made offenses only by orders of the . . . commanding general." *Id.*, at 6. Lastly, the import of this example is not undermined by *Duncan* v. *Kahanamoku,* 327 U. S. 304 (1946). The question before the Court in that case involved only whether "loyal civilians in loyal territory should have their daily conduct governed by military orders," *id.*, at 319; it did "not involve the well-established power of the military to exercise jurisdiction over . . . enemy belligerents," *id.*, at 313.

Statement 2 (Feb. 23, 1998), in Y. Alexander & M. Swetnam, Usama bin Laden's al-Qaida: Profile of a Terrorist Network, App. 1B (2001) ("The ruling to kill the Americans and their allies—civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it"). This was not mere rhetoric; even before September 11, 2001, al Qaeda was involved in the bombing of the World Trade Center in New York City in 1993, the bombing of the Khobar Towers in Saudi Arabia in 1996, the bombing of the U. S. Embassies in Kenya and Tanzania in 1998, and the attack on the U. S. S. *Cole* in Yemen in 2000. See *id.*, at 1. In response to these incidents, the United States "attack[ed] facilities belonging to Usama bin Ladin's network" as early as 1998. Dept. of State Fact Sheet: Usama bin Ladin (Aug. 21, 1998). Based on the foregoing, the President's judgment— that the present conflict substantially predates the AUMF, extending at least as far back as al Qaeda's 1996 declaration of war on our Nation, and that the theater of war extends at least as far as the localities of al Qaeda's principal bases of operations—is beyond judicial reproach. And the plurality's unsupportable contrary determination merely confirms that "'the Judiciary has neither aptitude, facilities nor responsibility'" for making military or foreign affairs judgments. *Hamdi*, 542 U. S., at 585 (THOMAS, J., dissenting) (quoting *Chicago & Southern Air Lines*, 333 U. S., at 111).

## B

The third consideration identified by Winthrop's treatise for the exercise of military commission jurisdiction pertains to the persons triable before such a commission, see *ante*, at 33; Winthrop 838. Law-of-war military commissions have jurisdiction over "'individuals of the enemy's army who have been guilty of illegitimate warfare or other offences in violation of the laws of war,'" *ante*, at 33-34

(quoting Winthrop 838). They also have jurisdiction over "[i]rregular armed bodies or persons not forming part of the organized forces of a belligerent" "who would not be likely to respect the laws of war." *Id.*, at 783, 784. Indeed, according to Winthrop, such persons are not "within the protection of the laws of war" and were "liable to be shot, imprisoned, or banished, either summarily where their guilt was clear or upon trial and conviction by military commission." *Id.*, at 784. This consideration is easily satisfied here, as Hamdan is an unlawful combatant charged with joining and conspiring with a terrorist network dedicated to flouting the laws of war. 344 F. Supp. 2d 152, 161 (DC 2004); App. to Pet. for Cert. 63a–67a.

C

The fourth consideration relevant to the jurisdiction of law-of-war military commissions relates to the nature of the offense charged. As relevant here, such commissions have jurisdiction to try "'[v]iolations of the laws and usages of war cognizable by military tribunals only,'" *ante*, at 34 (quoting Winthrop 839). In contrast to the preceding considerations, this Court's precedents establish that judicial review of "whether any of the acts charged is an offense against the law of war cognizable before a military tribunal" is appropriate. *Quirin*, 317 U. S., at 29. However, "charges of violations of the law of war triable before a military tribunal need not be stated with the precision of a common law indictment." *Yamashita*, 327 U. S., at 17. And whether an offense is a violation of the law of war cognizable before a military commission must be determined pursuant to "the system of common law applied by military tribunals." *Quirin*, *supra*, at 30; *Yamashita*, *supra*, at 8.

The common law of war as it pertains to offenses triable by military commission is derived from the "experience of our wars" and our wartime tribunals, Winthrop 839, and

"the laws and usages of war as understood and practiced by the civilized nations of the world," 11 Op. Atty. Gen. 297, 310 (1865). Moreover, the common law of war is marked by two important features. First, as with the common law generally, it is flexible and evolutionary in nature, building upon the experience of the past and taking account of the exigencies of the present. Thus, "[t]he law of war, like every other code of laws, declares what shall not be done, and does not say what may be done. The legitimate use of the great power of war, or rather the prohibitions upon the use of that power, increase or diminish as the necessity of the case demands." *Id.*, at 300. Accordingly, this Court has recognized that the "jurisdiction" of "our common-law war courts" has not been "prescribed by statute," but rather "has been adapted in each instance to the need that called it forth." *Madsen*, 343 U. S., at 346–348. Second, the common law of war affords a measure of respect for the judgment of military commanders. Thus, "[t]he commander of an army in time of war has the same power to organize military tribunals and execute their judgments that he has to set his squadrons in the field and fight battles. His authority in each case is from the law and usage of war." 11 Op. Atty. Gen., at 305. In recognition of these principles, Congress has generally "'left it to the President, and the military commanders representing him, to employ the commission, *as occasion may require*, for the investigation and punishment of violations of the law of war.'" *Madsen, supra*, at 347, n. 9 (quoting Winthrop 831; emphasis added).

In one key respect, the plurality departs from the proper framework for evaluating the adequacy of the charge against Hamdan under the laws of war. The plurality holds that where, as here, "neither the elements of the offense nor the range of permissible punishments is defined by statute or treaty, the precedent [establishing whether an offense is triable by military commission]

must be plain and unambiguous." *Ante*, at 38. This is a pure contrivance, and a bad one at that. It is contrary to the presumption we acknowledged in *Quirin*, namely, that the actions of military commissions are "not to be set aside by the courts without the *clear conviction* that they are" unlawful, 317 U. S., at 25 (emphasis added). It is also contrary to *Yamashita*, which recognized the legitimacy of that military commission notwithstanding a substantial disagreement pertaining to whether Yamashita had been charged with a violation of the law of war. Compare 327 U. S., at 17 (noting that the allegations were "adequat[e]" and "need not be stated with . . . precision"), with *id.*, at 35 (Murphy, J., dissenting) (arguing that the charge was inadequate). Nor does it find support from the separation of powers authority cited by the plurality. Indeed, Madison's praise of the separation of powers in The Federalist No. 47, quoted *ante*, at 38-39, if it has any relevance at all, merely highlights the illegitimacy of today's judicial intrusion onto core executive prerogatives in the waging of war, where executive competence is at its zenith and judicial competence at its nadir.

The plurality's newly minted clear-statement rule is also fundamentally inconsistent with the nature of the common law which, by definition, evolves and develops over time and does not, in all cases, "say what may be done." 11 Op. Atty. Gen., at 300. Similarly, it is inconsistent with the nature of warfare, which also evolves and changes over time, and for which a flexible, evolutionary common-law system is uniquely appropriate.[6]  Though the charge

_____

[6] Indeed, respecting the present conflict, the President has found that "the war against terrorism ushers in a new paradigm, one in which groups with broad, international reach commit horrific acts against innocent civilians, sometimes with the direct support of states. Our Nation recognizes that this new paradigm—ushered in not by us, but by terrorists—requires new thinking in the law of war." App. 34–35. Under the Court's approach, the President's ability to address this "new

against Hamdan easily satisfies even the plurality's manufactured rule, see *supra*, at 16–28, the plurality's inflexible approach has dangerous implications for the Executive's ability to discharge his duties as Commander in Chief in future cases. We should undertake to determine whether an unlawful combatant has been charged with an offense against the law of war with an understanding that the common law of war is flexible, responsive to the exigencies of the present conflict, and deferential to the judgment of military commanders.

1

Under either the correct, flexible approach to evaluating the adequacy of Hamdan's charge, or under the plurality's new, clear-statement approach, Hamdan has been charged with conduct constituting two distinct violations of the law of war cognizable before a military commission: membership in a war-criminal enterprise and conspiracy to commit war crimes. The charging section of the indictment alleges both that Hamdan "willfully and knowingly joined an enterprise of persons who shared a common criminal purpose," App. to Pet. for Cert. 65a, and that he "conspired and agreed with [al Qaeda] to commit . . . offenses triable by military commission," *ibid*.[7]

---

paradigm" of inflicting death and mayhem would be completely frozen by rules developed in the context of conventional warfare.

[7] It is true that both of these separate offenses are charged under a single heading entitled "CHARGE: CONSPIRACY," App. to Pet. for Cert. 65a. But that does not mean that they must be treated as a single crime, when the law of war treats them as separate crimes. As we acknowledged in *In re Yamashita*, 327 U. S. 1 (1946), "charges of violations of the law of war triable before a military tribunal need not be stated with the precision of a common law indictment." *Id.*, at 17; cf. W. Birkhimer, Military Government and Martial Law 536 (3d ed. 1914) (hereinafter Birkhimer) ("[I]t would be extremely absurd to expect the same precision in a charge brought before a court-martial as is required to support a conviction before a justice of the peace" (internal quotation marks omitted)).

The common law of war establishes that Hamdan's willful and knowing membership in al Qaeda is a war crime chargeable before a military commission. Hamdan, a confirmed enemy combatant and member or affiliate of al Qaeda, has been charged with willfully and knowingly joining a group (al Qaeda) whose purpose is "to support violent attacks against property and nationals (both military and civilian) of the United States." *Id.,* at 64a; 344 F. Supp. 2d, at 161. Moreover, the allegations specify that Hamdan joined and maintained his relationship with al Qaeda even though he "believed that Usama bin Laden and his associates were involved in the attacks on the U. S. Embassies in Kenya and Tazania in August 1998, the attack on the USS COLE in October 2000, and the

---

Nevertheless, the plurality contends that Hamdan was "not actually charged," *ante*, at 37, n. 32 (emphasis deleted), with being a member in a war criminal organization. But that position is demonstrably wrong. Hamdan's charging document expressly *charges* that he "willfully and knowingly joined an enterprise of persons who shared a common criminal purpose." App. to Pet. for Cert. 65a. Moreover, the plurality's contention that we may only look to the label affixed to the charge to determine if the charging document alleges an offense triable by military commission is flatly inconsistent with its treatment of the Civil War cases—where it accepts as valid charges that did not appear in the heading or title of the charging document, or even the listed charge itself, but only in the supporting specification. See, *e.g., ante*, at 45–46 (discussing the military commission trial of Wirz). For example, in the Wirz case, Wirz was charged with conspiring to violate the laws of war, and that charge was supported with allegations that he personally committed a number of atrocities. The plurality concludes that military commission jurisdiction was appropriate in that case not based upon the charge of conspiracy, but rather based upon the allegations of various atrocities in the specification which were *not* separately charged. *Ante,* at 45. Just as these atrocities, not separately charged, were independent violations of the law of war supporting Wirz's trial by military commission, so too here Hamdan's membership in al Qaeda and his provision of various forms of assistance to al Qaeda's top leadership are independent violations of the law of war supporting his trial by military commission.

attacks on the United States on September 11, 2001." App. to Pet. for Cert. 65a. These allegations, against a confirmed unlawful combatant, are alone sufficient to sustain the jurisdiction of Hamdan's military commission.

For well over a century it has been established that "to unite with banditti, jayhawkers, guerillas, or any other unauthorized marauders is a high offence against the laws of war; *the offence is complete when the band is organized or joined. The atrocities committed by such a band do not constitute the offence, but make the reasons, and sufficient reasons they are, why such banditti are denounced by the laws of war*." 11 Op. Atty. Gen., at 312 (emphasis added).[8] In other words, unlawful combatants, such as Hamdan, violate the law of war merely by joining an organization, such as al Qaeda, whose principal purpose is the "killing [and] disabling . . . of peaceable citizens or soldiers." Winthrop 784; see also 11 Op. Atty. Gen., at 314 ("A bush-whacker, a jayhawker, a bandit, a war rebel, an assassin, being public enemies, may be tried, condemned, and executed as offenders against the laws of war"). This conclusion is unsurprising, as it is a "cardinal principle of the law of war . . . that the civilian population must enjoy complete immunity." 4 International Committee of Red Cross, Commentary: Geneva Convention Relative to the

---

[8]These observations respecting the law of war were made by the Attorney General in defense of the military commission trial of the Lincoln conspirators'. As the foregoing quoted portion of that opinion makes clear, the Attorney General did not, as the Court maintains, "trea[t] the charge as if it alleged the substantive offense of assassination." *Ante*, at 40, n. 35. Rather, he explained that the conspirators "high offence against the laws of war" was "complete" when their band was "organized or joined," and did not depend upon "atrocities committed by such a band." 11 Op. Atty. Gen. 297, 312 (1865). Moreover, the Attorney General's conclusions specifically refute the plurality's unsupported suggestion that I have blurred the line between "those categories of 'offender' who may be tried by military commission . . . with the 'offenses' that may be so tried." *Ante*, at 37, n. 32.

Protection of Civilian Persons in Time of War 3 (J. Pictet ed. 1958). "Numerous instances of trials, for 'Violation of the laws of war,' of offenders of this description, are published in the General Orders of the years 1862 to 1866." Winthrop 784, and n. 57.[9]    Accordingly, on this basis

––––––

[9] The General Orders establishing the jurisdiction for military commissions during the Civil War provided that such offenses were violations of the laws of war cognizable before military commissions. See H. R. Doc. No. 65, 55th Cong., 3d Sess., 164 (1894) ("[P]ersons charged with the violation of the laws of war as spies, bridge-burners, marauders, &c., will . . . be held for trial under such charges"); *id.*, at 234 ("[T]here are numerous rebels . . . that . . . furnish the enemy with arms, provisions, clothing, horses and means of transportation; [such] insurgents are banding together in several of the interior counties for the purpose of assisting the enemy to rob, to maraud and to lay waste to the country. *All such persons are by the laws of war in every civilized country liable to capital punishment*" (emphasis added)).   Numerous trials were held under this authority. See, *e.g.*, U. S. War Dept., General Court-Martial Order No. 51, p. 1 (1866) (hereinafter G. C. M. O.). (indictment in the military commission trial of James Harvey Wells charged "[b]eing a guerrilla" and specified that he "willfully . . . [took] up arms as a guerrilla marauder, and did join, belong to, act and co-operate with guerrillas"); G. C. M. O. No. 108, Head-Quarters Dept. of Kentucky, p. 1 (1865) (indictment in the military commission trial of Henry C. Magruder charged "[b]eing a guerrilla" and specified that he "unlawfully, and of his own wrong, [took] up arms as a guerrilla marauder, and did join, belong to, act, and co-operate with a band of guerrillas"); G. C. M. O. No. 41, p. 1 (1864) (indictment in the military commission trial of John West Wilson charged that Wilson "did take up arms as an insurgent and guerrilla against the laws and authorities of the United States, and did join and co-operate with an armed band of insurgents and guerrillas who were engaged in plundering the property of peaceable citizens . . . in violation of the laws and customs of war"); G. C. M. O. No. 153, p. 1 (1864) (indictment in the military commission trial of Simeon B. Kight charged that defendant was "a guerrilla, and has been engaged in an unwarrantable and barbarous system of warfare against citizens and soldiers of the United States"); G. C. M. O. No. 93, pp. 3–4 (1864) (indictment in the military commission trial of Francis H. Norvel charged "[b]eing a guerrilla" and specified that he "unlawfully and by his own wrong, [took] up arms as an outlaw, guerrilla, and bushwhacker, against the lawfully constituted

alone, "the allegations of [Hamdan's] charge, tested by any reasonable standard, adequately allege a violation of the law of war." *Yamashita*, 327 U. S., at 17.

The conclusion that membership in an organization whose purpose is to violate the laws of war is an offense triable by military commission is confirmed by the experience of the military tribunals convened by the United States at Nuremberg. Pursuant to Article 10 of the Charter of the International Military Tribunal (IMT), the United States convened military tribunals "to bring individuals to trial for membership" in "a group or organization . . . declared criminal by the [IMT]." 1 Trials of War Criminals Before the Nuernberg Military Tribunals, p. XII (hereinafter Trials). The IMT designated various components of four Nazi groups—the Leadership Corps, Gestapo, SD, and SS—as criminal organizations. 22 IMT, Trial of the Major War Criminals 505, 511, 517 (1948); see also T. Taylor, The Anatomy of the Nuremberg Trials: A Personal Memoir 584–585 (1992). "[A] member of [such] an organization [could] be . . . convicted of the crime of membership and be punished for that crime by death." 22 IMT, at 499. Under this authority, the United States Military Tribunal at Nuremberg convicted numerous individuals for the act of knowing and voluntary membership in these organizations. For example, in Military Tribunal Case No. 1, *United States* v. *Brandt,* Karl Brandt, Karl Gebhardt, Rudolf Brandt, Joachim

─────────────

authorities of the United States government"); *id.*, at 9 (indictment in the military commission trial of James A. Powell charged "[t]ransgression of the laws and customs of war" and specified that he "[took] up arms in insurrection as a military insurgent, and did join himself to and, in arms, consort with . . . a rebel enemy of the United States, and the leader of a band of insurgents and armed rebels"); *id.*, at 10–11 (indictment in the military commission trial of Joseph Overstreet charged "[b]eing a guerrilla" and specified that he "did join, belong to, consort and co-operate with a band of guerrillas, insurgents, outlaws, and public robbers").

Mrugowsky, Wolfram Sievers, Viktor Brack, and Walde-
mar Hoven, were convicted and sentenced to death for the
crime of, *inter alia*, membership in an organization de-
clared criminal by the IMT; Karl Genzken and Fritz
Fischer were sentenced to life imprisonment for the same;
and Helmut Poppendick was convicted of no other offense
than membership in a criminal organization and sen-
tenced to a 10-year term of imprisonment. 2 Trials 180–
300. This Court denied habeas relief, 333 U. S. 836
(1948), and the executions were carried out at Landsberg
prison on June 2, 1948. 2 Trials 330.

Moreover, the Government has alleged that Hamdan
was not only a member of al Qaeda while it was carrying
out terrorist attacks on civilian targets in the United
States and abroad, but also that Hamdan aided and as-
sisted al Qaeda's top leadership by supplying weapons,
transportation, and other services. App. to Pet. for Cert.
65a–67a. These allegations further confirm that Hamdan
is triable before a law-of-war military commission for his
involvement with al Qaeda. See H. R. Doc. No. 65, 55th
Cong., 3d Sess., 234 (1894) ("[T]here are numerous rebels
. . . that . . . furnish the enemy with arms, provisions,
clothing, horses and means of transportation; [such] in-
surgents are banding together in several of the interior
counties for the purpose of assisting the enemy to rob, to
maruad and to lay waste to the country. *All such persons
are by the laws of war in every civilized country liable to
capital punishment*" (emphasis added)); Winthrop 840
(including in the list of offenses triable by law-of-war
military commissions "dealing with . . . enemies, or fur-
nishing them with money, arms, provisions, medicines,
&*c*").[10]   Undoubtedly, the conclusion that such conduct

_____

[10] Even if the plurality were correct that a membership offense must
be accompanied by allegations that the "defendant 'took up arms,'"
*ante*, at 37, n. 32, that requirement has easily been satisfied here. Not

violates the law of war led to the enactment of Article 104 of the UCMJ, which provides that "[a]ny person who . . . aids, or attempts to aid, the enemy with arms, ammunition, supplies, money, or other things . . . shall suffer death or such other punishment as a court-martial or military commission may direct." 10 U. S. C. §904.

2

Separate and apart from the offense of joining a contingent of "uncivilized combatants who [are] not . . . likely to respect the laws of war," Winthrop 784, Hamdan has been charged with "conspir[ing] and agree[ing] with . . . the al Qaida organization . . . to commit . . . offenses triable by military commission," App. to Pet. for Cert. 65a. Those offenses include "attacking civilians; attacking civilian objects; murder by an unprivileged belligerent; and terrorism." *Ibid.* This, too, alleges a violation of the law of war triable by military commission.

"[T]he experience of our wars," Winthrop 839, is rife with evidence that establishes beyond any doubt that conspiracy to violate the laws of war is itself an offense cognizable before a law-of-war military commission. World War II provides the most recent examples of the use of American military commissions to try offenses pertaining to violations of the laws of war. In that conflict, the orders establishing the jurisdiction of military commissions in various theaters of operation provided that conspiracy to violate the laws of war was a cognizable offense. See Letter, General Headquarters, United States Army Forces, Pacific (Sept. 24, 1945), Record in *Yamashita* v. *Styer*, O. T. 1945, No. 672, pp. 14, 16 (Exh. F) (Order respecting the "Regulations Governing the Trial of War

only has Hamdan been charged with providing assistance to top al Qaeda leadership (itself an offense triable by military commission), he has also been charged with receiving weapons training at an al Qaeda camp. App. to Pet. for Cert. 66a–67a.

Criminals" provided that "participation in a common plan
or conspiracy to accomplish" various offenses against the
law of war was cognizable before military commissions); 1
United Nations War Crimes Commission, Law Reports of
Trials of War Criminals 114–115 (1997) (hereinafter U. N.
Commission) (recounting that the orders establishing
World War II military commissions in the Pacific and
China included "participation in a common plan or con-
spiracy" pertaining to certain violations of the laws of war
as an offense triable by military commission).  Indeed,
those orders authorized trial by military commission of
participation in a conspiracy to commit "murder . . . or
other inhumane acts . . . against any civilian population,"
*id.*, at 114, which is precisely the offense Hamdan has
been charged with here.  And conspiracy to violate the
laws of war was charged in the highest profile case tried
before a World War II military commission, see *Quirin*,
317 U. S., at 23, and on numerous other occasions.  See,
*e.g.*, *Colepaugh* v. *Looney*, 235 F. 2d 429, 431 (CA10 1956);
Green 848 (describing the conspiracy trial of Julius Otto
Kuehn).

To support its contrary conclusion, *ante*, at 35–36, the
plurality attempts to evade the import of *Quirin* (and the
other World War II authorities) by resting upon this
Court's failure to address the sufficiency of the conspiracy
charge in the *Quirin* case, *ante*, at 41–43.  But the com-
mon law of war cannot be ascertained from this Court's
failure to pass upon an issue, or indeed to even mention
the issue in its opinion;[11] rather, it is ascertained by the
practice and usage of war.  Winthrop 839; *supra*, at 11–12.

_____

[11] The plurality recounts the respective claims of the parties in *Quirin*
pertaining to this issue and cites the United States Reports.  *Ante*, at
41-42.  But the claims of the parties are not included in the opinion of
the Court, but rather in the sections of the Reports entitled "Argument
for Petitioners," and "Argument for Respondent."  See 317 U. S., at
6–17.

The Civil War experience provides further support for the President's conclusion that conspiracy to violate the laws of war is an offense cognizable before law-of-war military commissions. Indeed, in the highest profile case to be tried before a military commission relating to that war, namely, the trial of the men involved in the assassination of President Lincoln, the charge provided that those men had "combin[ed], confederat[ed], and conspir[ed] . . . to kill and murder" President Lincoln. G. C. M. O. No. 356 (1865), reprinted in H. R. Doc. No. 314, 55th Cong., 3d Sess., 696 (1899) (hereinafter G. C. M. O. No. 356).[12]

In addition to the foregoing high-profile example, Winthrop's treatise enumerates numerous Civil War military commission trials for conspiracy to violate the law of war. Winthrop 839, n. 5. The plurality attempts to explain these examples away by suggesting that the conspiracies listed by Winthrop are best understood as "a species of

_____

[12] The plurality concludes that military commission jurisdiction was appropriate in the case of the Lincoln conspirators because they were charged with "'maliciously, unlawfully, and traitorously murdering the said Abraham Lincoln,'" *ante*, at 40, n. 35. But the sole charge filed in that case alleged conspiracy, and the allegations pertaining to "maliciously, unlawfully, and traitorously murdering the said Abraham Lincoln" were not charged or labeled as separate offenses, but rather as overt acts "in pursuance of and in prosecuting said malicious, unlawful, and traitorous *conspiracy*. " G. C. M. O. No. 356, at \_\_\_ (emphasis added). While the plurality contends the murder of President Lincoln was charged as a distinct separate offense, the foregoing quoted language of the charging document unequivocally establishes otherwise. Moreover, though I agree that the allegations pertaining to these overt acts provided an independent basis for the military commission's jurisdiction in that case, that merely confirms the propriety of examining all the acts alleged—whether or not they are labeled as separate offenses—to determine if a defendant has been charged with a violation of the law of war. As I have already explained, Hamdan has been charged with violating the law of war not only by participating in a conspiracy to violate the law of war, but also by joining a war criminal enterprise and by supplying provisions and assistance to that enterprise's top leadership.

compound offense," namely, violations both of the law of war and ordinary criminal laws, rather than "stand-alone offense[s] against the law of war." *Ante*, at 44–45 (citing, as an example, murder in violation of the laws of war). But the fact that, for example, conspiracy to commit murder can at the same time violate ordinary criminal laws and the law of war, so that it is "a combination of the two species of offenses," Howland 1071, does not establish that a military commission would not have jurisdiction to try that crime solely on the basis that it was a violation of the law of war. Rather, if anything, and consistent with the principle that the common law of war is flexible and affords some level of deference to the judgments of military commanders, it establishes that military commissions would have the discretion to try the offense as (1) one against the law of war, or (2) one against the ordinary criminal laws, or (3) both.

In any event, the plurality's effort to avoid the import of Winthrop's footnote through the smokescreen of its "compound offense" theory, *ante*, at 44–45, cannot be reconciled with the particular charges that sustained military commission jurisdiction in the cases that Winthrop cites. For example, in the military commission trial of Henry Wirtz, Charge I provided that he had been

"[m]aliciously, willfully, and traitorously . . . *combining, confederating, and conspiring*, together [with various other named and unnamed co-conspirators], to injure the health and destroy the lives of soldiers in the military service of the United States, then held and being prisoners of war within the lines of the so-called Confederate States, and in the military prisons thereof, to the end that the armies of the United States might be weakened and impaired, *in violation of the laws and customs of war*." G. C. M. O. No. 607 (1865), reprinted in H. R. Doc. No. 314, at 785 (em-

phasis added).

Likewise, in the military commission trial of Lenger Grenfel, Charge I accused Grenfel of *"[c]onspiring, in violation of the laws of war*, to release rebel prisoners of war confined by authority of the United States at Camp Douglas, near Chicago, Ill."  G. C. M. O. No. 452 (1865), reprinted in H. R. Doc. No. 314, at 724 (emphasis added)[13]; see also G. C. M. O. No. 41, at 20 (1864) (indictment in the military commission trial of Robert Louden charged "[c]onspiring with the rebel enemies of the United States to embarrass and impede the military authorities in the

---

[13]The plurality's attempt to undermine the significance of these cases is unpersuasive.  The plurality suggests the Wirz case is not relevant because the specification supporting his conspiracy charge alleged that he *"personally committed* a number of atrocities." *Ante*, at 45.  But this does not establish that conspiracy to violate the laws of war, the very crime with which Wirz was charged, is not itself a violation of the law of war.  Rather, at best, it establishes that in addition to conspiracy Wirz violated the laws of war by committing various atrocities, just as Hamdan violated the laws of war not only by conspiring to do so, but also by joining al Qaeda and providing provisions and services to its top leadership.  Moreover, the fact that Wirz was charged with overt acts that are more severe than the overt acts with which Hamdan has been charged does not establish that conspiracy is not an offense cognizable before military commission; rather it merely establishes that Wirz's offenses may have been comparably worse than Hamdan's offenses.

The plurality's claim that the charge against Lenger Grenfel supports its compound offense theory is similarly unsupportable.  The plurality does not, and cannot, dispute that Grenfel was charged with conspiring to violate the laws of war by releasing rebel prisoners—a charge that bears no relation to a crime "ordinarily triable in civilian courts." *Ante*, at 46, n. 37.  Tellingly, the plurality does not reference or discuss this charge, but instead refers to the conclusion of Judge Advocate Holt that Grenfel also "'united himself with traitors and malefactors for the overthrow of our Republic in the interest of slavery.'" *Ibid.* (quoting H. R. Doc. No. 314, at 689).  But Judge Advocate Holt's observation provides no support for the plurality's conclusion, as it does not discuss the charges that sustained military commission jurisdiction, much less suggest that such charges were not violations of the law of war.

suppression of the existing rebellion, by the burning and destruction of steamboats and means of transportation on the Mississippi river"). These examples provide incontrovertible support for the President's conclusion that the common law of war permits military commission trials for conspiracy to violate the law of war. And they specifically contradict the plurality's conclusion to the contrary, thereby easily satisfying its requirement that the Government "make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war." *Ante*, at 39-40.[14]

The plurality further contends, in reliance upon Win-

_____

[14] The plurality contends that international practice—including the practice of the IMT at Nuremberg—supports its conclusion that conspiracy is not an offense triable by military commission because "'[t]he Anglo-American concept of conspiracy was not part of European legal systems and arguably not an element of the internationally recognized laws of war.'" *Ante*, at 47 (quoting T. Taylor, Anatomy of the Nuremberg Trials: A Personal Memoir 36 (1992)). But while the IMT did not criminalize all conspiracies to violate the law of war, it did criminalize "participation in a common plan or conspiracy" to wage aggressive war. See 1 Trials, pp. XI–XII. Moreover, the World War II military tribunals of several European nations recognized conspiracy to violate the laws of war as an offense triable before military commissions. See 15 U. N. Commission 90–91 (noting that the French Military Tribunal at Marseilles found Henri Georges Stadelhofer "guilty of the crime of *association de malfaiteurs*," namely of "having formed with various members of the German Gestapo an association with the aim of preparing or committing crimes against persons or property, without justification under the laws and usages of war"); 11 *id.,* at 98 (noting that the Netherlands' military tribunals were authorized to try conspiracy to violate the laws of war). Thus, the European legal systems' approach to domestic conspiracy law has not prevented European nations from recognizing conspiracy offenses as violations of the law of war. This is unsurprising, as the law of war is derived not from domestic law but from the wartime practices of civilized nations, including the United States, which has consistently recognized that conspiracy to violate the laws of war is an offense triable by military commission.

throp, that conspiracy is not an offense cognizable before a law-of-war military commission because "it is not enough to intend to violate the law of war and commit overt acts in furtherance of that intention unless the overt acts either are themselves offenses against the law of war or constitute steps sufficiently substantial to qualify as an attempt*." Ibid.* But Winthrop does not support the plurality's conclusion. The passage in Winthrop cited by the plurality states only that "the jurisdiction of the military commission should be restricted to cases of offence consisting in *overt acts*, *i.e.* in unlawful commissions or actual attempts to commit, and not in intentions merely." Winthrop 841 (emphasis in original). This passage would be helpful to the plurality if its subject were "conspiracy," rather than the "jurisdiction of the military commission." Winthrop is not speaking here of the requirements for a conspiracy charge, but of the requirements for *all* charges. Intentions do not suffice. An unlawful act—such as committing the crime of conspiracy—is necessary. Winthrop says nothing to exclude either conspiracy or membership in a criminal enterprise, both of which go beyond "intentions merely" and "consis[t] of *overt acts, i.e.* . . . unlawful commissions or actual attempts to commit," and both of which are *expressly* recognized by Winthrop as crimes against the law of war triable by military commissions. *Id.*, at 784; *id.*, at 839, and n. 5, 840. Indeed, the commission of an *"overt ac[t]"* is the traditional requirement for the completion of the crime of conspiracy, and the charge against Hamdan alleges numerous such overt acts. App. to Pet. for Cert. 65a. The plurality's approach, unsupported by Winthrop, requires that any overt act to further a conspiracy must *itself* be a completed war crime *distinct from conspiracy*—which merely begs the question the plurality sets out to answer, namely, whether conspiracy itself may constitute a violation of the law of war. And, even the plurality's unsupported standard is satisfied

here. Hamdan has been charged with the overt acts of providing protection, transportation, weapons, and other services to the enemy, *id.*, at 65a–67a, acts which in and of themselves are violations of the laws of war. See *supra*, at 20–21; Winthrop 839–840.

3

Ultimately, the plurality's determination that Hamdan has not been charged with an offense triable before a military commission rests not upon any historical example or authority, but upon the plurality's raw judgment of the "inability on the Executive's part here to satisfy the most basic precondition . . . for establishment of military commissions: military necessity." *Ante*, at 48. This judgment starkly confirms that the plurality has appointed itself the ultimate arbiter of what is quintessentially a policy and military judgment, namely, the appropriate military measures to take against those who "aided the terrorist attacks that occurred on September 11, 2001." AUMF §2(a), 115 Stat. 224. The plurality's suggestion that Hamdan's commission is illegitimate because it is not dispensing swift justice on the battlefield is unsupportable. *Ante*, at 43. Even a cursory review of the authorities confirms that law-of-war military commissions have wide-ranging jurisdiction to try offenses against the law of war in exigent and nonexigent circumstances alike. See, *e.g.,* Winthrop 839–840; see also *Yamashita*, 327 U. S., at 5 (military commission trial after the cessation of hostilities in the Philippines); *Quirin*, 317 U. S. 1 (military commission trial in Washington, D. C.). Traditionally, retributive justice for heinous war crimes is as much a "military necessity" as the "demands" of "military efficiency" touted by the plurality, and swift military retribution is precisely what Congress authorized the President to impose on the September 11 attackers in the AUMF.

Today a plurality of this Court would hold that conspir-

acy to massacre innocent civilians does not violate the laws of war. This determination is unsustainable. The judgment of the political branches that Hamdan, and others like him, must be held accountable before military commissions for their involvement with and membership in an unlawful organization dedicated to inflicting massive civilian casualties is supported by virtually every relevant authority, including all of the authorities invoked by the plurality today. It is also supported by the nature of the present conflict. We are not engaged in a traditional battle with a nation-state, but with a worldwide, hydra-headed enemy, who lurks in the shadows conspiring to reproduce the atrocities of September 11, 2001, and who has boasted of sending suicide bombers into civilian gatherings, has proudly distributed videotapes of beheadings of civilian workers, and has tortured and dismembered captured American soldiers. But according to the plurality, when our Armed Forces capture those who are plotting terrorist atrocities like the bombing of the Khobar Towers, the bombing of the U. S. S. *Cole,* and the attacks of September 11—even if their plots are advanced to the very brink of fulfillment—our military cannot charge those criminals with any offense against the laws of war. Instead, our troops must catch the terrorists "redhanded," *ante*, at 48, in the midst of *the attack itself*, in order to bring them to justice. Not only is this conclusion fundamentally inconsistent with the cardinal principal of the law of war, namely protecting non-combatants, but it would sorely hamper the President's ability to confront and defeat a new and deadly enemy.

After seeing the plurality overturn longstanding precedents in order to seize jurisdiction over this case, *ante*, at 2–4 (SCALIA, J., dissenting), and after seeing them disregard the clear prudential counsel that they abstain in these circumstances from using equitable powers, *ante,* at 19–24, it is no surprise to see them go on to overrule one

after another of the President's judgments pertaining to the conduct of an ongoing war. Those Justices who today disregard the commander-in-chief's wartime decisions, only 10 days ago deferred to the judgment of the Corps of Engineers with regard to a matter much more within the competence of lawyers, upholding that agency's wildly implausible conclusion that a storm drain is a tributary of the waters of the United States. See *Rapanos* v. *United States*, 547 U. S. ___(2006). It goes without saying that there is much more at stake here than storm drains. The plurality's willingness to second-guess the determination of the political branches that these conspirators must be brought to justice is both unprecedented and dangerous.

## III

The Court holds that even if "the Government has charged Hamdan with an offense against the law of war cognizable by military commission, the commission lacks power to proceed" because of its failure to comply with the terms of the UCMJ and the four Geneva Conventions signed in 1949. *Ante*, at 49. This position is untenable.

## A

As with the jurisdiction of military commissions, the procedure of such commissions "has [not] been prescribed by statute," but "has been adapted in each instance to the need that called it forth." *Madsen*, 343 U. S., at 347–348. Indeed, this Court has concluded that "[i]n the absence of attempts by Congress to limit the President's power, it appears that, as Commander in Chief of the Army and Navy of the United States, he may, in time of war, establish and prescribe the jurisdiction and procedure of military commissions." *Id.*, at 348. This conclusion is consistent with this Court's understanding that military commissions are "our common-law war courts." *Id.*, at

346–347.[15]  As such, "[s]hould the conduct of those who compose martial-law tribunals become [a] matter of judicial determination subsequently before the civil courts, those courts will give great weight to the opinions of the officers as to what the customs of war in any case justify and render necessary."  Birkhimer 534.

The Court nevertheless concludes that at least one provision of the UCMJ amounts to an attempt by Congress to limit the President's power.  This conclusion is not only

_____

[15] Though it does not constitute a basis for any holding of the Court, the Court maintains that, as a "general rule," "the procedures governing trials by military commission historically have been the same as those governing courts-martial." *Ante*, at 54, 53.  While it is undoubtedly true that military commissions have invariably employed most of the procedures employed by courts-martial, that is not a requirement. See Winthrop 841 ("[M]ilitary commissions . . . are commonly conducted according to the rules and forms governing courts-martial.  These war-courts are indeed more summary in their action than are the courts held under the Articles of war, and . . . their proceedings . . . will not be rendered *illegal* by the omission of details required upon trials by courts-martial" (emphasis in original; footnotes omitted)); 1 U. N. Commission 116–117 ("The [World War II] Mediterranean Regulations (No. 8) provide that Military Commissions shall conduct their proceedings as may be deemed necessary for full and fair trial, having regard for, *but not being bound by*, the rules of procedure prescribed for General Courts Martial" (emphasis added)); *id.*, at 117 ("In the [World War II] European directive it is stated . . . that Military Commissions shall have power to make, as occasion requires, such rules for the conduct of their proceedings consistent with the powers of such Commissions, and with the rules of procedure . . . as are deemed necessary for a full and fair trial of the accused, having regard for, without being bound by, the rules of procedure and evidence prescribed for General Courts Martial").  Moreover, such a requirement would conflict with the settled understanding of the flexible and responsive nature of military commissions and the President's wartime authority to employ such tribunals as he sees fit.  See Birkhimer 537–538 ("[M]ilitary commissions may so vary their procedure as to adapt it to any situation, and may extend their powers to any necessary degree. . . . The military commander decides upon the character of the military tribunal which is suited to the occasion . . . and his decision is final").

contrary to the text and structure of the UCMJ, but it is also inconsistent with precedent of this Court.  Consistent with *Madsen*'s conclusion pertaining to the common-law nature of military commissions and the President's discretion to prescribe their procedures, Article 36 of the UCMJ authorizes the President to establish procedures for military commissions "which shall, *so far as he considers practicable*, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter."  10 U. S. C. §836(a) (emphasis added).  Far from constraining the President's authority, Article 36 recognizes the President's prerogative to depart from the procedures applicable in criminal cases whenever *he alone* does not deem such procedures "practicable."  While the procedural regulations promulgated by the Executive must not be "contrary to" the UCMJ, only a few provisions of the UCMJ mention "military commissions," see *ante*, at 58, n. 49, and there is no suggestion that the procedures to be employed by Hamdan's commission implicate any of those provisions.

Notwithstanding the foregoing, the Court concludes that Article 36(b) of the UCMJ, 10 U. S. C. §836(b), which provides that "'[a]ll rules and regulations made under this article shall be uniform insofar as practicable,'" *ante,* at 57, requires the President to employ the same rules and procedures in military commissions as are employed by courts-martial *"insofar as practicable." Ante*, at 59.  The Court further concludes that Hamdan's commission is unlawful because the President has not explained why it is not practicable to apply the same rules and procedures to Hamdan's commission as would be applied in a trial by court martial. *Ante*, at 60.

This interpretation of §836(b) is unconvincing.  As an initial matter, the Court fails to account for our cases interpreting the predecessor to Article 21 of the UCMJ—

Article 15 of the Articles of War—which provides crucial context that bears directly on the proper interpretation of Article 36(b). Article 15 of the Articles of War provided that:

> "The provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions, provost courts, or other military tribunals of concurrent jurisdiction in respect of offenders or offences that by statute or by the law of war may be triable by such military commissions, provost courts, or other military tribunals."

In *Yamashita*, this Court concluded that Article 15 of the Articles of War preserved the President's unfettered authority to prescribe military commission procedure. The Court explained, "[b]y thus recognizing military commissions in order to preserve their traditional jurisdiction over enemy combatants unimpaired by the Articles, Congress gave sanction . . . to *any use* of the military commission contemplated by the common law of war." 327 U. S., at 20 (emphasis added)[16]; see also *Quirin*, 317 U. S., at 28; *Madsen*, 343 U. S., at 355. In reaching this conclusion, this Court treated as authoritative the congressional testimony of Judge Advocate General Crowder, who testi-

---

[16]The Court suggests that Congress' amendment to Article 2 of the UCMJ, providing that the UCMJ applies to "persons within an area leased by or otherwise reserved or acquired for the use of the United States," 10 U. S. C. §802(a)(12), deprives *Yamashita*'s conclusion respecting the President's authority to promulgate military commission procedures of its "precedential value." *Ante*, at 56. But this merely begs the question of the scope and content of the remaining provisions of the UCMJ. Nothing in the additions to Article 2, or any other provision of the UCMJ, suggests that Congress has disturbed this Court's unequivocal interpretation of Article 21 as preserving the common-law status of military commissions and the corresponding authority of the President to set their procedures pursuant to his commander-in-chief powers. See *Quirin*, 317 U. S., at 28; *Yamashita*, 327 U. S., at 20; *Madsen* v. *Kinsella*, 343 U. S. 341, 355 (1952).

fied that Article 15 of the Articles of War was enacted to preserve the military commission as "'our common-law war court.'" *Yamashita, supra*, at 19, n. 7. And this Court recognized that Article 15's preservation of military commissions as common-law war courts preserved the President's commander-in-chief authority to both "establish" military commissions and to "prescribe [their] procedure[s]." *Madsen*, 343 U. S., at 348; *id.*, at 348–349 (explaining that Congress had "refrain[ed] from legislating" in the area of military commission procedures, in "contras[t] with its traditional readiness to . . . prescrib[e], with particularity, the jurisdiction and procedure of United States courts-martial"); cf. Green 834 ("The military commission exercising jurisdiction under common law authority is usually appointed by a superior military commander and is limited in its procedure only by the will of that commander. Like any other common law court, in the absence of directive of superior authority to the contrary, the military commission is free to formulate its own rules of procedure").

Given these precedents, the Court's conclusion that Article 36(b) requires the President to apply the same rules and procedures to military commissions as are applicable to courts-martial is unsustainable. When Congress codified Article 15 of the Articles of War in Article 21 of the UCMJ it was "presumed to be aware of . . . and to adopt" this Court's interpretation of that provision as preserving the common-law status of military commissions, inclusive of the President's unfettered authority to prescribe their procedures. *Lorillard* v. *Pons,* 434 U. S. 575, 580 (1978). The Court's conclusion that Article 36(b) repudiates this settled meaning of Article 21 is not based upon a specific textual reference to military commissions, but rather on a one-sentence subsection providing that "[a]ll rules and regulations made under this article shall be uniform insofar as practicable." 10 U. S. C. §836(b).

This is little more than an impermissible repeal by implication. See *Branch* v. *Smith,* 538 U. S. 254, 273 (2003). ("We have repeatedly stated . . . that absent a clearly expressed congressional intention, repeals by implication are not favored" (citation and internal quotation marks omitted)). Moreover, the Court's conclusion is flatly contrary to its duty not to set aside Hamdan's commission "without the *clear* conviction that [it is] in conflict with the . . . laws of Congress constitutionally enacted." *Quirin, supra*, at 25 (emphasis added).

Nothing in the text of Article 36(b) supports the Court's sweeping conclusion that it represents an unprecedented congressional effort to change the nature of military commissions from common-law war courts to tribunals that must presumptively function like courts-martial. And such an interpretation would be strange indeed. The vision of uniformity that motivated the adoption of the UCMJ, embodied specifically in Article 36(b), is nothing more than uniformity across the separate branches of the armed services. See ch. 169, 64 Stat. 107 (preamble to the UCMJ explaining that the UCMJ is an act "[t]o unify, consolidate, revise, and codify the Articles of War, the Articles for the Government of the Navy, and the disciplinary laws of the Coast Guard"). There is no indication that the UCMJ was intended to require uniformity in procedure between courts-martial and military commissions, tribunals that the UCMJ itself recognizes are different. To the contrary, the UCMJ expressly recognizes that different tribunals will be constituted in different manners and employ different procedures. See 10 U. S. C. §866 (providing for three different types of courts-martial—general, special, and summary—constituted in different manners and employing different procedures). Thus, Article 36(b) is best understood as establishing that, so far as practicable, the rules and regulations governing tribunals convened by the Navy must be uniform with the rules

and regulations governing tribunals convened by the Army. But, consistent with this Court's prior interpretations of Article 21 and over a century of historical practice, it cannot be understood to require the President to conform the procedures employed by military commissions to those employed by courts-martial.[17]

Even if Article 36(b) could be construed to require procedural uniformity among the various tribunals contemplated by the UCMJ, Hamdan would not be entitled to relief. Under the Court's reading, the President is entitled to prescribe different rules for military commissions than for courts-martial when he determines that it is not "practicable" to prescribe uniform rules. The Court does not resolve the level of deference such determinations would be owed, however, because, in its view, "[t]he President has not . . . [determined] that it is impracticable to apply the rules for courts-martial." *Ante*, at 60. This is simply not the case. On the same day that the President issued Military Commission Order No. 1, the Secretary of Defense explained that "the president decided to establish

_____

[17] It bears noting that while the Court does not hesitate to cite legislative history that supports its view of certain statutory provisions, see *ante*, at 14–15, and n. 10, it makes no citation of the legislative history pertaining to Article 36(b), which contradicts its interpretation of that provision. Indeed, if it were authoritative, the *only* legislative history relating to Article 36(b) would confirm the obvious—Article 36(b)'s uniformity requirement pertains to uniformity between the three branches of the Armed Forces, and no more. When that subsection was introduced as an amendment to Article 36, its author explained that it would leave the three branches "enough leeway to provide a different provision where it is absolutely necessary" because "there are some differences in the services." Hearings on H. R. 2498 before the Subcommittee No. 1 of the House Committee on Armed Services, 81st Cong., 1st Sess., 1015 (1949). A further statement explained that "there might be some slight differences that would pertain as to the Navy in contrast to the Army, but at least [Article 36(b)] is an expression of the congressional intent that we want it to be as uniform as possible." *Ibid.*

military commissions because he wanted the option of a process that is different from those processes which we already have, namely the federal court system . . . and the military court system," Dept. of Defense News Briefing on Military Commissions (Mar. 21, 2002) (remarks of Donald Rumsfeld), available at http://www.dod.gov/transcrips/ 2002/t03212002_t0321sd.html (as visited June 26, 2006, and available in Clerk of Court's case file) (hereinafter News Briefing), and that "[t]he commissions are intended to be different . . . because the [P]resident recognized that there had to be differences to deal with the unusual situa- tion we face and that a different approach was needed." *Ibid.* The President reached this conclusion because

> "we're in the middle of a war, and . . . had to design a procedure that would allow us to pursue justice for these individuals while at the same time prosecuting the war most effectively. And that means setting rules that would allow us to preserve our intelligence secrets, develop more information about terrorist ac- tivities that might be planned for the future so that we can take action to prevent terrorist attacks against the United States. . . . [T]here was a constant balanc- ing of the requirements of our war policy and the im- portance of providing justice for individuals . . . and *each* deviation from the standard kinds of rules that we have in our criminal courts was motivated by the desire to strike the balance between individual justice and the broader war policy." *Ibid.* (remarks of Doug- las J. Feith, Under Secretary of Defense for Policy (emphasis added)).

The Court provides no explanation why the President's determination that employing court-martial procedures in the military commissions established pursuant to Military Commission Order No. 1 would hamper our war effort is in any way inadequate to satisfy its newly minted "practica-

bility" requirement. On the contrary, this determination is precisely the kind for which the "Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.'" *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103, 111 (1948). And, in the context of the present conflict, it is exactly the kind of determination Congress countenanced when it authorized the President to use all necessary and appropriate force against our enemies. Accordingly, the President's determination is sufficient to satisfy any practicability requirement imposed by Article 36(b).

The plurality further contends that Hamdan's commission is unlawful because it fails to provide him the right to be present at his trial, as recognized in 10 U. S. C. A. §839(c) (Supp. 2006). *Ante*, at 61. But §839(c) applies to courts-martial, not military commissions. It provides:

> "When the members of a court-martial deliberate or vote, only the members may be present. All other proceedings, including any other consultation of the members of the court with counsel or the military judge, shall be made a part of the record and shall be in the presence of the accused, the defense counsel, the trial counsel, and, in cases in which a military judge has been detailed to the court, the military judge."

In context, "all other proceedings" plainly refers exclusively to "other proceedings" pertaining to a court-martial.[18] This is confirmed by the provision's subsequent reference to "members of the *court*" and to "cases in which a military

---

[18] In addition to being foreclosed by the text of the provision, the Court's suggestion that 10 U. S. C. A. §839(c) (Supp. 2006) applies to military commissions is untenable because it would require, in military commission proceedings, that the accused be present when the members of the commission voted on his guilt or innocence.

judge has been detailed to the *court*." It is also confirmed by the other provisions of §839, which refer only to courts-martial. See §§839(a)(1)–(4) ("[A]ny time after the service of charges which have been referred for trial to a court-martial composed of a military judge and members, the military judge may . . . call the court into session without the presence of the members for the purpose of," hearing motions, issuing rulings, holding arraignments, receiving pleas, and performing various procedural functions). See also §839(b) ("Proceedings under subsection (a) shall be conducted in the presence of the accused"). Section 839(c) simply does not address the procedural requirements of military commissions.

### B

The Court contends that Hamdan's military commission is also unlawful because it violates Common Article 3 of the Geneva Conventions, see *ante*, at 65–72. Furthermore, Hamdan contends that his commission is unlawful because it violates various provisions of the Third Geneva Convention. These contentions are untenable.

### 1

As an initial matter, and as the Court of Appeals concluded, both of Hamdan's Geneva Convention claims are foreclosed by *Johnson* v. *Eisentrager,* 339 U. S. 763 (1950). In that case the respondents claimed, *inter alia*, that their military commission lacked jurisdiction because it failed to provide them with certain procedural safeguards that they argued were required under the Geneva Conventions. *Id*., at 789–790. While this Court rejected the underlying merits of the respondents' Geneva Convention claims, *id*., at 790, it also held, in the alternative, that the respondents could "not assert . . . that anything in the Geneva Convention makes them immune from prosecution or punishment for war crimes," *id*., at 789. The Court explained:

> "We are not holding that these prisoners have no
> right which the military authorities are bound to re-
> spect. The United States, by the Geneva Convention
> of July 27, 1929, 47 Stat. 2021, concluded with forty-
> six other countries, including the German Reich, an
> agreement upon the treatment to be accorded cap-
> tives. These prisoners claim to be and are entitled to
> its protection. It is, however, the obvious scheme of
> the Agreement that responsibility for observance and
> enforcement of these rights is upon political and mili-
> tary authorities. Rights of alien enemies are vindi-
> cated under it only through protests and intervention
> of protecting powers as the rights of our citizens
> against foreign governments are vindicated only by
> Presidential intervention." *Id.*, at 789, n. 14.

This alternative holding is no less binding than if it were
the exclusive basis for the Court's decision. See *Massa-
chusetts* v. *United States,* 333 U. S. 611, 623 (1948). While
the Court attempts to cast *Eisentrager*'s unqualified,
alternative holding as footnote dictum, *ante*, at 63–64, it
does not dispute the correctness of its conclusion, namely,
that the provisions of the 1929 Geneva Convention were
not judicially enforceable because that Convention con-
templated that diplomatic measures by political and mili-
tary authorities were the exclusive mechanisms for such
enforcement. Nor does the Court suggest that the 1949
Geneva Conventions departed from this framework. See
*ante*, at 64 ("We may assume that 'the obvious scheme' of
the 1949 Conventions is identical in all relevant respects
to that of the 1929 Convention").

Instead, the Court concludes that petitioner may seek
judicial enforcement of the provisions of the Geneva Con-
ventions because "they are . . . part of the law of war. And
compliance with the law of war is the condition upon
which the authority set forth in Article 21 is granted."

*Ante*, at 65 (citation omitted). But Article 21 authorizes the use of military commissions; it does not purport to render judicially enforceable aspects of the law of war that are not so enforceable of their own accord. See *Quirin*, 317 U. S., at 28 (by enacting Article 21, "Congress has explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war"). The Court cannot escape *Eisentrager*'s holding merely by observing that Article 21 mentions the law of war; indeed, though *Eisentrager* did not specifically consider the Court's novel interpretation of Article 21, *Eisentrager* involved a challenge to the legality of a World War II military commission, which, like all such commissions, found its authorization in Article 15 of the Articles of War, the predecessor to Article 21 of the UCMJ. Thus, the Court's interpretation of Article 21 is foreclosed by *Eisentrager*.

In any event, the Court's argument is too clever by half. The judicial nonenforceability of the Geneva Conventions derives from the fact that those Conventions have exclusive enforcement mechanisms, see *Eisentrager*, *supra*, at 789, n. 14, and this, too, is part of the law of war. The Court's position thus rests on the assumption that Article 21's reference to the "laws of war" selectively incorporates only those aspects of the Geneva Conventions that the Court finds convenient, namely, the substantive requirements of Common Article 3, and not those aspects of the Conventions that the Court, for whatever reason, disfavors, namely the Conventions' exclusive diplomatic enforcement scheme. The Court provides no account of why the *partial* incorporation of the Geneva Conventions should extend only so far—and no further—because none is available beyond its evident preference to adjudicate those matters that the law of war, through the Geneva Conventions, consigns exclusively to the political branches.

Even if the Court were correct that Article 21 of the

UCMJ renders judicially enforceable aspects of the law of war that are not so enforceable by their own terms, Article 21 simply cannot be interpreted to render judicially enforceable the particular provision of the law of war at issue here, namely Common Article 3 of the Geneva Conventions. As relevant, Article 21 provides that "[t]he provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions . . . of concurrent jurisdiction with respect to *offenders or offenses* that by statute *or by the law of war* may be tried by military commissions." 10 U. S. C. §821 (emphasis added). Thus, to the extent Article 21 can be interpreted as authorizing judicial enforcement of aspects of the law of war that are not otherwise judicially enforceable, that authorization only extends to provisions of the law of war that relate to whether a particular "offender" or a particular "offense" is triable by military commission. Common Article 3 of the Geneva Conventions, the sole provision of the Geneva Conventions relevant to the Court's holding, relates to neither. Rather, it relates exclusively to the particulars of the tribunal itself, namely, whether it is "regularly constituted" and whether it "afford[s] all the judicial guarantees which are recognized as indispensable by civilized peoples." Third Geneva Convention, Art. 3, ¶1*(d),* Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U. S. T. 3316, 3320, T. I. A. S No. 3364.

2

In addition to being foreclosed by *Eisentrager*, Hamdan's claim under Common Article 3 of the Geneva Conventions is meritless. Common Article 3 applies to "armed conflict not of an international character occurring in the territory of one of the High Contracting Parties." 6 U. S. T., at 3318. "Pursuant to [his] authority as Commander in Chief and Chief Executive of the United States," the President has "accept[ed] the legal conclusion of the Department of

Justice . . . that common Article 3 of Geneva does not apply to . . . al Qaeda . . . detainees, because, among other reasons, the relevant conflicts are international in scope and common Article 3 applies only to 'armed conflict not of an international character.'" App. 35. Under this Court's precedents, "the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji America, Inc.* v. *Avagliano,* 457 U. S. 176, 184–185 (1982); *United States* v. *Stuart,* 489 U. S. 353, 369 (1989). Our duty to defer to the President's understanding of the provision at issue here is only heightened by the fact that he is acting pursuant to his constitutional authority as Commander in Chief and by the fact that the subject matter of Common Article 3 calls for a judgment about the nature and character of an armed conflict. See generally *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304, 320 (1936).

The President's interpretation of Common Article 3 is reasonable and should be sustained. The conflict with al Qaeda is international in character in the sense that it is occurring in various nations around the globe. Thus, it is also "occurring in the territory of" more than "one of the High Contracting Parties." The Court does not dispute the President's judgments respecting the nature of our conflict with al Qaeda, nor does it suggest that the President's interpretation of Common Article 3 is implausible or foreclosed by the text of the treaty. Indeed, the Court concedes that Common Article 3 is principally concerned with "furnish[ing] minimal protection to rebels involved in . . . a civil war," *ante*, at 68, precisely the type of conflict the President's interpretation envisions to be subject to Common Article 3. Instead, the Court, without acknowledging its duty to defer to the President, adopts its own, admittedly plausible, reading of Common Article 3. But where, as here, an ambiguous treaty provision ("not of an

international character") is susceptible of two plausible, and reasonable, interpretations, our precedents require us to defer to the Executive's interpretation.

3

But even if Common Article 3 were judicially enforceable and applicable to the present conflict, petitioner would not be entitled to relief. As an initial matter, any claim petitioner has under Common Article 3 is not ripe. The only relevant "acts" that "are and shall remain prohibited" under Common Article 3 are "the *passing of sentences* and the *carrying out of executions* without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Art. 3, ¶1*(d)*, 6 U. S. T., at 1318, 1320 (emphases added). As its terms make clear, Common Article 3 is only violated, as relevant here, by the act of "passing of sentenc[e]," and thus Hamdan will only have a claim *if* his military commission convicts him and imposes a sentence. Accordingly, as Hamdan's claim is "contingent [upon] future events that may not occur as anticipated, or indeed may not occur at all," it is not ripe for adjudication. *Texas* v. *United States,* 523 U. S. 296, 300 (1998) (internal quotation marks omitted).[19] Indeed, even if we assume he will be convicted and sentenced, whether his trial will be conducted in a manner

---

[19] The Court does not dispute the conclusion that Common Article 3 cannot be violated unless and until Hamdan is convicted and sentenced. Instead, it contends that "the Geneva Conventions d[o] not direct an accused to wait until sentence is imposed to challenge the legality of the tribunal that is to try him." *Ante*, at 62, n. 55. But the Geneva Contentions do not direct defendants to enforce their rights through litigation, but through the Conventions' exclusive diplomatic enforcement provisions. Moreover, neither the Court's observation respecting the Geneva Conventions nor its reference to the equitable doctrine of abstention bears on the *constitutional* prohibition on adjudicating unripe claims.

so as to deprive him of "the judicial guarantees which are recognized as indispensable by civilized peoples" is entirely speculative. And premature adjudication of Hamdan's claim is especially inappropriate here because "reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines* v. *Byrd,* 521 U. S. 811, 819–820 (1997).

In any event, Hamdan's military commission complies with the requirements of Common Article 3. It is plainly "regularly constituted" because such commissions have been employed throughout our history to try unlawful combatants for crimes against the law of war. This Court has recounted that history as follows:

> "'By a practice dating from 1847 and renewed and firmly established during the Civil War, military commissions have become adopted as authorized tribunals in this country in time of war. . . . Their competency has been recognized not only in acts of Congress, but in executive proclamations, in rulings of the courts, and in the opinions of the Attorneys General.'" *Madsen*, 343 U. S., at 346, n. 8.

Hamdan's commission has been constituted in accordance with these historical precedents. As I have previously explained, the procedures to be employed by that commission, and the Executive's authority to alter those procedures, are consistent with the practice of previous American military commissions. See *supra*, at 30–34 , and n. 15.

The Court concludes Hamdan's commission fails to satisfy the requirements of Common Article 3 not because it differs from the practice of previous military commissions but because it "deviate[s] from [the procedures] governing courts-martial." *Ante*, at 71. But there is neither a statutory nor historical requirement that military commissions conform to the structure and practice of

courts-martial. A military commission is a different tribunal, serving a different function, and thus operates pursuant to different procedures. The 150-year pedigree of the military commission is itself sufficient to establish that such tribunals are "regularly constituted court[s]." Art. 3, ¶1*(d),* 6 U. S. T., at 3320.

Similarly, the procedures to be employed by Hamdan's commission afford "all the judicial guarantees which are recognized as indispensable by civilized peoples." Neither the Court nor petitioner disputes the Government's description of those procedures.

> "Petitioner is entitled to appointed military legal counsel, 32 C.F.R. 9.4(c)(2), and may retain a civilian attorney (which he has done), 32 C.F.R. 9.4(c)(2)(iii)(B). Petitioner is entitled to the presumption of innocence, 32 C.F.R. 9.5(b), proof beyond a reasonable doubt, 32 C.F.R. 9.5(c), and the right to remain silent, 32 C.F.R. 9.5(f). He may confront witnesses against him, 32 C.F.R. 9.5(i), and may subpoena his own witnesses, if reasonably available, 32 C.F.R. 9.5(h). Petitioner may personally be present at every stage of the trial unless he engages in disruptive conduct or the prosecution introduces classified or otherwise protected information for which no adequate substitute is available and whose admission will not deprive him of a full and fair trial, 32 C.F.R. 9.5(k); Military Commission Order No. 1 (Dep't of Defense Aug. 31, 2005) §6(B)(3) and (D)(5)(b). If petitioner is found guilty, the judgment will be reviewed by a review panel, the Secretary of Defense, and the President, if he does not designate the Secretary as the final decisionmaker. 32 C.F.R. 9.6(h). The final judgment is subject to review in the Court of Appeals for the District of Columbia Circuit and ultimately in this Court. See DTA §1005(e)(3), 119 Stat. 2743; 28 U. S. C. 1254(1)." Brief for Re-

spondents 4.

Notwithstanding these provisions, which in my judgment easily satisfy the nebulous standards of Common Article 3,[20] the plurality concludes that Hamdan's commission is unlawful because of the possibility that Hamdan will be barred from proceedings and denied access to evidence that may be used to convict him. *Ante*, at 70–72. But, under the commissions' rules, the Government may not impose such bar or denial on Hamdan if it would render his trial unfair, a question that is clearly within the scope of the appellate review contemplated by regulation and statute.

Moreover, while the Executive is surely not required to offer a particularized defense of these procedures prior to their application, the procedures themselves make clear that Hamdan would only be excluded (other than for disruption) if it were necessary to protect classified (or classifiable) intelligence, Dept. of Defense, Military Commission Order No. 1, §6(B)(3) (Aug. 31, 2005), including the sources and methods for gathering such intelligence. The Government has explained that "we want to make sure that these proceedings, which are going on in the middle of the war, do not interfere with our war effort and . . . because of the way we would be able to handle interrogations and intelligence information, may actually assist us in promoting our war aims." News Briefing (remarks of Douglas J. Feith, Under Secretary of Defense for Policy). And this Court has concluded, in the very context of a

——————

[20] Notably, a prosecutor before the *Quirin* military commission has described these procedures as "a substantial improvement over those in effect during World War II," further observing that "[t]hey go a long way toward assuring that the trials will be full and fair." National Institute of Military Justice, Procedures for Trials by Military Commissions of Certain Non-United States Citizens in the War Against Terrorism, p. x (2002) (hereinafter Procedures for Trials) (foreword by Lloyd N. Cutler).

threat to reveal our Nation's intelligence gathering sources and methods, that "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation," *Haig*, 453 U. S., at 307 (quoting *Aptheker* v. *Secretary of State,* 378 U. S. 500, 509 (1964)), and that "[m]easures to protect the secrecy of our Government's foreign intelligence operations plainly serve these interests," *Haig*, *supra*, at 307. See also *Snepp* v. *United States,* 444 U. S. 507, 509, n. 3 (1980) *(per curiam)* ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service"); *Curtiss-Wright,* 299 U. S., at 320. This interest is surely compelling here. According to the Government, "[b]ecause al Qaeda operates as a clandestine force relying on sleeper agents to mount surprise attacks, one of the most critical fronts in the current war involves gathering intelligence about future terrorist attacks and how the terrorist network operates—identifying where its operatives are, how it plans attacks, who directs operations, and how they communicate." Brief for United States in No. 03–4792, *United States* v. *Moussaoui* (CA4), p. 9. We should not rule out the possibility that this compelling interest can be protected, while at the same time affording Hamdan (and others like him) a fair trial.

In these circumstances, "civilized peoples" would take into account the context of military commission trials against unlawful combatants in the war on terrorism, including the need to keep certain information secret in the interest of preventing future attacks on our Nation and its foreign installations so long as it did not deprive the accused of a fair trial. Accordingly, the President's understanding of the requirements of Common Article 3 is entitled to "great weight." See *supra*, at 43.

4

In addition to Common Article 3, which applies to conflicts "not of an international character," Hamdan also claims that he is entitled to the protections of the Third Geneva Convention, which applies to conflicts between two or more High Contracting Parties. There is no merit to Hamdan's claim.

Article 2 of the Convention provides that "the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties." 6 U. S. T., at 1318. "Pursuant to [his] authority as Commander in Chief and Chief Executive of the United States," the President has determined that the Convention is inapplicable here, explaining that "none of the provisions of Geneva apply to our conflict with al Qaeda in Afghanistan or elsewhere throughout the world, because, among other reasons, al Qaeda is not a High Contracting Party." App. 35. The President's findings about the nature of the present conflict with respect to members of al Qaeda operating in Afghanistan represents a core exercise of his commander-in-chief authority that this Court is bound to respect. See *Prize Cases,* 2 Black, at 670.

\*    \*    \*

For these reasons, I would affirm the judgment of the Court of Appeals.

# SUPREME COURT OF THE UNITED STATES

No. 05–184

SALIM AHMED HAMDAN, PETITIONER *v.* DONALD
H. RUMSFELD, SECRETARY OF DEFENSE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 29, 2006]

JUSTICE ALITO, with whom JUSTICE SCALIA and JUSTICE
THOMAS join in Parts I–III, dissenting.

For the reasons set out in JUSTICE SCALIA's dissent,
which I join, I would hold that we lack jurisdiction. On
the merits, I join JUSTICE THOMAS' dissent with the excep-
tion of Parts I, II–C–1, and III–B–2, which concern mat-
ters that I find unnecessary to reach. I add the following
comments to provide a further explanation of my reasons
for disagreeing with the holding of the Court.

I

The holding of the Court, as I understand it, rests on the
following reasoning. A military commission is lawful only
if it is authorized by 10 U. S. C. §821; this provision per-
mits the use of a commission to try "offenders or offenses"
that "by statute or by the law of war may be tried by" such
a commission; because no statute provides that an of-
fender such as petitioner or an offense such as the one
with which he is charged may be tried by a military com-
mission, he may be tried by military commission only if
the trial is authorized by "the law of war"; the Geneva
Conventions are part of the law of war; and Common
Article 3 of the Conventions prohibits petitioner's trial
because the commission before which he would be tried is
not "a regularly constituted court," Third Geneva Conven-

tion, Art. 3, ¶1*(d),* Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U. S. T. 3316, 3320, T. I. A. S. No. 3364.  I disagree with this holding because petitioner's commission is "a regularly constituted court."

Common Article 3 provides as follows:

> "In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:
>
> "(1) . . . [T]he following acts are and shall remain prohibited . . . :
>
> "(d)  [T]he passing of sentences and the carrying out of executions without previous judgment pronounced by *a regularly constituted court* affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  *Id.,* at 3318–3320 (emphasis added).

Common Article 3 thus imposes three requirements. Sentences may be imposed only by (1) a "court" (2) that is "regularly constituted" and (3) that affords "all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id.,* at 3320.

I see no need here to comment extensively on the meaning of the first and third requirements.  The first requirement is largely self-explanatory, and, with respect to the third, I note only that on its face it imposes a uniform international standard that does not vary from signatory to signatory.

The second element ("regularly constituted") is the one on which the Court relies, and I interpret this element to require that the court be appointed or established in accordance with the appointing country's domestic law.  I agree with the Court, see *ante*, at 69, n. 64, that, as used in Common Article 3, the term "regularly" is synonymous

with "properly." The term "constitute" means "appoint," "set up," or "establish," Webster's Third New International Dictionary 486 (1961), and therefore "regularly constituted" means properly appointed, set up, or established. Our cases repeatedly use the phrases "regularly constituted" and "properly constituted" in this sense. See, *e.g., Hamdi* v. *Rumsfeld,* 542 U. S. 507, 538 (2004) (plurality opinion of O'Connor, J.); *Nguyen* v. *United States,* 539 U. S. 69, 83 (2003); *Ryder* v. *United States,* 515 U. S. 177, 187 (1995); *Williams* v. *Bruffy,* 96 U. S. 176, 185 (1878).

In order to determine whether a court has been properly appointed, set up, or established, it is necessary to refer to a body of law that governs such matters. I interpret Common Article 3 as looking to the domestic law of the appointing country because I am not aware of any international law standard regarding the way in which such a court must be appointed, set up, or established, and because different countries with different government structures handle this matter differently. Accordingly, "a regularly constituted court" is a court that has been appointed, set up, or established in accordance with the domestic law of the appointing country.

## II

In contrast to this interpretation, the opinions supporting the judgment today hold that the military commission before which petitioner would be tried is not "a regularly constituted court" (a) because "no evident practical need explains" why its "structure and composition . . . deviate from conventional court-martial standards," *ante*, at 11 (KENNEDY, J., concurring in part); see also *ante*, at 69–70 (Opinion of the Court); and (b) because, contrary to 10 U. S. C. §836(b), the procedures specified for use in the proceeding before the military commission impermissibly differ from those provided under the Uniform Code of Military Justice (UCMJ) for use by courts-martial, *ante*, at

52–62 (Opinion of the Court); *ante*, at 16–18 (KENNEDY, J., concurring in part). I do not believe that either of these grounds is sound.

## A

I see no basis for the Court's holding that a military commission cannot be regarded as "a regularly constituted court" unless it is similar in structure and composition to a regular military court or unless there is an "evident practical need" for the divergence. There is no reason why a court that differs in structure or composition from an ordinary military court must be viewed as having been improperly constituted. Tribunals that vary significantly in structure, composition, and procedures may all be "regularly" or "properly" constituted. Consider, for example, a municipal court, a state trial court of general jurisdiction, an Article I federal trial court, a federal district court, and an international court, such as the International Criminal Tribunal for the Former Yugoslavia. Although these courts are "differently constituted" and differ substantially in many other respects, they are all "regularly constituted."

If Common Article 3 had been meant to require trial before a country's military courts or courts that are similar in structure and composition, the drafters almost certainly would have used language that expresses that thought more directly. Other provisions of the Convention Relative to the Treatment of Prisoners of War refer expressly to the ordinary military courts and expressly prescribe the "uniformity principle" that JUSTICE KENNEDY sees in Common Article 3, see *ante*, at 8–9. Article 84 provides that "[a] prisoner of war shall be tried only by a military court, unless the existing laws of the Detaining Power expressly permit the civil courts to try a member of the armed forces of the Detaining Power in respect of the particular offence alleged to have been

committed by the prisoner of war." 6 U. S. T., at 3382. Article 87 states that "[p]risoners of war may not be sentenced by the military authorities and courts of the Detaining Power to any penalties except those provided for in respect of members of the armed forces of the said Power who have committed the same acts." *Id.*, at 3384. Similarly, Article 66 of the Geneva Convention Relative to the Treatment of Civilian Persons in Time of War—a provision to which the Court looks for guidance in interpreting Common Article 3, see *ante* at 69—expressly provides that civilians charged with committing crimes in occupied territory may be handed over by the occupying power "to its properly constituted, non-political military courts, on condition that the said courts sit in the occupied country." 6 U. S. T. 3516, 3558–3560, T. I. A. S. No. 3365. If Common Article 3 had been meant to incorporate a "uniformity principle," it presumably would have used language like that employed in the provisions noted above. For these reasons, I cannot agree with the Court's conclusion that the military commission at issue here is not a "regularly constituted court" because its structure and composition differ from those of a court-martial.

Contrary to the suggestion of the Court, see *ante*, at 69, the commentary on Article 66 of Fourth Geneva Convention does not undermine this conclusion. As noted, Article 66 permits an occupying power to try civilians in its "properly constituted, non-political military courts," 6 U. S. T., at 3558. The commentary on this provision states:

> "The courts are to be 'regularly constituted'. This wording definitely excludes all special tribunals. It is the ordinary military courts of the Occupying Power which will be competent." 4 Int'l Comm. of Red Cross, Commentary: Geneva Convention Relative to the Protection of Civilian Persons in Time of War 340 (1958) (hereinafter GCIV Commentary).

The Court states that this commentary "defines '"regu-
larly constituted"' tribunals to include 'ordinary military
courts' and 'definitely exclud[e] all special tribunals.'"
*Ante*, at 69 (alteration in original). This much is clear
from the commentary itself. Yet the mere statement that
a military court *is* a regularly constituted tribunal is of no
help in addressing petitioner's claim that his commission
*is not* such a tribunal. As for the commentary's mention of
"special tribunals," it is doubtful whether we should take
this gloss on Article 66—which forbids an *occupying power*
from trying *civilians* in courts set up specially for that
purpose—to tell us much about the very different context
addressed by Common Article 3.

But even if Common Article 3 recognizes this prohibi-
tion on "special tribunals," that prohibition does not cover
petitioner's tribunal. If "special" means anything in con-
tradistinction to "regular," it would be in the sense of
"special" as "relating to a single thing," and "regular" as
"uniform in course, practice, or occurrence." Webster's
Third New International Dictionary 2186, 1913. Insofar
as respondents propose to conduct the tribunals according
to the procedures of Military Commission Order No. 1 and
orders promulgated thereunder—and nobody has sug-
gested respondents intend otherwise—then it seems that
petitioner's tribunal, like the hundreds of others respon-
dents propose to conduct, is very much regular and not at
all special.

## B

I also disagree with the Court's conclusion that peti-
tioner's military commission is "illegal," *ante*, at 62, be-
cause its procedures allegedly do not comply with 10
U. S. C. §836. Even if §836(b), unlike Common Article 3,
does impose at least a limited uniformity requirement
amongst the tribunals contemplated by the UCMJ, but see
*ante*, at 35 (THOMAS, J., dissenting), and even if it is as-

sumed for the sake of argument that some of the proce-
dures specified in Military Commission Order No. 1
impermissibly deviate from court-martial procedures, it
does not follow that the military commissions created by
that order are not "regularly constituted" or that trying
petitioner before such a commission would be inconsistent
with the law of war. If Congress enacted a statute requir-
ing the federal district courts to follow a procedure that is
unconstitutional, the statute would be invalid, but the
district courts would not. Likewise, if some of the proce-
dures that may be used in military commission proceed-
ings are improper, the appropriate remedy is to proscribe
the use of those particular procedures, not to outlaw the
commissions. I see no justification for striking down the
entire commission structure simply because it is possible
that petitioner's trial might involve the use of some proce-
dure that is improper.

## III

Returning to the three elements of Common Article 3—
(1) a court, (2) that is appointed, set up, and established in
compliance with domestic law, and (3) that respects uni-
versally recognized fundamental rights—I conclude that
all of these elements are satisfied in this case.

## A

First, the commissions qualify as courts.

Second, the commissions were appointed, set up, and
established pursuant to an order of the President, just like
the commission in *Ex parte Quirin,* 317 U. S. 1 (1942), and
the Court acknowledges that *Quirin* recognized that the
statutory predecessor of 10 U. S. C. §821 "preserved" the
President's power "to convene military commissions," *ante*,
at 29. Although JUSTICE KENNEDY concludes that "an
acceptable degree of independence from the Executive is
necessary to render a commission 'regularly constituted'

by the standards of our Nation's system of justice," *ante* at 9–10, he offers no support for this proposition (which in any event seems to be more about fairness or integrity than regularity). The commission in *Quirin* was certainly no more independent from the Executive than the commissions at issue here, and 10 U. S. C. §§821 and 836 do not speak to this issue.[1]

Finally, the commission procedures, taken as a whole, and including the availability of review by a United States Court of Appeals and by this Court*,* do not provide a basis for deeming the commissions to be illegitimate. The Court questions the following two procedural rules: the rule allowing the Secretary of Defense to change the governing rules "'from time to time'" (which does not rule out mid-trial changes), see *ante*, at 70, n. 65 (Opinion of the Court); *ante*, at 9–10 (KENNEDY, J., concurring in part), and the rule that permits the admission of any evidence that would have "'probative value to a reasonable person'" (which departs from our legal system's usual rules of evidence), see *ante*, at 51, 60 (Opinion of the Court); *ante*, at 16–18 (KENNEDY, J., concurring in part).[2] Neither of these two rules undermines the legitimacy of the commissions.

Surely the entire commission structure cannot be stricken merely because it is possible that the governing rules might be changed during the course of one or more

---

[1] Section 821 looks to the "law of war," not separation of powers issues. And §836, as JUSTICE KENNEDY notes, concerns procedures, not structure, see *ante*, at 10.

[2] The plurality, but not JUSTICE KENNEDY, suggests that the commission rules are improper insofar as they allow a defendant to be denied access to evidence under some circumstances. See, *ante*, at 70–72. But here too, if this procedure is used in a particular case and the accused is convicted, the validity of this procedure can be challenged in the review proceeding in that case. In that context, both the asserted need for the procedure and its impact on the accused can be analyzed in concrete terms.

proceedings. *If* a change is made and applied during the course of an ongoing proceeding and *if* the accused is found guilty, the validity of that procedure can be considered in the review proceeding for that case. After all, not every midtrial change will be prejudicial. A midtrial change might amend the governing rules in a way that is inconsequential or actually favorable to the accused.

As for the standard for the admission of evidence at commission proceedings, the Court does not suggest that this rule violates the international standard incorporated into Common Article 3 ("the judicial guarantees which are recognized as indispensable by civilized peoples," 6 U. S. T., at 3320). Rules of evidence differ from country to country, and much of the world does not follow aspects of our evidence rules, such as the general prohibition against the admission of hearsay. See, *e.g.,* Blumenthal, Shedding Some Light on Calls for Hearsay Reform: Civil Law Hearsay Rules in Historical and Modern Perspective, 13 Pace Int'l L. Rev. 93, 96–101 (2001). If a particular accused claims to have been unfairly prejudiced by the admission of particular evidence, that claim can be reviewed in the review proceeding for that case. It makes no sense to strike down the entire commission structure based on speculation that some evidence might be improperly admitted in some future case.

In sum, I believe that Common Article 3 is satisfied here because the military commissions (1) qualify as courts, (2) that were appointed and established in accordance with domestic law, and (3) any procedural improprieties that might occur in particular cases can be reviewed in those cases.

### B

The commentary on Common Article 3 supports this interpretation. The commentary on Common Article 3, ¶1(d), in its entirety states:

"[A]lthough [sentences and executions without a proper trial] were common practice until quite recently, they are nevertheless shocking to the civilized mind. . . . Sentences and executions without previous trial are too open to error. 'Summary justice' may be effective on account of the fear it arouses . . . , but it adds too many further innocent victims to all the other innocent victims of the conflict. All civilized nations surround the administration of justice with safeguards aimed at eliminating the possibility of judicial errors. The Convention has rightly proclaimed that it is essential to do this even in time of war. *We must be very clear about one point: it is only 'summary' justice which it is intended to prohibit.* No sort of immunity is given to anyone under this provision. There is nothing in it to prevent a person presumed to be guilty from being arrested and so placed in a position where he can do no further harm; and it leaves intact the right of the State to prosecute, sentence and punish according to the law." GCIV Commentary 39 (emphasis added).

It seems clear that the commissions at issue here meet this standard. Whatever else may be said about the system that was created by Military Commission Order No. 1 and augmented by the Detainee Treatment Act, §1005(e)(1), 119 Stat. 2742, this system—which features formal trial procedures, multiple levels of administrative review, and the opportunity for review by a United States Court of Appeals and by this Court—does not dispense "summary justice."

*     *     *

For these reasons, I respectfully dissent.